RACHEL LEDERMAN, SBN 130192
Rachel Lederman & Alexsis C. Beach, Attorneys
P.O. Box 40339
San Francisco, CA 94140-0339
Telephone: (415) 282-9300
rachel@sfbla.com

JAMES B. CHANIN, SBN 76043
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, CA 94705
Telephone: (510) 848-4752, Ext. 2

TIFANEI RESSL-MOYER, SBN 319721
Lawyers' Committee for Civil Rights of
San Francisco Bay Area
131 Steuart Street
San Francisco, CA 94105
Telephone: (415) 543-9444
tresslmoyer@lccrsf.org

R. MICHAEL FLYNN, SBN 258732
Flynn Law Office
1720 Broadway, Ste 430
P.O. Box 70973
Oakland CA 94612
Telephone: (510) 893-3226

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAACP OF SAN JOSÉ/ SILICON VALLEY; SAN JOSÉ PEACE AND JUSTICE CENTER; M. MICHAEL ACOSTA, AS AN INDIVIDUAL; AND JOSEPH CAÑAS; LESLIE VASQUEZ; PETER ALLEN; SHAUNN CARTWRIGHT; YESSICA RILES; JOSÉ GUSTAVO FLORES RODRIGUEZ; ALEX LEE; JOSÉPH MALDONADO; CINDY CUELLAR; MAHMOUDREZA NAEMEH; AND MEGAN SWIFT, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF SAN JOSÉ; SAM LICCARDO; EDGARDO GARCIA; DAVID SYKES; JASON DWYER; RONNIE LOPEZ, LEE TASSIO, JARED YUEN; SEAN MICHAEL CURRY, OFFICER FNU DELGADO, and DOES 1-100,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**42 U.S.C. § 1983**<br><br>**JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1. Black people have been hunted, brutalized and killed by the police since the inception of law enforcement in the United States, including a demonstrable history of violence in San José. This action arises out of protests across the nation in response to the May 25, 2020 murder of George Floyd by Minneapolis Police Department officers. Floyd's death, so soon after law enforcement killed Breonna Taylor and Ahmaud Arbery, mobilized millions of people around the country to condemn the deaths of Black and Brown people by law enforcement in one of the largest social justice movements in U.S. history.[1]

2. In San José, thousands of demonstrators took to the streets on May 29, 2020, and for several days thereafter, to express their view that police brutality and institutionalized racism must end. But the demonstrators were met with brutal and racially targeted repression by defendant CITY OF SAN JOSÉ.

3. This is a civil rights action for damages, injunctive and declaratory relief arising from unconstitutional CITY OF SAN JOSÉ Police's violence and arrests of demonstrators on May 29-31, 2020. Named plaintiffs M. MICHAEL ACOSTA (suing as an individual), and JOSEPH CAÑAS, LESLIE VASQUEZ, PETER ALLEN, SHAUNN CARTWRIGHT, YESSICA RILES, JOSÉ GUSTAVO FLORES RODRIGUEZ, ALEX LEE, JOSÉPH MALDONADO, CINDY CUELLAR, MAHMOUDREZA NAEMEH, AND MEGAN SWIFT (suing as individuals and class representatives) seek redress for the violation of their constitutional rights to assemble, protest, and be free from racial discrimination, disability discrimination, excessive force, and wrongful arrest. Organization plaintiffs NAACP OF SAN JOSÉ / SILICON VALLEY and SAN JOSÉ PEACE AND JUSTICE CENTER, along with all of the individual plaintiffs, seek prospective and declaratory relief to ensure the right to express viewpoints critical of the police or government in San José without fear of

---

[1] Larry Buchanan, Quoctrung Bui, and Jugal K. Patel, *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. Times (Jul. 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

violent repression or wrongful arrest.

4.     Starting on May 29, 2020, and continuing during the demonstrations on May 30, 31, and thereafter, the CITY OF SAN JOSÉ Police fired impact munitions into the bodies of unarmed, predominately peaceful demonstrators, observers and journalists without justification; threw explosive flash-bang and "stinger" grenades at them; attacked them with chemical weapons; and beat them with hands and batons.

5.     Impact munitions are widely known to cause serious harm. These munitions, also known as Projectile Impact Weapons (PIW), Specialty Impact Munitions (SIM), or Kinetic Impact Projectiles (KIP), can cause fractures, serious organ injuries, and death, especially when the point of impact is the head, neck, or torso.[2] Two of the plaintiffs in this case were struck in the eye: plaintiff M. MICHAEL ACOSTA lost his eye entirely, and plaintiff JOSEPH CAÑAS sustained permanent vision impairment. Police also shot several plaintiffs with impact munitions in the groin area. The groin is another area where impact munitions can cause serious injuries or death if shot into.[3]

6.     The CITY and its Police Department failed to establish policies to mitigate the risk of harm from impact munitions, were intentionally indifferent to the risk of these harms, and caused Plaintiffs' injuries. Indeed, the CITY OF SAN JOSÉ has admitted that *"[c]rowd control training has been minimal and infrequent"* and that most of the commanders and officers assigned to the events at issue in this case were not trained adequately.[4]

7.     The CITY OF SAN JOSÉ Police have a long history of targeting Black, Brown, and Muslim communities, or people who they perceive as such, for racially discriminatory policing, and unreasonable force. The pattern and practice of racially discriminatory policing persisted on the abovementioned dates, constituting discrimination based on race, religion and national origin. Plaintiffs such as MICHAEL

---

[2]Rohini J. Haar, et al., *Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review.* British Med. J. Open 1 (2017).
[3]*Id.* at 5.
[4]Edgardo Garcia, *Memorandum: Police Department Preliminary After Action Report for the Public Protests, Civil Unrest, and Law Enforcement Response From May 29 — June 7, 2020 1,* 4-5 (2020), https://sanjose.legistar.com/View.ashx?M=F&ID=8769493&GUID=3ED4A6F5-F069-4E7F-BADE-99421D9991B3.

ACOSTA, JOSEPH CAÑAS, LESLIE VASQUEZ, YESSICA RILES, JOSÉ
GUSTAVO FLORES RODRIGUEZ, ALEX LEE, JOSÉPH MALDONADO, CINDY
CUELLAR, MAHMOUDREZA NAEMEH, and others similarly situated, were
targeted by CITY OF SAN JOSÉ Police Officers to be shot, beaten, and/or arrested.
Additionally, MAHMOUDREZA NAEMEH was subjected to racial and/or religious
slurs.

8.      Defendants CITY OF SAN JOSÉ, SAM LICCARDO, EDGARDO GARCIA,
DAVID SYKES, and DOE CITY OF SAN JOSÉ officials violated the plaintiffs'
constitutional rights by maintaining customs, policies and/or practices which would
foreseeably result in constitutional violations such as those suffered by the plaintiffs,
and/or by their deliberate indifference in the hiring, training, supervision and discipline
of CITY OF SAN JOSÉ Police Officers involved in the May 29 – June 7, 2020
operations. Plaintiffs are informed and believe and thereon allege that Defendants
encouraged, tacitly authorized, and/or condoned unlawful customs, policies and/or
practices: the use of excessive force; the failure to report the use of excessive force; the
failure to hold officers and supervisors accountable for the use of excessive force; the
failure to enforce policies which were intended to prevent the use of excessive force on
civilians and the violation of their rights to free speech, freedom of association and
freedom of the press by CITY OF SAN JOSÉ Police Officers during demonstrations;
firing chemical agents and impact munitions at non-violent persons; wrongful arrests
without probable cause; the failure to hold officers and supervisors responsible for
wrongful arrests; the racial and religious profiling of perceived Muslims and Black,
Indigenous and people of color by CITY OF SAN JOSÉ Police Officers; the failure to
hold officers and supervisors accountable for racial profiling; the failure to enforce
policies which were intended to prevent racial and religious profiling by CITY OF SAN
JOSÉ Police Officers; and/or other unlawful customs, policies and/or practices.

9.      The CITY OF SAN JOSÉ Police Department's mass use of excessive force
engulfed downtown San José in toxic chemical agents and caused chaos and panic as
police discharged explosive Flashbang and Stinger grenades into the crowd, shot people
with impact munitions, and used clubs and hands to beat demonstrators and push them

to the ground. The burden of these brutal tactics fell disproportionately on demonstrators and observers with disabilities, who receive little or no notice or opportunity to comply with any police orders before the police subjected them to excessive force. In fact, demonstrators and observers were brutalized even as they informed officers of their disabilities and attempted to comply with police instructions.

## II. JURISDICTION AND VENUE

10.     This action seeks damages and injunctive relief under 42 U.S.C. § 1983.  This Court has jurisdiction over the action under 28 U.S.C. §§ 1331 and 1343. It has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

11.     Venue properly lies within this District under 28 U.S.C. § 1391(b). The named defendants perform their official duties in this District, and the events and omissions giving rise to plaintiffs' claims occurred in this District.

12.     Plaintiffs M. MICHAEL ACOSTA; JOSEPH CAÑAS; LESLIE VASQUEZ; PETER ALLEN; SHAUNN CARTWRIGHT; YESSICA RILES; JOSÉ GUSTAVO FLORES RODRIGUEZ; ALEX LEE; JOSÉPH MALDONADO; CINDY CUELLAR; MAHMOUDREZA NAEMEH; and MEGAN SWIFT have each filed administrative claims with the CITY OF SAN JOSÉ, in compliance with California Government Code § 910 et seq. All of the claims have been denied or have been deemed denied because they have been pending for more than 45 days.

## III. INTRADISTRICT ASSIGNMENT

13.     Pursuant to Local Rule 3-2(e), this action is properly assigned to the San José division of this Court.

## IV. PARTIES

### A. PLAINTIFFS

#### 1. **Organization Plaintiffs**

14.     Plaintiff NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE OF SAN JOSÉ/ SILICON VALLEY (hereafter, NAACP) is a 501(c)(3) nonprofit organization that works on issues related to equal access to education, voter empowerment, criminal justice, police misconduct, health equity, and economic growth for People of Color. The NAACP's mission is to secure the political, educational,

social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons. NAACP's constituents engage in public protest in San José on the issues NAACP is concerned about, including institutional racism and police brutality, and wish to continue to do so in the future, but they are not able to participate in public protests in San José without fear of unlawful, racially discriminatory policing, excessive force, and arrest without probable cause. Defendants' actions interfered with the NAACP's constituents' rights to assembly and speech. NAACP plans to assist in and participate in similar events to the late May – early June, 2020, protests in the future, on its own or in conjunction with others, and is fearful that the same unlawful police actions in response to these and similar protests of institutional racism and police brutality will be repeated absent injunctive relief to prohibit the San José Police Department's (hereafter, SJPD) practices, policies, and customs that caused the unlawful action in response to the recent protests.

15.     Plaintiff SAN JOSÉ PEACE AND JUSTICE CENTER (hereafter, SJPJC), is an unincorporated association and a project of the Collins Foundation, a 501(c)(3) nonprofit. SJPJC was established in 1957 as a resource and action center for progressive activism, seeking to develop and nurture the growing community of people who work to create and participate in a just, peaceful, and non-violent society, one that ensures human rights for all people and ensures the continuation of, and respect for, all life on earth.  SJPJC serves more than 50 affiliated organizations, many of whom plan and/or participate in demonstrations in San José. SJPJC supported its constituent organizations in mobilizing for the late May – early June, 2020, demonstrations. SJPJC's staff, volunteers and constituent organizations' rights to speech and assembly were violated by the SJPD's unlawful response to the demonstrations. SJPJC and its constituent organizations plan to assist, plan, participate in, and hold similar events in the future, and are fearful that the same unlawful police actions in response to these and similar protests of institutional racism and police brutality will be repeated absent injunctive relief to prohibit the SJPD's practices, policies, and customs that caused the unlawful action in response to the recent protests.

### 2. **Individual Plaintiff**

16. Plaintiff M. MICHAEL ACOSTA is a 49-year-old San José resident of mixed ethnicity who works as an engineering manager. Mr. Acosta came across the May 29, 2020, demonstration while running an errand near his home in downtown San José, and decided to observe in support of the Black Lives Matter movement. He never expected that he would lose his left eye that night, when a DOE CITY OF SAN JOSÉ Police Officer shot him with an impact munition.

### 3. **Class Representative Plaintiffs**

17. Plaintiff JOSEPH CAÑAS is a 26-year-old San José resident and musician of mixed ethnicity. Mr. Cañas was playing his guitar at the May 29, 2020, San José demonstration, when he, too, was shot in the eye with an impact munition by defendant JARED YUEN or a DOE CITY OF SAN JOSÉ Police Officer.

18. Plaintiff LESLIE VASQUEZ is a 32-year-old, Latinx, San José resident who works as a Service Line Coordinator in the maternity and children's health division at a local hospital. Ms. Vasquez attended the May 29, 2020, San José demonstration and was shot in the groin, thighs and genital area by defendant JARED YUEN and/or a DOE CITY OF SAN JOSÉ Police Officer, and bludgeoned in the stomach by a DOE CITY OF SAN JOSÉ Police Officer as she stood with her hands up.

19. Plaintiff PETER ALLEN is a 43-year-old white San José resident who works as a Communications Specialist and is a former San José Planning Commissioner. Mr. Allen was pushed to the ground and repeatedly shot with impact munitions by DOE CITY OF SAN JOSÉ Police Officers at the May 29, 2020 demonstration.

20. Plaintiff SHAUNN CARTWRIGHT is a disabled, 51-year-old, white Santa Clara County resident, who attended the San José demonstrations on May 29, 30, and 31, 2020 as a legal observer. Ms. Cartwright suffers from trigeminal neuralgia and has a brain implant to treat this that runs on a battery implanted in her chest. Her right knee was surgically replaced in October 2019, and her left knee also needed replacement at the time of these incidents, so she was limping and following the marches in her van at various times. Her van displayed a disabled placard. DOE CITY OF SAN JOSÉ Police Officers shoved Ms. Cartwright hard in the chest on May 29, shot in her right knee, left

calf and finger on May 30, and wrongfully arrested her on May 31.

21.     Plaintiff YESSICA RILES is a 41-year-old Latinx San José resident who works as a Labor and Delivery Nurse at a local hospital. Ms. Riles participated in the May 29, 2020, demonstration, where one or more DOE CITY OF SAN JOSÉ Police Officers shot her multiple times in the groin, pelvic region, and abdomen.

22.     Plaintiff JOSÉ GUSTAVO FLORES RODRIGUEZ (hereafter, GUSTAVO FLORES) is a 48-year-old Latinx San José resident who works as a commercial driver. A DOE CITY OF SAN JOSÉ Police Officer shot Mr. Flores in the groin and collarbone when they perceived him visibly trying to warn others at the May 29 demonstration that the police were about to use weapons.

23.     Plaintiff ALEX LEE is a 25-year-old, Asian, San José resident and State Assembly Member. Mr. Lee attended the May 29, 30, and 31 San José demonstrations. DOE CITY OF SAN JOSÉ Police Officers used chemical agents that impacted LEE on May 29; DOE CITY OF SAN JOSÉ Police Officers launched and struck him with a grenade or chemical agent device on May 30; and DOE CITY OF SAN JOSÉ Police Officers wrongfully arrested him on May 31.

24.     Plaintiff JOSEPH MALDONADO is a 33-year-old, Latinx, San José resident who works as a Technology Administrator. Mr. MALDONADO was impacted by a chemical agent used by DOE CITY OF SAN JOSÉ Police Officers when he participated in the May 29, 2020, demonstration.

25.     Plaintiff CINDY CUELLAR is a 22-year-old, Latinx, recent San José State University graduate. Ms. Cuellar participated in the May 29, 2020, San José demonstration and a DOE CITY OF SAN JOSÉ Police Officer shot her in the calf muscle of her leg.

26.     Plaintiff MAHMOUDREZA NAEMEH is a 30-year-old, Iranian resident of Santa Cruz County who works as a chemical analyst. Mr. Naemeh attended the May 30, 2020, San José demonstration.  DOE CITY OF SAN JOSÉ Police Officers shot Mr. Naemeh in the shin, wrongfully arrested him, and subjected him to anti-Muslim psychological torture and harassment.

27.     Plaintiff MEGAN SWIFT is a 49-year-old, white, San José resident and

community organizer who participated in the May 29, 2020, demonstration. Defendant STEPHEN MICHAEL CURRY and/or a DOE CITY OF SAN JOSÉ Police Officer clubbed Ms. Swift repeatedly and wrongfully arrested her.

**B. DEFENDANTS**

28.     Defendant CITY OF SAN JOSÉ (the "CITY") is, and at all times herein mentioned was, a municipal corporation duly organized and existing under the laws of the State of California.

29.     Defendant SAM LICCARDO is, and at all times herein mentioned was, the elected Mayor of the CITY OF SAN JOSÉ and an authorized policymaker of the CITY OF SAN JOSÉ. LICCARDO approved a city-wide 8:30 p.m. - 5:30 a.m. curfew, enacted to suppress First Amendment rights of racial justice protesters without a legitimate government purpose or adequate notice, causing the wrongful arrests of plaintiffs SHAUNN CARTWRIGHT, ALEX LEE, and class members.  LICCARDO also caused, approved, acquiesced in, and/or failed to intervene to stop the constitutional violations by CITY OF SAN JOSÉ Police Officers against all of the plaintiffs and class members on May 29, 30, and 31, 2020, and thereafter, including but not limited to the racial and religious profiling, use of excessive force, wrongful arrests, and deprivation of the plaintiffs' First Amendment rights.

30.     Defendant DAVID SYKES is, and at all times herein mentioned was, the City Manager of the CITY OF SAN JOSÉ and an authorized policymaker of the CITY OF SAN JOSÉ and San José Police Department. At all times relevant hereto, the San José Police Department was under the direction, administration and supervision of City Manager DAVID SYKES, pursuant to the San José City Charter. SYKES was responsible for declaring a city-wide 8:30 p.m. - 5:30 a.m. curfew enacted to suppress First Amendment rights of racial justice protesters without a legitimate government purpose or adequate notice, causing the wrongful arrests of plaintiffs SHAUNN CARTWRIGHT, ALEX LEE, and class members.  SYKES also caused, set in motion, supervised, directed, approved, acquiesced in, and/or failed to intervene to stop the constitutional violations by CITY OF SAN JOSÉ Police Officers against all of the plaintiffs and class members on May 29, 30 and 31, 2020, and thereafter, including but

not limited to racial and religious profiling, use of excessive force, wrongful arrests, and deprivation of the plaintiffs' First Amendment rights, by, *inter alia*, failing to provide adequate policies, training, supervision or command of the officers assigned to the demonstrations.

31. Defendant EDGARDO GARCIA was, and at all times herein mentioned, the CITY OF SAN JOSÉ Police Chief and an authorized policymaker of the CITY OF SAN JOSÉ. Chief GARCIA caused, set in motion, supervised, directed, approved, acquiesced in, and/or failed to intervene to stop his police officers' constitutional violations against the plaintiffs and class members at the May 29, 30 and 31, 2020, racial justice demonstrations, including but not limited to racial and religious profiling, use of excessive force, wrongful arrests, and deprivation of the plaintiffs' First Amendment rights, by, on information and belief, approving the use of chemical weapons and PIW at the demonstrations, and failing to provide adequate policies, training, supervision or command of the officers assigned to the demonstrations.

32. Defendant JASON DWYER is, and at all times herein mentioned was, a CITY OF SAN JOSÉ Police Captain, and was assigned as Special Operations Commander during the events that are the subject of this complaint. DWYER caused, set in motion, supervised, directed, approved, acquiesced, and/or failed to intervene to stop his subordinate officers' constitutional violations at the May 29, 30 and 31, 2020, racial justice demonstrations, including but not limited to the racial and religious profiling, use of excessive force, wrongful arrests, and deprivation of the plaintiffs' First Amendment rights, by, on information and belief, approving the use of chemical weapons and PIW at the demonstrations, and failing to provide adequate policies, training, supervision or command of the officers assigned to the demonstrations.

33. Defendant RONNIE LOPEZ is, and at all times herein mentioned was, a CITY OF SAN JOSÉ Police Sergeant. LOPEZ caused, set in motion, supervised, directed, approved, acquiesced, and/or failed to intervene to stop his subordinate officers' constitutional violations at the May 29, 30 and 31, 2020, racial justice demonstrations, including but not limited to racial and religious profiling, use of excessive force, wrongful arrests, and deprivation of the plaintiffs' First Amendment rights, by, on

information and belief, approving the use of chemical weapons and PIW at the demonstrations, and failing to provide adequate policies, training, supervision or command of the officers assigned to the demonstrations.

34.	Defendant LEE TASSIO is, and at all times herein mentioned was, a CITY OF SAN JOSÉ Police Sergeant. TASSIO caused, set in motion, supervised, directed, approved, acquiesced, and/or failed to intervene to stop his subordinate officers' constitutional violations at the May 29, 30 and 31, 2020, racial justice demonstrations, including but not limited to racial and religious profiling, use of excessive force, wrongful arrests, and deprivation of the plaintiffs' First Amendment rights, by, on information and belief, approving the use of chemical weapons and PIW at the demonstrations, and failing to provide adequate policies, training, supervision or command of the officers assigned to the demonstrations

35.	Defendant JARED YUEN is, and at all times herein mentioned was, a CITY OF SAN JOSÉ Police Officer who participated in the police conduct complained of including, but not limited to, on information and belief, shooting plaintiff JOSEPH CAÑAS and/or other plaintiffs and class members, and targeting for excessive force persons he perceived as people of color.

36.	Defendant STEPHEN MICHAEL CURRY is, and at all times herein mentioned was, a CITY OF SAN JOSÉ Police Officer who participated in the police conduct complained of including, but not limited to, clubbing plaintiff MEGAN SWIFT multiple times with excessive force and wrongfully arresting her.

37.	Defendant Officer FNU DELGADO is, and at all times herein mentioned was, a CITY OF SAN JOSÉ Police Officer who participated in the police conduct complained of including, but not limited to, shoving plaintiff SHAUNN CARTWRIGHT repeatedly in the chest with excessive force despite being informed of her disability.

38.	 The individual defendants are sued in their individual capacities.

39.	The DOE defendants include other individuals who supervised and/or participated in the conduct complained of herein. Plaintiffs are informed and believe and therefore allege that each of the DOE defendants is legally responsible and liable for the incident, injuries and damages hereinafter set forth, and that each of said defendants proximately

caused said incidents, injuries and damages by reason of their negligence, breach of duty, negligent supervision, management or control, violation of constitutional and legal rights, or by reason of other personal, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, or control or upon any other act or omission. Plaintiffs will ask leave to amend this complaint to insert further charging allegations when such facts are ascertained.

40.     In doing the acts alleged herein, defendants, and each of them, acted within the course and scope of their employment.

41.     In doing the acts and/or omissions alleged herein, defendants, and each of them, acted under color of authority and/or under color of law.

42.     In doing the acts and/or omissions alleged herein, defendants, and each of them, acted as the agent, servant, employee and/or in concert with each of said other defendants.

## V. FACTUAL ALLEGATIONS

**A. The CITY OF SAN JOSÉ Police Officers responded violently to protestors participating in demonstrations against racist police violence.**

43.     On May 25, 2020, Minneapolis police officers killed George Floyd, a 46-year-old Black resident. One white police officer knelt on Mr. Floyd's neck for nearly nine minutes while three other officers observed. Mr. Floyd died calling out for his mother and begging for his life as passersby recorded. The recordings were shared on multiple media platforms for all of America to witness.

44.     In the weeks and months following Mr. Floyd's death, people across the country flooded into streets demanding an end to police brutality against Black people; protesting the deaths of Mr. Floyd, Breonna Taylor, Ahmaud Arbery, and countless others by the hands of police through vigils, demonstrations, and public gatherings.

45.     In San José, demonstrators began to gather outside San José City Hall around 2 p.m. on May 29, 2020, and then marched through the streets. Some participants carried signs denouncing the policing system that kills Black people and other people of color. Other participants came with medical supplies, water, and aid for the demonstrators.

Finally, some, including journalists, legal observers, and passersby, simply observed the demonstration. Most of the demonstrators and observers wore masks and observed social distancing.

46.    The defendants would ultimately inflict the same sort of ruthless violence on the demonstrators that the demonstrators were protesting, indiscriminately dispersing tear gas into the crowd, shooting impact munitions without justification, beating demonstrators, and detonating explosive grenades to cause panic and disorientation.



| 1 | Plaza de César Chávez |
| 2 | San Jose City Hall |
| 3 | South 4th Street |
| 4 | South 10th Street |

### B.  Defendants attacked and injured Plaintiffs at the Black Lives Matter protests.

47.    Plaintiffs JOSEPH CAÑAS and CINDY CUELLAR arrived separately at City Hall at approximately 2:00 p.m., intending to protest the Minneapolis Police murder of George Floyd, systemic racism and police violence. Each watched as the crowd grew from a few scattered people to around one-hundred demonstrators, chanting their support for the Black Lives Matter movement and denouncing police brutality. The crowd marched from City Hall toward Highway 101, where some demonstrators continued protesting and repeated their chants. Demonstrators safely exited the highway area and made their way back downtown, where organizers had publicized a rally with speakers in

front of City Hall.

48. Reverend Jethroe Moore II, President of NAACP, attended the demonstration to meet with CITY OF SAN JOSÉ Chief of Police EDGARDO GARCIA with the intent to help coordinate dialogue between protesters and the police. EDGARDO GARCIA and Rev. Moore arranged for the meeting over the phone. However, when Rev. Moore arrived, he could not find EDGARDO GARCIA anywhere and neither did the CITY OF SAN JOSÉ Police Officers answer his request to notify EDGARDO GARCIA of Rev. Moore's arrival.



Image 1. Demonstrator Khennedi Meeks, crying, feeling disappointed and helpless to stop the violence.

49. Instead, as the demonstrators peacefully marched toward City Hall, CITY OF SAN JOSÉ Police Officers, on orders from defendant JASON DWYER, formed a line behind the demonstrators, at E. Santa Clara and 8th Streets, and another line of police, including officers on foot, on motorcycles and in vehicles, blocked the marchers' way at E. Santa Clara and S. 7th Streets.

50. Blocked by the police line, the plaintiffs and other demonstrators stopped marching. The CITY OF SAN JOSÉ Police Officers moved to surround and kettle[5] them. Plaintiffs did not see, hear, or perceive any unlawful or dangerous activity that would warrant this police action or the police use of force that ensued. There was no justification for defendant DWYER's decision that the demonstration constituted an unlawful assembly.

51. Rev. Moore watched as CITY OF SAN JOSÉ Police Officers aggressively

---

[5]"Kettling" refers to a military or police tactic in which military or police box in a crowd on all sides in a confined space.

assembled and became concerned for the safety of the young people in the crowd. He instructed the people at the front of crowd—those closest to the police formation—to kneel before the law enforcement officers and pray. Several people did as Rev. Moore suggested. This was ineffective in deescalating the police response.

52.     The CITY OF SAN JOSÉ Police Officers aimed their weapons at the demonstrators and began to strike and jab protesters with batons in their faces, chest, and abdomen. The police show of force quickly escalated to using chemical weapons, impact munitions and explosive flash-bang grenades and stinger grenades.

53.     Rev. Moore witnessed one DOE defendant CITY OF SAN JOSÉ Police Officer grab a young woman by her legs from her kneeling position, exposing her undergarments and body to the crowd. He saw another young woman fall as she attempted to stand and move away from the aggressive forward movements of the police. But as Rev. Moore attempted to help her, CITY OF SAN JOSÉ Police Officers pushed them both down. DOE defendant CITY OF SAN JOSÉ Police Officers then jabbed Rev. Moore in the ribs more than once. Two demonstrators helped extricate Rev. Moore from the kettle as the police closed tighter around the crowd.

54.     Rev. Moore sat outside of the enclosing police circle to gather his breath and strength enough to leave downtown. However, before Rev. Moore could stand to leave, the police launched chemical weapons into the crowd. Rev. Moore could not see or breathe for several minutes, and suffered from wheezing for months afterward.

55.     Plaintiff JOSEPH CAÑAS had been playing his guitar while marching, and continued to play while kettled by the police. As he was standing, peacefully playing the guitar about 5 p.m., he heard an announcement from the police, but could not make out the words. Suddenly, defendant JARED YUEN or a DOE defendant CITY OF SAN JOSÉ Police Officer shot Mr. Cañas in the eye with an impact munition, causing searing pain and permanently damaging his vision.

56.     The impact caused Mr. Cañas to collapse to the ground in the middle of the street. No CITY OF SAN JOSÉ Police Officers came to Mr. Cañas' aid or summoned aid for him. Other demonstrators picked him up, gave him first aid, and helped him get home.

57.     Plaintiff CINDY CUELLAR watched the defendants shoot impact munitions into the crowd while she standing in front of City Hall. She saw the munitions hit demonstrators and cause them to fall to the ground. Some demonstrators scrambled in horror and attempted to run away from Defendants.

58.     Ms. Cuellar saw a CITY OF SAN JOSÉ Police Officer shoot a journalist she knew with a munition. Ms. Cuellar started to go to her friend's aid, but a DOE defendant CITY



Image 2. Mr. Cañas on the ground after impact being tended by other civilians.


Image 3. Ms. Cuellar's bleeding left calf

OF SAN JOSÉ Police Officer shot her, too, causing a white hot, excruciating pain in her left calf. The impact and pain sent her tumbling toward the ground.

59. Other demonstrators caught Ms. Cuellar before she hit the ground. A demonstrator applied disinfectant to Ms. Cuellar's wound, which had immediately bruised and swelled. No CITY OF SAN JOSÉ Police Officer came to Ms. Cuellar's aid or summoned aid for her.

60. As Ms. Cuellar sat to tend to her wound, she witnessed CITY OF SAN JOSÉ Police Officers cover their faces with gas masks, and then shoot rounds of tear gas and explosive Stinger grenades and/or flash-bang grenades into the crowd. It became so frightening that Ms. Cuellar decided she needed to go home, as she would not be able to run from the munitions the police were shooting into the crowd. Walking on her injured leg made the wound bleed heavily.

61. Plaintiffs LESLIE VASQUEZ and YESSICA RILES, sisters, also went to the May 29, 2020, San José demonstration to protest the Minneapolis Police murder of George Floyd, systemic racism and police violence, arriving around 4 p.m. When the police arrived in the civic center area, the sisters became separated in the crowd.

62. As Ms. Vasquez walked toward E. Santa Clara and S. 7th Streets, she saw police were shooting a young woman with impact munitions. When Ms. Vasquez tried to help the woman, defendant JARED YUEN or a DOE CITY OF SAN JOSÉ Police Officer shot her in the groin at close range with an impact munition.

63. Another DOE CITY OF SAN JOSÉ Police Officer hit Ms. Vasquez in the stomach



NEWS > CALIFORNIA NEWS

**On fourth day of protests, Newsom tells demonstrators: "Your rage is real. Express it."**

His approach — a sharp contrast to Trump's — come after a weekend full of unrest across California

SAN JOSE – MAY 29: Protesters put their hands in the air as police walk in their direction during a protest decrying the police killing of George Floyd in downtown San Jose on Friday, May 29, 2020. (Randy Vazquez / Bay Area News Group)

By MAGGIE ANGST | mangst@bayareanewsgroup.com | Bay Area News Group
PUBLISHED: June 1, 2020 at 2:22 p.m. | UPDATED: June 2, 2020 at 3:53 a.m.

Image 4. Ms. Vasquez with her hands up

with his baton multiple times and pushed her, even though she put her hands up.

64.     Ms. Riles walked toward S. 7th Street looking for her sister, Ms. Vasquez, when she heard shooting. At the intersection of E. Santa Clara and S. 7th Streets, she saw Ms. Vasquez standing in front of the police line with her hands up.

65.     Ms. Riles put her hands up too in a gesture of "Don't shoot", and crossed the street, intending to get her sister and leave. But then, without warning, a DOE CITY OF SAN JOSÉ Police Officer took aim at and shot her, too, in the abdomen with an impact munition. Ms. Riles heard multiple shots and felt searing pain as the DOE CITY OF SAN JOSÉ Police Officer shot her in the groin, pelvic region and abdomen, repeatedly, and other officers shot people around her.

66.     No CITY OF SAN JOSÉ Police Officers came to Ms. Vasquez' or Ms. Riles' aid or summoned aid for them.

67.     Defendants failed to give clear warnings before using force against the plaintiffs. Ms. Riles first heard the police give an amplified dispersal order after they had already shot her and multiple others. Other plaintiffs did not hear or could not make out an order.

68.     Plaintiff GUSTAVO FLORES participated in the May 29, 2020, demonstration to protest the Minneapolis Police murder of George Floyd, systemic racism and police



Image 5. Ms. Riles' bruises.

violence. Shortly after 5:00 p.m., Mr. Flores walked in the direction of Mexican Heritage Plaza with other demonstrators, when their path was blocked by CITY OF SAN JOSÉ Police Officers who had formed a line in the area of E. Santa Clara St. between 8th and 9th Streets.

69.    Mr. Flores was near the front of the crowd when he heard a DOE CITY OF SAN JOSÉ Police Officer tell the other CITY OF SAN JOSÉ Police Officers, softly, "Get ready to shoot!" Defendants did not make any announcement or warning to the crowd. Mr. Flores tried to warn the other demonstrators, walking down the front line of demonstrators suggesting they put their hands up in a gesture of "Don't shoot!", to show they were unarmed did not pose a threat. But before Mr. Flores reached the end of the line, a DOE CITY OF SAN JOSÉ Police Officer shot him in the groin and testicle with an impact munition.

70.    Mr. Flores fell to the ground as a result of being shot. As he stood up, he saw that the DOE CITY OF SAN JOSÉ Police Officer was reloading his gun. Mr. Flores tried to walk away, limping from his injury. Someone in the crowd warned Mr. Flores that the officer was aiming at him again. When Mr. Flores turned to look, the DOE CITY OF SAN JOSÉ Police Officer shot him in the left collarbone with another impact munition.

71.    Mr. Flores saw CITY OF SAN JOSÉ Police Officers shoot other people who, like him, were doing no wrong and presenting no threat.

72.    No CITY OF SAN JOSÉ Police Officers provided or summoned aid for Mr. Flores.

73.    SHAUNN CARTWRIGHT attended the May 29, 2020, demonstration as a legal observer to support the participants' right to protest for racial justice.

74.    At E. Santa Clara and 7th Streets, Ms. Cartwright observed CITY OF SAN JOSÉ Police Officers shooting impact munitions into the crowd of demonstrators, and officers throw two people, including a young teen girl, to the ground by police and beat them with batons. Ms. Cartwright attempted to take photographs to document and discourage this police use of force, but CITY OF SAN JOSÉ Police Officer FNU DELGADO or a DOE CITY OF SAN JOSÉ Police Officer shoved her in the chest very forcefully with his hands. Ms. Cartwright told the officer that she had a brain injury, but he shoved her twice more, almost knocking her off her feet.

75.    Ms. Cartwright suffers from trigeminal neuralgia, a chronic pain condition that was being treated with neurostimulator devices implanted in her head which are powered by a battery implanted in her chest. The area where Officer Delgado struck Ms. Cartwright is where the battery is located, and she had to later have her medical team check to make sure the wire leading to the neurostimulators was intact.

76.    Plaintiff JOSÉPH MALDONADO went to the May 29, 2020, San José demonstration to protest the Minneapolis Police murder of George Floyd, systemic racism and police violence, arriving after the police had blocked Santa Clara at 7th Street. Mr. Maldonado observed only peaceful demonstrating - nothing that would justify the use of chemical weapons - but noticed that the police put on gas masks.

77.    Mr. Maldonado heard no warning before DOE defendant CITY OF SAN JOSÉ Police Officers launched a chemical agent, most likely teargas, into the crowd. The gas felt like it slapped Mr. Maldonado in the face. He experienced an intense burning sensation like no pain he had ever experienced before: "like a thousand needles hitting your eyeballs at once."

78.    Mr. Maldonado ran, and a stranger gave him some water to rinse his eyes. The CITY OF SAN JOSÉ Police Officers did not offer decontamination or any other form of aid.

79.    At 6:15 p.m., the CITY OF SAN JOSÉ Police Department moved its line of officers to 5th and Santa Clara. At 6:30 p.m., they began to use "flashbang grenades" and

"OC Blast Stinger grenades"[6] on the crowd, grenades that explode with a very loud bang and bright flash of light, and are designed to cause panic and chaos. These grenades can cause temporary or permanent hearing loss, burns, and impact injuries. The Stinger grenades also contain pepper spray and release rubber pellets indiscriminately in all directions.[7]

80.     Plaintiff M. MICHAEL ACOSTA tried to go shopping on May 29, 2020, but discovered that both Walmart and Target were closed. As he was driving back to his residence in downtown San José, he became aware that a large demonstration was going on in response to the Minneapolis Police murder of George Floyd. Mr. Acosta realized that this was a historic event and wanted to show solidarity with the Black Lives Matter movement, and to document the demonstration. He parked at his building and walked around taking photos and video with his cell phone over an approximately five block area. He observed that the demonstration was peaceful.

81.     But unbeknownst to Mr. Acosta, around 7 p.m., a reported white supremacist deliberately drove a grey SUV into the crowd, hitting two people near 3rd and E. Santa Clara and sending demonstrators running and screaming. CITY OF SAN JOSÉ Police Officers shot impact munitions at the vehicle, which broke the windshield, and arrested the driver.

---

[6] The San Jose Police Department's "Special Operations division is equipped with DEFTECH 1095 / CTS 9594 OC Blast Stinger Grenades. These are hand-thrown less lethal grenades that utilize OC powder and/or stinger balls and a 'flashbang' (startling light & concussive sound effect) to disperse a crowd. The blast is sufficient to project the rubber balls and chemical agents in a 50-foot radius, all around the point of impact such that anyone in the vicinity could be struck or affected. The device is 175 decibels loud at approximately 5 feet. It contains 8 grams of flash powder and approximately 4.2 grams of OC Powder." Garcia, *supra*, at 106. SJPD's Special Operations also carries, and used at the events at issue herein, the Def Tech Low Noise Flash Device or Flashbang. "These devices are used to temporarily disorient anyone around it by producing blinding flash of light and an intensely loud "bang". This device contains 12 grams of flash powder resulting in 6-8 million candelas and 175 decibels at approximately 5 feet." *Id.* at 107.

[7] Amnesty International, *USA: THE WORLD IS WATCHING - Mass Violations By U.S. Police Of Black Lives Matter Protesters' Rights* 1, 24 (2020), https://www.amnesty.org/en/documents/amr51/2807/2020/en/; *see also* International Network of Civil Liberties Organizations (INCLO) and Physicians for Human Rights, *LETHAL IN DISGUISE - The Health Consequences of Crowd-Control Weapons* 1, 85 (2016) https://www.inclo.net/issues/lethal-in-disguise/ last accessed March 7, 2021.

82.     As Mr. Acosta walked home on E. Santa Clara between 3rd and 4th Streets, he saw the grey SUV abandoned on the corner of 3rd Street. This was the SUV that had struck people a short time earlier and one or more people pushing a burning dumpster into it.



Image 7. Impact munition circled in red heading towards Mr. Acosta.

83.     Mr. Acosta was not sure how to get onto 3rd Street safely, and the police line was blocking the way to 4th Street. Suddenly, DOE CITY OF SAN JOSÉ Police Officers threw exploding "flash-bang" and/or Stinger grenades nearby, and the crowd began to run.

84.     At approximately 7:10 p.m., without warning, a DOE CITY OF SAN JOSÉ Police Officer



Image 8. Impact munition circled in red right before hitting Mr. Acosta.

shot Mr. Acosta in the eye with an impact munition. Mr. Acosta instantly lost all vision and fell to one knee. The next few moments were the most terrifying of his life; he

remained on the ground, unable to see, while listening to explosions and people rushing by. No CITY OF SAN JOSÉ Police Officers came to Mr. Acosta's aid or summoned medical aid for him.



Image 9. Mr. Acosta's eye after the initial eye surgery but before the enucleation surgery.

85.     Fortunately, demonstrators dragged Mr. Acosta to safety. They bandaged a bleeding laceration above his eye and helping him into his nearby residence. Vision returned to his right eye, but not his left eye which was the one that had been hit.

86.     A friend took Mr. Acosta to the hospital later that night, where he learned that the munition had caused a severe ruptured globe injury, as well as multiple fractures to the surrounding orbital of his left eye. The laceration on his face also required stitches.

87.     Mr. Acosta had to be transported to a different hospital for immediate eye surgery to try to repair the rupture. However, vision in his left eye could not be restored. Eventually, Mr. Acosta had to undergo further surgery to completely remove his eye globe as a result of being shot by the DOE CITY OF SAN JOSÉ Police Officer.

88.     As local media covered the defendants' violent reaction to the demonstration, additional San José residents began to arrive to aid the demonstrators, but they, too, were met with CITY OF SAN JOSÉ police violence.

89.     Plaintiff MEGAN SWIFT heard about the police violence and went to find the May 29, 2020, demonstration at the Plaza de César Chávez in downtown San José in order to bring aid in support of the racial justice demonstrators. She brought a book bag filled with water and first aid materials, including gauze and gloves.

90.     When she arrived between 8:30 and 9 p.m., Ms. SWIFT observed a crowd of mostly young people, chanting and holding signs, while some passersby observed from a distance. Suddenly, DOE CITY OF SAN JOSÉ Police Officers charged the crowd with guns and/or launchers raised, while throwing explosive flashbang and/or OC Blast Stinger grenades into the crowd. The mood abruptly shifted to panic and the demonstrators began to scatter.

91.     At this point, Ms. Swift noticed CITY OF SAN JOSÉ Police Officers form a line with batons held crosswise from the bodies, and march toward her. The police yelled "Move" at the demonstrators while simultaneously pushing Ms. Swift and others back with their clubs. Ms. Swift tried to comply by stepping back, but defendant STEPHEN MICHAEL CURRY #4700 and/or DOE CITY OF SAN JOSÉ Police Officers stepped out of the police line multiple times to strike Ms. Swift hard in two-handed blows with his club.

92.     A nearby demonstrator yelled at the officer to stop hitting Ms. Swift. Defendant



CURRY clubbed Ms. Swift one more time, and then grabbed her and dragged her through and behind the police line. He took her book bag with force and then proceeded to handcuff her with her hands behind her back.

93.     CURRY sat Ms. Swift on a sidewalk away from the crowd. After questioning her, he left her with two DOE CITY OF SAN JOSÉ Police Officers who were not

Image 9. Ms. Swift's bruising on her left arm.

wearing masks. Ms. Swift was detained for approximately three hours, until after midnight.

94.    Ms. Swift was never charged with any crime.

95.    Plaintiff PETER ALLEN walked to the May 29, 2020, demonstration from his home, to protest the Minneapolis Police murder of George Floyd, systemic racism and police violence. Mr. Allen joined the demonstration at the Plaza de César Chávez around 8:30 p.m. and sat on the edge of the stage.



Image 10. Mr. Allen's thigh.

96.    Mr. Allen observed that the crowd was peaceful and posed no threat to the police. Suddenly, CITY OF SAN JOSÉ Police Officers charged the demonstrators while throwing explosive flashbangs and/or OC Blast Stinger grenades into the crowd. Mr. Allen tried to back away but before he could do so, a DOE CITY OF SAN JOSÉ Police Officer shoved him forcefully to the ground with his baton. Mr. Allen again tried to stand and back away, but the same DOE CITY OF SAN JOSÉ Police Officer used his baton to shove him to the ground again.

97.    Mr. Allen scrambled up and jogged away from the police line. When he was about 20 yards from them, he turned to face them with his hands up in a gesture of "Don't shoot" while backing away from them, but a DOE CITY OF SAN JOSÉ Police Officer proceeded to shoot him in the left upper thigh with an impact munition.

98.    Moments later, a DOE defendant CITY OF SAN JOSÉ Police Officer shot him again, this time in the left upper chest with an impact munition.

99.    Plaintiff ALEX LEE also attended the May 29, 2020 demonstrations in downtown San José to protest the Minneapolis Police murder of George Floyd, systemic racism and police violence, and to document the events on social media. Around 8 p.m. at City Hall Plaza, without warning, CITY OF SAN JOSÉ Police Officers started shooting impact

munitions, explosive grenades and chemical agents at the demonstrators, even though neither Mr. Lee nor anyone nearby was threatening the police in any way. As a result of DOE CITY OF SAN JOSÉ Police Officers' use of chemical agents, Mr. Lee suffered serious difficulty breathing. As a result of DOE CITY OF SAN JOSÉ Police Officers' use of impact munitions and grenades, Mr. Lee was in fear of serious harm. He perceived that the CITY OF SAN JOSÉ Police Officers were trying to prevent him and others from exercising their rights to protest the police killing of George Floyd.

100. Another anti-police violence/racial justice demonstration took place in downtown San José on Saturday, May 30, 2020, and Mr. Lee again participated. That evening, near City Hall, DOE CITY OF SAN JOSÉ Police Officers again, without warning, fired munitions, grenades, and chemical agents into the crowd of demonstrators.

101. A DOE CITY OF SAN JOSÉ Police Officer launched and/or threw a projectile, believed to be a tear gas canister or a grenade, that hit Mr. Lee's heel and ankle. This caused pain, bruising, and fear. As a result of the chemical agent, Mr. Lee again suffered difficulty breathing, feared serious harm from the police-fired projectiles, and felt the police were trying to prevent him and others from exercising their rights to protest the police killing of George Floyd.

102. Plaintiff SHAUNN CARTWRIGHT also attended the May 30, 2020, San José demonstration, as a legal observer, when DOE CITY OF SAN JOSÉ Police Officers used chemical agents against her and the demonstrators. Ms. Cartwright stayed in what she thought was a safe spot against a wall on 4th Street by City Hall, because she was physically unable to run due to her knee condition: her right knee had been surgically replaced and her left knee needed replacement. Then, a DOE CITY OF SAN JOSÉ Police Officer shot at her four times in quick succession with impact munitions. Munitions struck her right knee (the one that had recently been replaced), her left calf, and her pinkie finger. The fourth shot whizzed by, barely missing her hip.

103. Plaintiff MAHMOUDREZA NAEMEH went to the May 30, 2020, demonstration in San José to protest the Minneapolis Police murder of George Floyd, systemic racism and police violence against Black people. Mr. Naemeh was wearing Muslim prayer beads, a gift from his mother. He arrived at about 2:30 p.m. near City Hall, and took

photos as a small crowd gathered. Around 5:30 p.m., Mr. Naemeh marched to the library with the other demonstrators. Some of the demonstrators engaged in a die-in, lying down on the ground for a couple of minutes. There were speakers and chanting, conveying their message against police violence and racism.

104. At about 6:30 p.m., CITY OF SAN JOSÉ Police Officers blocked the intersection of E. Santa Clara and 4th Streets with a line of officers, increasing tension so that police and demonstrators began yelling at each other. Mr. Naemeh walked backward on the sidewalk away from the police with his hands up, but a DOE CITY OF SAN JOSÉ Police Officer shot him in the shin just below his knee with an impact munition.

105. Mr. Naemeh tried to take cover and walked between the buildings back to 4th and San Fernando, but the line of police came down and blocked the street at that location and began shooting. Mr. Naemeh walked away and continued looking for the friend who was giving him a ride home

106. At 2nd and San Fernando Streets, Mr. Naemeh came upon a small group of demonstrators and walked with them to the Plaza de César Chávez. Suddenly, a large group of CITY OF SAN JOSÉ Police Officers charged toward them on foot and motorcycles. Mr. Naemeh and others ran, but DOE CITY OF SAN JOSÉ Police Officers came from all directions, surrounding the demonstrators so that they could not leave. They then tackled and arrested Mr. Naemeh along with about thirty to forty other people at around 8:30 - 9 p.m.

107. DOE CITY OF SAN JOSÉ Police Officers told Mr. Naemeh that he was the person responsible for throwing frozen water bottles and that they had caught this on video. Mr. Naemeh had not thrown anything and denied this, but the DOE officers told him that he was going to jail for six months. When Mr. Naemeh provided his identification, a DOE CITY OF SAN JOSÉ Police Officer asked him how to pronounce his name. Mr. Naemeh said to call him Reza (short for Mahmoudreza). Another DOE CITY OF SAN JOSÉ Police Officer came up and photographed him. Mr. Naemeh did not see the police take anyone else's photograph, so this felt like an act of intimidation. The officers continued to talk about Mr. Naemeh throwing frozen water bottles and that he would be going to jail, seeming to single him out as a ringleader. Once the police were

ready to transport the arrestees, they handed Mr. Naemeh to another DOE CITY OF SAN JOSÉ Police Officer, who looked at his identification and called him "Mohammed". Mr. Naemeh corrected him, saying, "It's Reza." The DOE officer smirked, and another DOE CITY OF SAN JOSÉ Police Officer repeated, "Mohammed". Mr. Naemeh was placed on a bus and taken to a stadium parking lot, where he was put on a different bus.

108.    On the second bus, DOE CITY OF SAN JOSÉ Police Officers or Santa Clara County Sheriff Officers took Mr. Naemeh's face mask off without his consent. He was forced to remain in an enclosed space, caged in the back of the bus, with about ten other people, most of whom were not wearing masks. Finally, after approximately three hours in custody, Mr. Naemeh was given a citation and placed in the back of another vehicle with six other people, none of whom were wearing masks. Public health officials have warned against remaining in enclosed areas in close quarters with other people without face masks as this greatly increases the risk of COVID-19 transmission.

109.    Santa Clara County Sheriff's Department personnel proceeded to drive Mr. Naemeh and the other arrestees to the parking lot of the Great Mall in Milpitas, CA, where they were released after 11:30 p.m., when no public transit was running.

110.    Mr. Naemeh was never charged with any crime.

111.    On May 31, 2020, defendant CITY OF SAN JOSÉ imposed an unlawful city-wide 8:30 p.m. – 5:30 a.m. curfew. The 8:30 p.m. curfew was declared by San José City Manager defendant DAVID SYKES, approved by San José Mayor defendant SAM LICCARDO and CITY OF SAN JOSÉ Police Chief defendant EDDIE GARCIA, and announced at approximately 5:30 p.m. that same day, Sunday May 31. The curfew remained in effect until June 4, 2020.

112.    The curfew was enacted by CITY OF SAN JOSÉ policymakers LICCARDO, GARCIA and SYKES with the intention to unlawfully suppress First Amendment rights by purporting to ban all political protest in the evening hours, during a time when thousands of people sought to express their opposition to racially discriminatory police violence.

113.    Defendant CITY OF SAN JOSÉ's curfew violated the First Amendment's prohibition on laws restricting speech by entirely suppressing all demonstrations

occurring after 8:30 p.m., when the CITY had other, less restrictive, lawful means to prevent any actual or imminent violence.

114.    Moreover, to satisfy First Amendment requirements, a curfew must both be narrowly tailored and allow for ample alternative channels of communication. Defendant CITY OF SAN JOSÉ's curfew was not narrowly tailored and did not allow for ample alternative channels of communication. Less burdensome means for preventing violence were readily available by employing traditional legal methods.

115.    Defendants' curfew also violated the fundamental constitutional right of freedom of movement by imposing restrictions on the plaintiffs' and class members' freedom of movement that were not narrowly tailored.

116.    Defendants failed to provide sufficient notice of the curfew before enforcing it. The curfew was only announced three hours before its start, and it was not adequately publicized. This inadequate notice deprived plaintiffs SHAUNN CARTWRIGHT, ALEX LEE, and class members of their Fifth and Fourteenth Amendment right to due process.

117.    Despite hobbling from her injuries of the preceding night, plaintiff SHAUNN CARTWRIGHT went to the May 31, 2020, San José demonstration at approximately 6:30 or 7 p.m. to distribute a legal hotline number to demonstrators and again serve as a legal observer. She was wearing a green "legal observer" hat and a face mask to protect her and others from COVID-19. Plaintiff ALEX LEE also attended the May 31, 2020, demonstration.

118.    At about 8:30 p.m., Ms. Cartwright, Mr. Lee, medics, and journalists were peacefully talking on the sidewalk, when DOE CITY OF SAN JOSÉ Police Officers threatened them with arrest telling them that they were going to be made examples of and were going to jail for violating the curfew. Ms. Cartwright explained that she was a legal observer and that others were medics and journalists. Ms. Cartwright, Mr. Lee, the medics and journalists went on to observe the police, and once they returned around 11:30 p.m., the DOE CITY OF SAN JOSÉ Police Officers arrested Ms. Cartwright, Mr. Lee, and the others.

119.    A DOE CITY OF SAN JOSÉ Police Officer told Ms. Cartwright to get into a police van, but she could not step up into the van because of her injuries from being shot

the previous night, so DOE CITY OF SAN JOSÉ Police Officers had her sit in a patrol car with two officers who were not wearing masks. The officers drove her to the SAP Center, where she was forced to sit in a bus with two other people who were not wearing masks for 30-60 minutes.

120.    The police then processed Ms. Cartwright, and handed her off to Santa Clara County Sheriff's Office personnel to transport her. The Santa Clara Sheriffs dropped Ms. Cartwright off in the parking lot of Eastridge Mall at 1 a.m., with no way to get home, and despite the still ongoing curfew. Ms. Cartwright was never charged with any crime.

121.    Mr. Lee on the other hand was taken to the Great Mall in Milpitas, CA, and dropped off in the parking lot, similarly after public transportation had stopped running. Mr. Lee was never charged with any crime.

122.    The CITY OF SAN JOSÉ and its police neither provided nor summoned medical aid for any of the plaintiffs they had shot with impact munitions or subjected to chemical weapons on May 29, 30, and 31, 2020.

123.    None of the plaintiffs presented a threat or engaged in any conduct justifying any use of force by the CITY OF SAN JOSÉ Police Officers at any time.

124.    The force of the munitions knocked the plaintiffs and class members off their feet and/or otherwise restricted their freedom of movement by stopping them in their tracks and causing injuries. People who were trying to disperse or back up in compliance with police orders were as likely to be shot as people who stood still. Clouds of chemical agents prevented plaintiffs and other assembled persons from escaping. Others were temporarily stopped from getting to injured persons to aid them and helping them to safety.

125.    Defendants egregiously restrained and intruded upon the liberty and privacy of plaintiffs by their show of force in striking plaintiffs about their bodies with munitions and explosives, and assaulting plaintiffs with chemical agents in their eyes, noses and mouths.

126.    There was no probable cause to support Mr. Naemeh's, Mr. Lee's, Ms. Swift's, or Ms. Cartwright's arrests, or any of the arrests of class members for curfew violations, failure to disperse, failure to follow a lawful order of a police officer, and/or unlawful

assembly.

127.    As a direct and proximate cause of the conduct described herein, the named individual plaintiffs and the class members have been denied their constitutional, statutory, and legal rights as stated herein, and have suffered general and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, loss of wages and damage to career, pain, fear, humiliation, embarrassment, discomfort, and anxiety and other damages in an amount according to proof.

**C. Defendants' excessive force impeded each of the plaintiffs' ability to continue exercising their First Amendment rights and continues to chill their First Amendment rights.**

128.    Each of the plaintiffs continues to desire, and possesses the intention, to peacefully and lawfully assemble and express their views in opposition to police racist violence and related issues in San José, but the defendants' indiscriminate and excessive use of munitions, explosive grenades and chemical agents is causing them to fear that when they participate in such expressive activities, the defendants will injure them again by such indiscriminate, unlawful and/or excessive use of force that harmed them and other persons engaged in lawful and peaceful activity on May 29, 30, and 31, 2020.

129.    Plaintiff MEGAN SWIFT suffered sizeable and painful bruising as a result of the actions of the CITY OF SAN JOSÉ Police, including defendant Officer CURRY. Since being beaten and wrongfully arrested on May 29, 2020, she has felt nervous and scared around officers. The day after her arrest, CITY OF SAN JOSÉ Police Officers contacted her mother in Pennsylvania asking her mother if she knew her daughter had been arrested. Ms. Swift has not lived in Pennsylvania since 1993, and had not given her mother's contact information to Defendants, so this was very disconcerting and intimidating, and compounded Ms. Swift's fear of the police. She is not only afraid for herself, but for friends who interact with the CITY OF SAN JOSÉ Police. Ms. Swift is upset and embarrassed that her daughters saw her injured by the police. While she still wants to help make social change, she feels helpless and is more hesitant to participate in demonstrations in San José as a result of Defendants' misconduct.

130.     After the protest on May 29, Plaintiff LESLIE VASQUEZ went to work, but tried not to walk as she was in so much pain. Unfortunately, her job requires her to walk all over a large hospital. She usually does so easily, but the pain made walking so unbearable, that she did her best to avoid walking for about two weeks. She felt this decision impacted how she functioned at work and as a parent. Because of the location of the bruises, she was too embarrassed to tell anyone, or ask for help managing the pain. As a result, the only medication she took was Tylenol. The week after the May 29 protest, she had a gynecologist appointment, and seeing her enormous bruises, her doctor was concerned that Ms. Vasquez was being abused. This upset and embarrassed Ms. Vasquez. She avoided seeing her partner until the bruises healed, and is still uncomfortable wearing shorts or other clothing that exposes what is now permanent scarring. Ms. Vasquez feels scared that this happened just because she was trying to help someone. As a result of defendants' misconduct, she is hesitant to attend San José demonstrations or be around police.

131.     Plaintiff JOSÉPH MALDONADO has suffered from anxiety, tension, and difficulty sleeping as a result of the police violence on May 29, 2020, and his performance at work has suffered. Mr. Maldonado lives in the downtown area where the police violence occurred, and going to his usual grocery store or even just leaving his house triggers his anxiety and memories of the experience of being teargassed. He has only attended one other demonstration since then, and



Image 11. Ms. Vasquez's bruising on one of her inner thighs.

when the group started marching, Mr. Maldonado became so anxious that he had to step out. He stood to the side because he didn't feel safe. As a result of Defendants' misconduct, Mr. Maldonado distrusts police and feels they are dangerous to him.

132.    After his arrest on May 30, 2020, plaintiff MAHMOUDREZA NAEMEH was worried that he might be infected with COVID-19 as a result of the DOE CITY OF SAN JOSÉ Police and/or Santa Clara County Sheriffs' acts of removing his mask and unlawfully detaining him for an extended period under conditions likely to spread COVID-19. He had to quarantine himself and undergo testing, and could not go into the laboratory where he worked as a chemical analyst for two weeks. He suffered a bleeding wound, bruising, pain and disability as a result of being shot. The shooting, wrongful arrest, and Islamophobic profiling and harassment deeply affected him and caused him continuing psychological trauma.

133.    Plaintiff M. MICHAEL ACOSTA remained in severe pain over the month after the DOE CITY OF SAN JOSÉ Police Officer shot him in the eye. Doctors advised him that he was at risk for sympathetic ophthalmia of his right eye, which could result in complete blindness. Mr. Acosta ultimately had to have his left eye enucleated – surgically removed – as a result of the severe injury caused by being shot with an impact munition by a DOE CITY OF SAN JOSÉ Police Officer.

134.    Mr. Acosta missed weeks of work after he was shot. After having the surgery to remove his eye on July 1, 2020, he is no longer in pain, but struggled to adjust to his new monocular, impaired vision, and to the trauma of being shot by the police and losing a part of his body. In November, 2020, Mr. Acosta was fitted with a prosthetic eye for his eye socket. He experiences continuing numbness on the left side of his face, which is a constant reminder of the fact that his eye is missing.

135.    The loss of his eye, emotional trauma, and reduced vision have impacted every aspect of Mr. Acosta's personal and professional life. At first, he could not leave the house by himself. He is now starting to be more independent, but has particular difficulty at night. His impaired vision precluded him from driving until very recently, which was extraordinarily inconvenient given his continuing need to see doctors for his injuries. For example, a follow-up medical appointment with the ocularist involved more than six

hours round trip on public transportation unless a friend was available to drive him. Due to the ongoing COVID-19 pandemic and Santa Clara County public health orders, each time Mr. Acosta was forced to take public transportation for such a long trip, he had to then quarantine himself for two weeks from his small social "bubble". In February, 2021, Mr. Acosta began to try driving again but only in daylight and good weather. Driving is very challenging and he feels very nervous, and still cannot drive at all at night. Mr. Acosta has a demanding position at Apple, and work, too, has been a struggle.

136.   Before he was shot, if Mr. Acosta became aware of a protest nearby in his neighborhood of downtown San José, he would want to see what was going on and potentially observe and document as he did on May 29, 2020. Now, if he is out walking and hears the sound of a protest, he feels uncomfortable and immediately heads to the safety of his home.

137.   Plaintiff JOSEPH CAÑAS was struck in the eye with the impact munition as well, leaving him with a black eye and blurred vision. Over the following days he had continued pain, and although this gradually eased, his vision continued to be impaired. Mr. Cañas has trouble reading, viewing lighted screens, adjusting to brightness, and experiences flashes, floaters and issues with depth perception and peripheral vision with his left eye. This vision impairment is permanent and he must now wear glasses which he never needed before. The glasses are helpful, but do not completely alleviate the problems caused by being shot in the eye.

138.   Mr. Cañas still feels strongly about police racism and violence and would like to express his views through street demonstrations. But, since he was shot, he has not been as active in demonstrations because he experiences anxiety about the police injuring him again. He knows from experience that even if he is being peaceful, he can still pay a price for being in the crowd. If he does attend a demonstration, he is always looking over his shoulder.

139.   Mr. Cañas moved out of San José after the May 29 incident in large part because he felt anxious about police retaliation. After he was shot, his name and photograph appeared in the San José Mercury News, and he found out that he was mentioned on a CITY OF SAN JOSÉ Police private Facebook page that has been exposed as a forum for

racist and anti-Muslim hate speech by current and former CITY OF SAN JOSÉ Police Officers.[8] On the Facebook page, a recently retired CITY OF SAN JOSÉ Police Officer, Steve Wilson, seems to be referring to Mr. Cañas in a publicized post which called Mr. Cañas an "idiot" who deserved to have his eye injured, and referred to the demonstrators as "trash".[9]  This caused Mr. Cañas considerable anxiety.

140.    Plaintiff GUSTAVO FLORES, too, had his life upended by Defendants' act of intentionally shooting him in the groin, genitals and collarbone in retaliation for warning other protestors that the police were preparing to shoot them. Mr. Flores was shocked when the police shot not only him, but others in his vicinity, including an elderly woman and a young boy.

141.    Mr. Flores suffered severe bruising, and continuing pain and disability that only gradually improved over the following months. He struggled with everyday activities such as lifting things, doing chores, or getting groceries.

142.    The injuries Defendants caused prevented Mr. Flores from working and earning his regular full-time income for months. Mr. Flores, a tow truck driver, was unable to work from May 30, 2020, until approximately June 22, 2020. He then returned to work part time even though he was not completely healed. He needed the income to pay basic living expenses but could only work part-time due to his continuing serious shoulder and groin pain.

143.    There is still a hard, painful lump in Mr. Flores' testicle.

144.    Defendants' violent actions shook Mr. Flores to the core and made him much more hesitant to express advocacy against white supremacy and for changes in policing.

145.    Plaintiff PETER ALLEN suffered severe bruising to his leg, chest, and rib area as a result of Defendants' violence. He had to stay off his feet for a few days after May 29, 2020. The bruises lasted for a month, and Mr. Allen still feels some pain when walking.

---

[8]Charlie Paulsen, *Racism and Hate Behind the Blue Wall: Exposing Secret Law Enforcement Facebook Group*, Noteworthy – The Journal Blog (Jun. 26, 2020), https://blog.usejournal.com/racism-and-hate-behind-the-blue-wall-exposing-secret-law-enforcement-facebook-groups-6cf23a596a98.
[9]*Id.*


Image 12. Ms. Cartwright's knee.

146.    Since being shot by Defendants on May 29, Mr. Allen feels apprehensive to participate in demonstrations in San José. When he pushed himself to attend another rally at City Hall in San José, he found that when he walked past the street where he was shot, his leg began to throb and he experienced anxiety. In fact, whenever he finds himself at the Plaza de César Chávez his heart rate goes up and he has flashbacks of the police charging and shooting him on May 29.

147.    Mr. Allen has beautiful memories of the Plaza de César Chávez, one of San José's oldest parks, which he considers the heart of the city. It was the site of his first date with his wife. They were married in the nearby Cathedral Basilica of St. Joseph, and took wedding photographs in the Plaza with the cathedral tower in the background. Mr. Allen remembers seeing this same tower when he was being shot. It really upsets Mr. Allen that his beautiful memories of this park are now tarnished by the police violence and that he will no longer be able to fully enjoy Plaza de César Chávez because of the negative emotions and memories associated with the May 29, 2020, police violence.

148.    Mr. Allen continues to be a part of civic life and does not like letting defendants' actions get in the way of expressing himself and his values, yet the trauma of having been brutalized on May 29 gives him pause.

149. Plaintiff SHAUNN CARTWRIGHT incurred multiple physical injuries and Post Traumatic Stress Disorder (PTSD) as a result of Defendants' violence. This has made her daily activities such as driving, hearing sounds, and seeing police officers difficult. Ms. Cartwright dreads going to bed because she wakes up, startled, repeatedly throughout the night. Every time Ms. Cartwright leaves her house, her leg shakes, she breathes heavily and starts hyperventilating. Her trigeminal neuralgia requires that she not express herself through her facial muscles, but the PTSD causes her to use these muscles, triggering excruciating pain. Ms. Cartwright must struggle to hold back her tears and emotions to avoid unbearable pain in her face.

150. Ms. Cartwright now has a permanent scar on her right knee where she was shot. Seeing this is extremely upsetting as it reminds her of the pain and Defendants' wrongful actions towards her.

151. Ms. Cartwright still wishes to attend demonstrations, but feels traumatized by the violence, wrongful arrest, and other mistreatment Defendants inflicted on her on May 29,


Image 13. Ms. Cartwright's knee.

30, and 31, 2020, and must overcome this in order to exercise her First Amendment rights.

152. For at least a month after she was shot, the bruises on Plaintiff YESSICA RILES' abdomen and pelvis were tender, and it was difficult and painful for her to breastfeed and care for her baby. As a result of the police violence, she had trouble sleeping, was restless, tearful, and often felt uneasy for an even longer time.

153. Ms. Riles is afraid to express her views by attending demonstrations as a result of being shot on May 29, although she has overcome this to attend one demonstration that had little police presence. Ever since May 29, 2020, when Ms.

Riles sees police officers, her heart rate goes up and she experiences anxiety. Just the

thought of that day causes Ms. Riles to feel sick to her stomach. For example, the sound of loud fireworks on July 4th and New Year's Eve brought back the memory of the police violence, causing Ms. Riles to experience anxiety and difficulty sleeping.

154.    For Plaintiff ALEX LEE, being arrested and experiencing the CITY OF SAN JOSÉ Police Officers' violent use of chemical weapons and impact munitions on himself and the peaceful demonstrators around him on May 29, 30, and 31, 2020, had long lasting impacts. Even after his difficulty breathing, pain and bruising subsided, the traumatic experiences of those three nights continue to haunt him. Although Mr. Lee has attended some other demonstrations since then, he feels triggered and apprehensive when he sees police, because he remembers how the CITY OF SAN JOSÉ Police Officers reacted to the demonstrations with anger and punitive aggression, evidently intending to suppress his and others' rights to demonstrate to express their outrage over racist police killings. He tries to avoid being near the police, and does not stay as long as he would have prior to the May 2020, police misconduct. He has lost trust in CITY OF SAN JOSÉ Police Officers to keep him safe and uphold his constitutional rights.

155.    Plaintiff CINDY CUELLAR's calf injury continued to hurt for more than two weeks after the incident. Walking was difficult, and she needed help doing ordinary life activities that involved standing, such as showering and cooking.

156.    The May 29, 2020, police misconduct was draining for Ms. Cuellar physically, psychologically and mentally, and being physically unable to participate in the subsequent demonstrations over the following two weeks was frustrating.

157.    Ms. Cuellar has a permanent scar now reminding her that the police shot her.

### D. Defendants targeted Black, Indigenous, and other people of color when using excessive force to break up the crowd.

158.    Defendants targeted the May 29-31 demonstrations for excessive force and imposition of a curfew because the message of the demonstrations was focused on police racist killings of Black people. Plaintiffs are informed and believe that the CITY OF SAN JOSÉ Police have never used the amount or level of excessive force used against the May 29, 30, and 31 protests, against any San José demonstration that was not focused on police killings of Black people and other people of color.

159.    Defendants targeted people of color for wrongful arrest. According to the CITY, of 176 total arrests related to the demonstrations on May 29 – June 2 and 5, 2020, only 34, or 19.3%, were of Whites, whereas 96 or 54.5% were Latinx, and 46 or 26%, other people of color[10]. In contrast San José is only 32.8% Latinx and is 26.7% White[11].

160.    YESSICA RILES saw a DOE CITY OF SAN JOSÉ Police Officer repeatedly strike her sister LESLIE VASQUEZ with a baton, and when a White woman asked why they were targeting people of color instead of her, the DOE CITY OF SAN JOSÉ Police Officer hit her sister, who is Latina, harder with the baton. At the same time, there was a Muslim woman wearing a hijab to the left of Ms. Vasquez. The White woman was still asking the DOE CITY OF SAN JOSÉ Police Officers why they were targeting people of color when those officers then arrested the Muslim hijabi woman.

161.    Moreover, the CITY OF SAN JOSÉ Police Department has a well-documented history of discriminatory policing, failing to adequately address the behavior that precipitates discriminatory policing, and fostering a culture of white supremacy.

162.    Defendants have long stopped, cited, and arrested people of color at considerably disproportionate rates. In 1999, SJPD was found to stop Black and Latinx drivers at high rates relative to census population data for the city: Latinx drivers represented 31% of the population and 43% of people stopped, while Black people represent 4.5% of the population and 7% of the people stopped by SJPD.[12]

163.    From 2013-2016, in an analysis of the 80,000 traffic and pedestrian stops, Black drivers were 9 times more likely, and Latinx drivers 3.4 times more likely, than white drivers to be stopped by SJPD, and 2 times and 1.7 times, respectively, more likely to be searched. In pedestrian stops, the disparities persisted for Latinx people.[13]

---

[10] Edgardo Garcia, *Memorandum: Police Department Preliminary After Action Report for the Public Protests, Civil Unrest, and Law Enforcement Response From May 29 — June 7, 2020* 1, 122 (September 4, 2020), https://sanjose.legistar.com/View.ashx?M=F&ID=8769493&GUID=3ED4A6F5-F069-4E7F-BADE-99421D9991B3.

[11] City of San José, Fact Sheet: Community Profile, https://www.sanjoseca.gov/your-government/departments/planning-building-code-enforcement/planning-division/data-and-maps/demographics/fact-sheet-community-profile (last visited Dec. 6, 2020).

[12] American Civil Liberties Union, *Police and Community React to San Jose Traffic Stop Data* (Dec. 18, 1999), https://www.aclu.org/press-releases/police-and-community-react-san-jose-traffic-stop-data.

[13] Michael R. Smith, Jeff Rojek, Robert Tillyer & Caleb Lloyd, *San Jose Police Department Traffic and Pedestrian Stop Study* 1, 3 (2017).

164.    The most recent FBI data, from 2018, reveals that despite Black people making up only three percent of the San José population, they are *three times* more likely to be arrested by SJPD compared to White people[14].

165.    In 2020, Racial Identity Profiling Act ("RIPA") data demonstrated the SJPD still has racially discriminatory ticketing practices for infractions—Latinx people are 2.2 times and Black people are 6.6 times more likely to receive a citation than their White counterparts, more than 20 years after community advocates raised the alarm over SJPD's original stop data study.[15] This data confirms that SJPD has not adequately addressed its harmful practice of targeting people of color and that SJPD's discriminatory policing persists.

166.    In 2013, the San José Independent Police Auditor (IPA) recommended that the "Field Training Officer (FTO) Handbook to include better instruction and guidance about how recruits should interact with people of color[16]." While the SJPD revised their FTO Handbook in response to this recommendation, the IPA determined that they have "continuing concerns and found the revisions to be *woefully inadequate*[17]." In 2019, the IPA again recommended that the SJPD evaluate its FTO program, and specifically categorized "Improper Behavior" as an area of concern[18]. In its analysis, the IPA wrote:

> "…the FTO and a recruit stated that two detained Hispanic males were directed to sit on the curb for *their comfort* and not to exert control. In another encounter, an FTO and recruit pulled over a Black bicyclist for riding without a reflective light at night. At the end of this encounter, the bicyclist asked why he was ordered to throw his bicycle on the ground. The FTO's response included self-initiated references to Black Lives Matter and Hands Up-Don't Shoot. This resulted in the bicyclist alleging that the officers engaged in bias-based policing. Given the FTO's many years of experience, one

---

[14]Melanie Woodrow, *Data Analysis: Black people 4x more likely to be arrested than white people in Bay Area*, ABC 7 News (Jun. 12, 2020), https://abc7news.com/police-arrests-bay-area-systematic-racism/6243588/.

[15]Lawyers' Committee for Civil Rights of the San Francisco Bay Area, *Cited for Being in Plain Sight: How California Polices Being Black, Brown and Unhoused in Public* (2020), https://lccrsf.org/wp-content/uploads/LCCR_CA_Infraction_report_4WEB-1.pdf.

[16]Interactive Dashboard of All IPA Recommendations (1993 to Present), https://www.sanjoseca.gov/your-government/appointees/independent-police-auditor/ipa-recommendations (last visited Mar. 9, 2021).

[17]*Id.*

[18]Office of Independent Police Auditor - City of San José, *supra*, at 29.

would presume that an explanation could have been provided that did not reference these polarizing terms associated with Black men.[19]"

167.    In 2020, a private SJPD Facebook group called "10-7ODSJ" was exposed as a platform for white supremacist racism within the department. William Rockmiller, a retired SJPD officer, posted publicly about Black Lives Matter, describing its supporters as "***racist idiots***," "***un-American***" and "***enemies***" that the police "swore an oath against."[20] He condemned any of his friends who support BLM and stated, "***Fuck BLM***."[21] Current CITY OF SAN JOSÉ Police Officer, Mark Pimental posted, "***Black lives don't really matter***."[22] Rockmiller also posted about a Los Angeles Muslim woman, whose hijab, a head covering, was pulled off by a male cop. His post drew comments from current SJPD officers, including Pimental who said, "***Hell, I would have pulled it over her face***."[23] Retired officer Michael Nagel posted, "***I say re-purpose the hijabs into nooses***", with a smile emoji.[24] Nagel also posted a chilling image of a "Sharia Barbie" -- a woman wearing a hijab with a black eye and bruises.   [25]

168.    Defendant EDGARDO GARCIA, then SAN JOSÉ's Chief of Police, purported to be "shocked" and condemned these latest revelations about racism and Islamophobia in the SJPD,[26] but organizations such as Plaintiff NAACP- San Jose/Silicon Valley, journalists, advocates, and citizens have issued complaints and reports of racist behaviors and culture in the SJPD for years or decades.

169.    GARCIA said he would move to terminate officers who made racist comments or

---

[19]*Id.*

[20]Charlie Paulsen, *Racism and Hate Behind the Blue Wall: Exposing Secret Law Enforcement Facebook Group*, Noteworthy – The Journal Blog (Jun. 26, 2020), https://blog.usejournal.com/racism-and-hate-behind-the-blue-wall-exposing-secret-law-enforcement-facebook-groups-6cf23a596a98.

[21]*Id.*

[22]*Id.*

[23]*Id.*

[24]*Id.*

[25]Jason Green, *San Jose police officers' racist Facebook posts exposed by blogger,* S.J. Mercury News (Jun. 26, 2020) https://www.mercurynews.com/2020/06/26/san-jose-police-officers-racist-facebook-posts-exposed-by-blogger/; *see also* Paulsen, *supra*.

[26]Jesse Gary, '*I was shocked' SJPD Police Chief says after racist social media posts from officers surface,* KVTU FOX 2 (Jun. 29, 2020), https://www.ktvu.com/news/i-was-shocked-sjpd-chief-says-after-racist-social-media-posts-from-officers-surface.

posts,[27] but so far, no terminations have been reported.

170.    In 2018, a Muslim SJPD officer of Lebanese-American heritage sued the CITY OF SAN JOSÉ, alleging years of discriminatory harassment from other officers based on his race, national origin, and/or religion since September 11, 2001.[28] This officer alleged, *inter alia*, that fellow officers suggested on multiple occasions that he was a member of ISIS or a terrorist, and that when he complained, his superiors in SJPD retaliated against him, for example with a disciplinary writeup."[29]

171.    Further, it appears that CITY OF SAN JOSÉ Police Officers were unnecessarily panicked prior to the May 29, 2020 demonstration in part due to information their department passed on to them that GARCIA and other high-ranking officers should have known to be unreliable. In the days leading up to the May 29 protest, the SJPD received briefings from the Northern California Regional Intelligence Center (NCRIC) which parroted unsubstantiated secondhand reports.[30] In its After Action Report, the CITY OF SAN JOSÉ admitted that this NCRIC information "contextualize[d] the mindset of the officers in the days leading up to and throughout the civil unrest."[31] A 2012 Senate investigation of fusion centers, like NCRIC, determined that they provided intel of "uneven quality — oftentimes shoddy, rarely timely, sometimes endangering civilians' liberties and Privacy Act protections, occasionally taken from already-published sources, and more often than not unrelated to counterterrorism."[32]

**E. Defendants discriminated against demonstrators with disabilities by subjecting them to excessive force when they are unable to move due to their disability, failing to provide clear and consistent directions with an**

---

[27]*Id.*

[28]Jason Green, *'Racism problem': Muslim SJPD officer suing city, department,* Bay Area News Group (Sep. 24, 2018), https://www.mercurynews.com/2018/09/24/muslim-sjpd-officer-sues-city-department-over-racism-problem/.

[29]*Id.*

[30]Jennifer Wadsworth, *BlueLeaks Hack Suggests Bad Intel Fueled SJPD's Violent Response to Recent Protests,* San Jose Inside (Sept. 15, 2020), https://www.sanjoseinside.com/news/blueleaks-hack-suggests-bad-intel-fueled-sjpds-violent-response-to-recent-protests/.

[31]Garcia, *supra*, at 34.

[32]Permanent Subcommittee of Investigations, United States Senate, *Federal Support for and Involvement in State and Local Fusion Centers* 1 (Oct. 3, 2012), https://www.hsgac.senate.gov/imo/media/doc/10-3-2012%20PSI%20STAFF%20REPORT%20re%20FUSION%20CENTERS.2.pdf.

COMPLAINT *NAACP, et al., v. CITY OF SAN JOSÉ*                                    42

**opportunity to comply, and failing to ensure that demonstrators have a safe route of egress from protests.**

172.    Defendants routinely fail to provide reasonable accommodations for people with disabilities to equally participate in constitutionally protected free speech during demonstrations. Further, they fail to provide reasonable modifications to their orders such that a person with a disability will have the same opportunity to comply and/or escape brutal force.

173.    In a recent report, the CITY OF SAN JOSÉ was found to be the only major city within the United States to govern without an Office of Disability Affairs and the CITY OF SAN JOSÉ Police Department wholly fails to track any data regarding disability status and accommodations.[33]

174.    During each day of the Black Lives Matter demonstrations, Defendants failed to communicate orders to disperse, including instructions for doing so, warnings about imminent use of force, and declarations of unlawful assemblies. When Defendants have communicated orders, they were inaudible to most people in and near the demonstrations. The insufficient orders placed Plaintiff CARTWRIGHT and SJPJC Director Michele Mashburn at great risk of harm due to their disabilities.

175.    SJPJC Director Michele Mashburn lives with multiple disabilities and chronic health conditions that limit her daily life activities and uses an electronic wheelchair for mobility. On May 29, 2020, Ms. Mashburn left her downtown apartment to join the demonstrations using her electronic wheelchair. Ms. Mashburn intended to join her friends participating in the demonstration, but when she approached the corner of 4th and Santa Clara Streets she saw the heavy police presence and decided not to continue forward. The sheer number of police surrounding the crowd was dangerous for her, because there were no clear paths for her to maneuver her chair in the event of an emergency. Ms. Mashburn could hear indiscernible announcements from Defendants from where she observed. Being unable to decipher what the police were saying also made Ms. Mashburn weary of going into the crowd toward her friends. Instead, she sat

---

[33]Tifanny Maciel, *Juvenile Justice Involved Youth with Disabilities: An Epidemic of Misunderstanding*, 1,8 (2020).

out and watched the demonstration from the sidelines rather than being able and free to participate in the anti-brutality demonstrations.

176. When Defendants began to deploy impact munitions, Ms. Mashburn saw impact munitions fly into multiple directions around her, even on the sidelines. Ms. Mashburn could see that Defendants were not exercising any restraint with who they were shooting and how, which made things especially dangerous for Ms. Mashburn in a wheelchair. She retreated home and seldom left her apartment in the days following to even go to work, because the police presence—given their extreme violence—was too dangerous with her disability.

177. Similarly, on May 30, 2020, Plaintiff SHAUNN CARTWRIGHT tried to stay back against a wall near City Hall on 4th Street while Defendants indiscriminately deployed chemical weapons into the crowd. She could not outrun the chemicals due to her disability. Defendants aimed at Ms. Cartwright as she attempted to make herself smaller and hide, and shot her four times in quick succession with impact munitions as if she were a sitting duck. The munitions struck her knee replacement and other parts of her body.

178. In another instance, on May 29, 2020, Ms. Cartwright, who attended the protest as a legal observer, attempted to take photos of the Defendants' treatment of other demonstrators at E. Santa Clara and 7th Streets. Defendants approached her, and one DOE CITY OF SAN JOSÉ Police Officer attempted to stop Ms. Cartwright from recording by forcefully shoving her in the chest. Ms. Cartwright told the officer she had a disability, but the officer shoved her twice more anyway and almost knocked her to her feet.

179. Ms. Cartwright endured significant trauma to her body. Her leg turned purple from thigh to ankle, swelled, and the alignment of her artificial knee was affected. As a result, Ms. Cartwright had to use crutches and undergo physical therapy. Because a DOE CITY OF SAN JOSÉ Police Officer shoved Ms. Cartwright in the chest despite being warned that she had a brain condition, she had to have her neurosurgeon team check whether the wire had broken.

### F. Defendants participate in a culture that glorifies and encourages violence and discrimination.

180.    During her detention, Plaintiff SWIFT saw a group of CITY OF SAN JOSÉ Police Officers take a picture to send to their boss in order to show how much fun they were having. She also overheard the officers making jokes about George Floyd's death. CITY OF SAN JOSÉ Police Officers around the area she was detained did not wear masks, despite the fact that they were engaging with the public during a pandemic.

181.    Defendant JARED YUEN was captured on video shouting "Let's get this motherfucker" and "Shut up, bitch" to a young woman who asked him a question. Yuen appeared visibly excited and eager to shoot demonstrators. When a protestor said "Fuck you", Yuen could be seen on the video to rush forward and shoot impact munitions out of anger, and not because the use of force was necessary or reasonable. However, in response to widespread outcry over YUEN's behavior, defendant Chief GARCIA stated publicly, *inter alia*, "He's a good kid and a good cop."[34]

### G. CITY OF SAN JOSÉ officials made a number of false and misleading statements to the public and media about the May 29 – June 7, 2020, demonstrations and the actions of CITY OF SAN JOSÉ Police Officers.

182.    For example, the After Action Report the CITY released emphasizes that SJPD had received reports of violence at other demonstrations around the country in a tone that is clearly exaggerated. One demonstrably false statement in the Report is the claim that SJPD received bulletins "in the days leading up to May 29th, 2020", which stated that a Federal Security Officer at the Federal Building in Oakland was murdered during a protest and implies that this was related to the George Floyd protests.[35] (The federal security officer was killed on the evening of May 29, not prior to May 29, so SJPD could not have received such reports; moreover, federal authorities have acknowledged that the crime was committed by an individual linked to the "Boogaloo Boys" far-right white

---

[34]Robert Salonga, *Let's get this motherf—ker': San Jose officer benched after viral protest comments,* The Mercury News, May 31, 2020, https://www.mercurynews.com/2020/05/31/lets-get-this-motherf-ker-san-jose-officers-viral-protest-comments-draw-wide-condemnation/.
[35]Garcia, *supra*, at 34.

supremacist movement, and was not related to the George Floyd protests.)[36]

183.    The CITY released only three selected, edited excerpts from the SJPD body camera footage to the public, rather than releasing all of the body camera footage. In particular, the CITY withheld the body camera footage of the most serious excessive force incidents.

184.    The After Action Report also contains a highly misleading summary of the injuries sustained by protesters.[37]  This summary is based only on the few protester injuries that the police documented in their reports, plus one additional high-profile injury that was reported in the media. Since CITY OF SAN JOSÉ Police Officers failed to summon medical aid for any of the plaintiffs herein, for example, none of their injuries are included in these numbers. In fact, the report lists the number of injuries to protesters on May 29 as only nine, but the report also states that officers expended approximately 246 40mm foam baton rounds, 200 OC/pepper spray rounds, 100 37mm foam baton rounds, 2 beanbag rounds, 30 stinger grenades, 13 flashbangs, and 45 baton strikes on May 29 alone.[38] These facts show that far more than nine people, and far more than the thirteen named individual plaintiffs herein, were injured.

185.    While GARCIA accused rioters of causing "millions of dollars" in property damage, private business reported about $160,000 in vandalism and theft, and the CITY estimated only $120,000 in damages.[39] The largest cost, according to the CITY's damage estimates from May 29 to June 13, was the amount the CITY paid to deploy 816 police, seven firefighters, and four non-sworn employees.[40]

186.    Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious disregard and deliberate indifference for plaintiff's rights and safety, justifying an award of punitive damages.

187.    As a direct and proximate result of the conduct of defendants described herein,

---

[36]Maria Dinzeo, *Two Charged in Murder of Oakland Federal Officer During Protests,* Courthouse News Service (Jun. 16, 2020), https://www.courthousenews.com/two-charged-in-murder-of-oakland-federal-officer-during-protests/.
[37]Garcia, *supra*, at 119-121.
[38] *Id.* at 102-108
[39]Wadsworth, *supra*.
[40] *Id.*

plaintiffs have been denied their constitutional, statutory and legal rights as stated below, and have suffered general and special damages, including but not limited to, pain, suffering, humiliation, emotional distress, fear, anxiety, disabilities, medical and related expenses, lost wages, damage to career, and other damages in amounts according to proof.

188.    Plaintiffs have incurred, and will continue to incur, attorneys' fees and costs in amounts to be determined according to proof.

### VI. MONELL AND SUPERVISORY LIABILITY ALLEGATIONS

189.    The constitutional violations alleged herein were the proximate result of decisions, orders, acts, and omissions of the CITY OF SAN JOSÉ's authorized policymakers including but not limited to defendants LICCARDO, GARCIA, and SYKES.

190.    For LICCARDO, GARCIA and SYKES, this included the decision to declare a curfew on May 31, which was unconstitutional as further explained below, and used as a pretext to wrongfully arrest 70 people.

191.    LICCARDO, GARCIA, SYKES, and DOE City officials caused the CITY OF SAN JOSÉ Police Officers' constitutional violations complained of herein by failing to provide adequate policies, training, supervision, and command of their officers assigned to the May 29- June 7, 2020, demonstrations to stop the officers from engaging in racial and religious profiling and harassment, use of excessive force, wrongful arrests, and deprivation of First Amendment rights. This included, but is not limited to, sending inadequately trained commanders and officers to the May 29 - June 7, 2020, demonstrations. The CITY has admitted in its After Action Report approved by defendant Police Chief GARCIA and defendant City Manager SYKES that the CITY OF SAN JOSÉ Police Officers who responded to the demonstrations were inadequately trained and supervised, and that the SJPD failed to call in more experienced agencies through mutual aid.

> *Much of the Department's personnel lack experience and tenure in their rank. . . . In recent years, the Department has engaged in rapid hiring which dilutes the experience pool. Most of the Department's officers have never experienced civil unrest of this type. Crowd control training has been minimal and infrequent as mass training requires time away from already depleted patrol staffing. In some instances, commanders lacked the*

*sufficient training and experience in the implementation of the [Incident Command System] as it related to crowd control. [41]*

*. . . .*

*There were no patrol commanders in the field for the first two days, resulting in a lack of continuity in communicating mission objectives and tactical plans.[42]*

*. . . .*

*Special Operations commanders expressed concern that without patrol commanders in the field, their span of control was unmanageable….
…[A]t times, [Mobile Field Force] sergeants began making independent decisions about where to move the crowd without unity in command and full understanding of the mission. [43]*

*. . . .*

*While some command staff have received training in crowd control, few of those trained were involved on the ground during the [May-June 2020 demonstrations].[44]*

192.    Defendant GARCIA and the CITY OF SAN JOSÉ Police Department changed its policies days before the May 29, 2020, demonstration to allow use of additional chemical agent devices and allow use of impact munitions that it had previously prohibited in crowd control situations and which it acknowledges can cause serious injury or death.[45] These and other impact munitions are highly likely to cause unjustified injuries when used in crowds, but GARCIA and other CITY OF SAN JOSÉ Police supervisors failed to adequately train and supervise the officers supplied with the dangerous munitions.

193.    LICCARDO, GARCIA, SYKES and DOE City officials caused the CITY OF SAN JOSÉ Police Officers' constitutional violations complained of herein by equipping inadequately trained officers with highly dangerous impact munitions, explosive grenades and chemical weapons; approving the use of impact munitions, explosive grenades and chemical weapons at the demonstrations, which resulted in such weapons being used in

---

[41]Garcia, *supra*, at 4.
[42]*Id.* at 5.
[43]*Id.* at 47.
[44]*Id.* at 32.
[45]*Id.* at 167-168, 170-172.

an unconstitutional, indiscriminate, racially discriminatory, unnecessary, and excessive manner; failing to have adequate policies and practices for oversight of the use of such dangerous weapons; and by failing to train or have an explicit policy requiring CITY OF SAN JOSÉ Police Officers to intervene in and report excessive force by other officers when they are present and observe it.

194.    Plaintiffs further allege that the constitutional violations alleged herein were the proximate result of a repeated course of conduct by members of the SJPD tantamount to a custom, policy, pattern or repeated practice of condoning, ratifying and/or tacitly encouraging the abuse of police authority, and disregard for the constitutional rights of citizens, including the rights of the plaintiffs and class members.

195.    Plaintiffs are further informed and believe and thereon allege that the constitutional violations alleged herein were the proximate result of a custom, policy, pattern or practice of deliberate indifference by defendant CITY OF SAN JOSÉ to the repeated violations of the constitutional rights of citizens by defendant CITY OF SAN JOSÉ's Police Officers, which have included, but are not limited to, the repeated use of excessive force, racial and religious bias and profiling, and the repeated failure to properly and/or adequately train, supervise and/or discipline officers with respect to the use of excessive force, constitutional limitations on the use of force, and racial and religious bias and profiling; the repeated failure by CITY OF SAN JOSÉ's high ranking officials, police department managers and/or supervisors to hold officers accountable for violating the rights of citizens; and/or other customs, policies and/or practices subject to continuing discovery.

196.    Plaintiffs are informed and believe that defendants GARCIA, DWYER, SYKES, LOPEZ, TASSIO, and DOE defendants, and/or each of them, caused the violation of the plaintiffs' constitutional rights as a result of their supervisory malfeasance and/or deliberate indifference to the need for more or different training, supervision and/or discipline of the CITY OF SAN JOSÉ Police personnel assigned to the subject incident, including, but not limited to, defendants YUEN, CURRY, DELGADO, and the DOE defendants, and each of them, to prevent the foreseeable violation of plaintiffs' constitutional rights, as further discussed above.

# VII. CLASS ACTION ALLEGATIONS

197.    Class representative plaintiffs JOSEPH CAÑAS; LESLIE VASQUEZ; PETER ALLEN; SHAUNN CARTWRIGHT; YESSICA RILES; JOSÉ GUSTAVO FLORES RODRIGUEZ; ALEX LEE; JOSÉPH MALDONADO; CINDY CUELLAR; MAHMOUDREZA NAEMEH; AND MEGAN SWIFT seek class certification pursuant to Fed.R.Civ.P. 23(a), Fed.R.Civ.P. 23(b)(2), and Fed.R.Civ.P. 23(b)(3) to pursue claims for damages, injunctive, and declaratory relief on behalf of themselves and all persons similarly situated.

## A. CLASS DEFINITION – 23(B)(2) (INJUNCTIVE RELIEF CLASS)

198.    The injunctive relief class is defined as all persons who have in the past participated, presently are participating, or may in the future participate in, or be present at, demonstrations within the CITY OF SAN JOSÉ in the exercise of their rights of free speech, assembly, association, petition, and of the press, in general, and particularly as it relates to protesting police violence and discrimination against people of color, and observing, documenting or reporting on such protests.

## B. CLASS DEFINITIONS – 23(B)(3) (DAMAGES CLASSES)

199.    One or more of the named plaintiffs (who are indicated for each class) bring this action individually and on behalf of a proposed class of all other persons similarly situated pursuant to Fed.R.Civ.P. Rule 23(b)(1), (b)(2) and (b)(3). The damages classes are defined as:

### 1. Arrest Damages Class:

200.    All persons present at or during the aftermath of protests regarding the killing of George Floyd in the CITY OF SAN JOSÉ, between May 29 and June 4, 2020, who were arrested by CITY OF SAN JOSÉ Police Officers on suspicion of one or more of the following misdemeanors or infractions, and never convicted of a crime related to this arrest: failure to obey a curfew, failure to disperse, failure to follow a lawful order of a police officer and/or unlawful assembly. The Class Representatives for this class are MAHMOUDREZA NAEMEH, MEGAN SWIFT, ALEX LEE and SHAUNN CARTWRIGHT.

### 2. Direct Force Damages Class

201.    The direct force damages class is defined as all person who were present during the May 29 – June 7, 2020, anti-police violence/racial justice demonstrations in the general downtown San José area, who did not engage in any conduct justifying the defendants' use of force against them, and who were subjected to the use of force, including those who CITY OF SAN JOSÉ Police Officers hit with projectiles, struck with batons, or who were injured by chemical agents or grenades deployed by the CITY OF SAN JOSÉ Police at the demonstrations. The Class Representatives for this class are JOSEPH CAÑAS; LESLIE VASQUEZ; PETER ALLEN; SHAUNN CARTWRIGHT; YESSICA RILES; JOSÉ GUSTAVO FLORES RODRIGUEZ; ALEX LEE; JOSÉPH MALDONADO; CINDY CUELLAR; MAHMOUDREZA NAEMEH; AND MEGAN SWIFT.

## C. RULE 23 PREREQUISITES

### i.  Numerosity

202.    This case satisfies the prerequisites of a Rule 23 class action. The class is so numerous that joinder of all members is impracticable. The injunctive relief class consists of hundreds or even thousands of people. The direct force damages class consists of at least 50 or more people. The arrest damages class consists of 70-131 people. Plaintiffs do not know the identities of all of the class members.

### ii.      Questions of Law or Fact Prevail

203.    There are questions of law and fact common to the class, in that the named plaintiffs claim that defendants' unlawful indiscriminate use of force and threats of force at the San José demonstrations described herein, were based on San José Police Department policies and orders that were unlawful and chilled their First Amendment rights, including but not limited to unwarranted use of riot weapons including impact munitions, 'flashbang' and Stinger grenades, chemical weapons, batons, and physical violence by officers with their strikes, blows or kicks against protestors who did not pose a threat to officers, and unlawful curfews targeting protestors against racism and police violence.

204.    The questions of law and/or fact which predominate over any question affecting only individual members include, but are not limited to:

- Whether defendants improperly declared an unlawful assembly or assemblies, without justification and without adequate sound amplification and without providing directions, means, and opportunity to disperse before taking violent, injurious and potentially deadly police action;
- Whether the curfew imposed was unjustified and unconstitutional;
- Whether defendants used excessive force against the crowd, without regard to whether the individuals against whom force was used were engaged in conduct justifying such force;
- Whether defendants routinely used impact munitions and other force against demonstrators and observers even though those people were not engaging in conduct justifying such force;
- Whether the officers who used force at the events in question were properly trained in use of force standards and the proper use of the weapons they were given;
- Whether when arresting people at these demonstrations, defendants routinely subjected arrestees to prolonged detention in vehicles without all occupants being masked and without adequate ventilation for COVID-19 safety;
- Whether the length of the arrestees' detention was excessive and whether it was reasonable to transport them to distant malls to be released;
- Whether defendants were obligated to provide decontamination and medical treatment to persons impacted by their chemical weapons, impact munitions and grenades;
- Whether defendants' motivation for the unlawful assembly declarations, curfew, use of force and arrests was to deprive participants of their First Amendment rights;
- Whether defendants engaged in racial, content and viewpoint-discrimination;
- Whether the defendants failed to accommodate disabled demonstrators by not providing them adequate opportunity and ability to avoid being subjected to use of force and arrest;

- Whether these actions violated the class members' First, Fourth, and Fourteenth amendment rights and their California analogues;

- Whether these actions violated the Americans with Disabilities Act;

- Did some or all of the conduct described above constitute a policy or custom of defendant CITY OF SAN JOSÉ;

- Whether any individual defendants entitled to qualified immunity on the federal claims;

- Whether any of the conduct alleged herein violated Cal. Civil Code, § 52.1;

- Whether general class wide damages are available to the Damages Classes; and

- Whether statutory damages under § 52.1 are available to the Damages Classes.

205.    By declaring unlawful assemblies and a curfew, ordering officers to use highly dangerous weapons on the crowd at the demonstrations, failing to adequate adequately train the officers given impact munitions and other dangerous weapons at the demonstrations in the use of those weapons, failing to adequately respond to accusations of racism and Islamophobia within the SJPD and failing to adequately discipline and train officers accused of excessive force, racist and Islamophobic misconduct, allowing a culture of violence, racism and Islamophobia to exist within the SJPD, and failing to adopt policies prohibiting race, religion, national origin, and viewpoint discrimination and use of excessive force. As further described above, defendants have acted on grounds generally applicable to the class, so that injunctive and declaratory relief is appropriate respecting the class as a whole.

206.    The questions of law and fact common to the classes, which are outlined above, predominate over any questions affecting only individual members.

### iii.    Typicality

207.    The claims of the named plaintiffs are typical of the claims of the class in that the named plaintiffs and class members claim that their First Amendment rights have been chilled by the same misconduct of defendants' unlawful curfew law and related unlawful arrests, as well as the aggressive and unwarranted use of force, including batons, impact munitions, chemical agents, and grenades. Plaintiffs seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future.

208.    Thus, the named plaintiffs have the same interests and have suffered the same type of damages as the class members. The class representative plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members of each class. Each class member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by the named plaintiffs are similar in type to the actual damages suffered by each class member although the severity of those injuries may vary among class members.

209.    The class representatives will fairly and adequately protect the interests of the class because they were subject to the unlawful law enforcement conduct complained of herein, and have no interests antagonistic to the class.

### iv.    Adequate Representation

210.    The class representatives will fairly and adequately represent the common class interest. The class representatives have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the plaintiff class, and they will fairly and adequately protect the interests of the class.

211.    The class representatives are represented by counsel who are well-experienced in federal civil rights class action litigation and are familiar with the issues in this case.

212.    Counsel for the class representatives know of no conflicts among or between members of the class, the named plaintiffs, or the attorneys in this action.

### v.    Maintenance and Superiority

213.    In accordance with Fed.R.Civ.P. Rule 23(b)(1)(A), the prosecution of separate actions by individual members of the class would create a risk of inconsistent or incompatible standards of conduct for the defendants, thereby making a class action the superior method of adjudicating the controversy.

214.    In accordance with Fed.R.Civ.P. Rule 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

215.    In accordance with Fed.R.Civ.P. Rule 23(b)(2), defendants have acted on grounds

generally applicable to the class.

216.    In accordance with Fed.R.Civ.P. Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and thereon allege, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, i.e., the CITY OF SAN JOSÉ. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

217.    Plaintiffs do not know the identities of most class members. Plaintiffs are informed and believe, and thereon allege, that the identities of the arrest class members are ascertainable from SJPD records. Plaintiffs are informed and believe, and thereon allege, that a significant number of direct force class members may be reached by the use of outreach efforts by organizations that participated in organizing the affected protests.

218.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Liability can be determined on a class-wide basis. Plaintiffs are informed and believe that defendants have little or no records or evidence of any kind justifying any use of force against individual demonstrators, and that defendants' only justifications for any use of force against peaceful participants is based on facts which apply to all the peaceful participants equally.

219.    General damages can also be determined through use of subclasses.

220.    In accordance with Fed.R.Civ.P. Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all

members who can be identified through reasonable effort. Plaintiffs contemplate that individual notice be given to class members at last known address by first class mail, email, cell phone outreach, social media, and efforts of organizations that organized the protests. Plaintiffs contemplate that the notice inform class members of the following regarding their damages claims:

    a.    The pendency of the class action, and the issues common to the class;

    b.    The nature of the action;

    c.    Their right to 'opt out' of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

    d.    Their right, if they do not 'opt out,' to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named plaintiffs and their counsel; and

    e.    Their right, if they do not 'opt out,' to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

## VIII. CLAIMS FOR RELIEF

### COUNT ONE – INJUNCTIVE RELIEF
**(First, Fourth And Fourteenth Amendments, 42 U.S.C. § 1983; California Constitution Articles 1 §§ 2, 3, 7, 13; Cal. Penal Code § 835.5; Civil Code § 52.1; and Civil Code § 815.6)**

221.    Plaintiffs reallege and incorporate herein by reference the preceding paragraphs of this Complaint.

222.    The Defendants engaged in repeated, widespread violations of law, as outlined above, over the course of at least several nights, using excessive force against hundreds if not thousands of protestors in retaliation for their First Amendment activity; imposing a curfew without accommodating the right to peaceable assembly and protest; declaring unlawful assemblies without adequate sound amplification and without providing adequate notice, means and opportunity to disperse before taking aggressive police action including the use of highly dangerous PIW, chemical weapons and explosive grenades;

hitting large numbers of protestors with batons, hands, grenades and/or PIW and using chemical weapons on them all with unreasonable and excessive force; failing to provide medical aid or decontamination to persons defendants shot and/or teargassed; unlawfully arresting and detaining 70 or more people and placing detainees at great risk of exposure to COVID-19 while on buses as described above; and targeting perceived people of color for these civil rights violations.

223. The CITY, through GARCIA and the SJPD, has failed to train its officers in the constitutional responses to demonstrations as revealed by the above allegations.

224. Without intervention by this Court, the plaintiffs, including the NAACP and SJPJC and the Injunctive Relief class members, who have participated, observed or documented protest activities and wish to do so in the future, particularly related to police violence and racial justice, are at risk of having their rights violated in the future due to the defendants' demonstrated pattern of constitutional violations. The plaintiffs have no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief.

225. The Defendants have acted and refused to act on grounds generally applicable to the putative Injunctive Relief Class. Injunctive and declaratory relief for the class as a whole is appropriate.

226. Defendants' policies, practices, customs, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to the plaintiffs, including but not limited to violations of their constitutional and statutory rights. Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein. Plaintiffs intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in demonstrations, observation and documentation of demonstrations and police actions, and other expressive activities in the CITY OF SAN JOSÉ. Defendants' conduct described herein has created fear, anxiety and uncertainty among plaintiffs with respect to their exercise now and in the future of these constitutional rights.

227. Specifically, plaintiffs are concerned that if they participate in, observe or

document protest activities in the CITY OF SAN JOSÉ they will again be subjected to unreasonable and excessive force by CITY OF SAN JOSÉ Police Officers.

228.    Plaintiffs are concerned that, when engaged in protest activities, Defendants will impose curfews without accommodating or attempting to accommodate First Amendment rights; will not provide adequate notice of such curfews or in the event unlawful assemblies are declared; will not provide adequate means and opportunity to disperse; and will again employ indiscriminate, racially discriminatory, unreasonable or excessive force, injuring and terrifying protestors.

229.    Plaintiffs are also concerned that they will be wrongfully arrested and detained under conditions that increase their risk of infection with COVID-19.

230.    Plaintiffs therefore seek injunctive relief from this court to ensure that plaintiffs and persons similarly situated will not suffer violations of their rights from defendants' illegal and unconstitutional policies, customs, and practices described herein.

231.    Plaintiffs also seek injunctive relief in the form of an order requiring that defendants seal and destroy and records derived from the arrests of the Arrest Damages Class, including fingerprints, photographs, and other identification and descriptive information, and all information, and biological samples and information obtained from such biological samples collected from the Arrest Damages Class, and identify to the Arrest Damages Class all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

**COUNT TWO – DECLARATORY RELIEF**

232.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

233.    An actual controversy exists between plaintiffs and defendants in that plaintiffs contend that the policies, practices and conduct of defendants alleged herein are unlawful and unconstitutional, whereas plaintiffs are informed and believe that defendants contend that said policies, practices and conduct are lawful and constitutional. Plaintiffs therefore seek a declaration of rights with respect to this controversy pursuant to 28 U.S.C. §§ 2201-2202.

## COUNT THREE – 42 U.S.C. § 1983
## VIOLATION OF FIRST AMENDMENT RIGHTS

234.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

235.    Plaintiffs' association with the anti-police violence/racial justice demonstrations and observation and/or documentation of the police response were substantial and motivating factors for the defendants use excessive force on all of the plaintiffs, and in the case of CARTWRIGHT, LEE, SWIFT, NAEMEH and the Arrest Damages Class, arrest them. The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, chilled the plaintiffs' rights to freedom of speech, expression and association, under the First Amendment to the United States Constitution.

236.    The curfew order also violated and chilled the plaintiffs' First Amendment rights.

237.    As a result of Defendants' wrongful conduct, the named plaintiffs, Direct Force Damages Class members, and Arrest Damages class members suffered damages as alleged above.

238.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

239.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT FOUR - 42 U.S.C. § 1983
## EXCESSIVE FORCE – U.S. Const., 4th and 14th Amds.

240.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

241.    The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, violated plaintiffs' rights to be free from excessive force, under the Fourth and Fourteenth Amendments to the United States Constitution.

242.    As a result of Defendants' wrongful conduct, all of the named plaintiffs and the Direct Force Damages Class members suffered damages as alleged above.

243. As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

244. Wherefore, the plaintiffs pray for relief as hereinafter set forth.

**COUNT FIVE –42 U.S.C. § 1983**
**WRONGFUL ARREST – U.S. Const., 4th and 14th Amds.**
**(By Plaintiffs NAACP, SJPJC, CARTWRIGHT, LEE, SWIFT, NAEMEH, ARREST DAMAGES CLASS, and INJUNCTIVE RELIEF CLASS against Defendants CITY OF SAN JOSÉ, SYKES, GARCIA, DWYER, AND DOES)**

245. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

246. There was no probable cause to support the arrests of CARTWRIGHT, LEE, SWIFT, NAEMEH, and the ARREST DAMAGES CLASS. Therefore, the acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, violated plaintiffs' rights to be free from wrongful arrest, under the Fourth and Fourteenth Amendments to the United States Constitution.

247. CARTWRIGHT, LEE, SWIFT, NAEMEH, and all of the Arrest Damages Class members were arrested on suspicion of misdemeanors consisting of failure to obey a curfew, failure to disperse, failure to follow a lawful order of a police officer and/or unlawful assembly during the protests, and were placed on buses and driven to distant locations where they were released. While held on buses or otherwise detained prior to their release, Arrest Damages Class members held in enclosed vehicles with people who were not wearing masks, and the police removed masks from some of the plaintiffs and class members. This significantly increased their risk of COVID-19 exposure because, even if they had previously been similarly distanced from others during outdoor protests, the risk of exposure is significantly greater in enclosed, unventilated spaces.

248. Defendants' above-described conduct violated Arrest Class members' rights to be free from unreasonable seizures under the Fourth Amendment and under the Fourteenth Amendment's due process clause and the state constitutional analogues.

249. As a result of Defendants' wrongful conduct, Arrest Damages Class members suffered damages as alleged above.

250.     As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

251.     Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT SIX – 42 U.S.C. § 1983
## EQUAL PROTECTION – U.S. Const., 14th Amd.

252.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

253.     The named and DOE unidentified defendants subjected plaintiffs, many of whom are people of color, and all of whom were protesting anti-Black racist police violence and in support of the movement for Black lives, to excessive force and/or unlawful detention and arrest, and/or suppressed their right to freedom of speech and assembly, with discriminatory motive and intent, and racial animus toward each and every plaintiff individually and as a group, either because of their identity and/or because of what they were protesting, and therefore violated plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

254.     As a result of Defendants' wrongful conduct, all of the plaintiffs and damages class members suffered damages as alleged above.

255.     As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

256.     Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT SEVEN – 42 U.S.C. § 1982
## FREEDOM OF MOVEMENT – U.S. Const., 4th, 9th and 14th Amds.
## (By Plaintiffs NAACP, SJPJC, ALEX LEE, SHAUNN CARTWRIGHT, the INJUNCTIVE RELIEF CLASS and the ARREST DAMAGES CLASS against Defendants CITY OF SAN JOSÉ, LICCARDO, SYKES, GARCIA and DOE CITY OF SAN JOSÉ POLICE OFFICERS)

257.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

258.     The curfew order violated the plaintiffs' constitutionally protected freedom of

movement. "Citizens have a fundamental right of free movement, 'historically part of the amenities of life as we have known them.'" *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (internal citations omitted); *United States v. Wheeler*, 254 U.S. 281, 293 (1920). As discussed above, the curfew order was without lawful basis and was not narrowly tailored to serve a compelling government interest.

259.    Therefore, the acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, violated plaintiffs CARTWRIGHT, LEE, NAACP and SJPJC's members and constituents, and the ARREST DAMAGES CLASS members' rights to freedom of movement under the Fifth, Ninth and Fourteenth Amendments.

260.    As a result of Defendants' wrongful conduct, CARTWRIGHT, LEE, and the arrest damages class members suffered damages as alleged above.

261.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

262.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

**COUNT EIGHT – 42 U.S.C. § 1983**
**FAILURE TO INTERVENE**
**(By All Plaintiffs against SYKES, GARCIA, DWYER, YUEN, CURRY, DELGADO and DOES)**

263.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

264.    During the events described above, the Defendants stood by without intervening to prevent the violations of Plaintiffs' constitutional rights heretofore alleged, even though the violations occurred in plain view of numerous CITY OF SAN JOSÉ Police Officers and all of the Police Defendants had the opportunity and duty to do so.

265.    Defendants' failure to intervene was caused in part by the CITY OF SAN JOSÉ's, SYKES and GARCIA's failure to provide adequate policies and training requiring CITY OF SAN JOSÉ Police Officers to intervene in and report excessive force by other officers when they are present and observe it.

266.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

267. As a result of Defendants' wrongful conduct, all of the plaintiffs and damages class members suffered damages as alleged above.

268. As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

269. Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT NINE – 42 U.S.C. § 1983
## CONSPIRACY TO DEPRIVE PLAINTIFFS OF THEIR CONSTITUTIONAL RIGHTS

270. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

271. Count Nine is alleged against all Defendants.

272. Defendants CITY OF SAN JOSÉ, DAVID SYKES, SAM LICCARDO, EDGARDO GARCIA; JASON DWYER; JARED YUEN; SEAN MICHAEL CURRY, OFFICER FNU DELGADO, and each of the as yet unidentified DOE defendants, acted in concert with each other and conspired by concerted action to accomplish an unlawful purpose by unlawful means.

273. EDGARDO GARCIA; JASON DWYER; JARED YUEN; SEAN MICHAEL CURRY, OFFICER FNU DELGADO, and DOE CITY OF SAN JOSÉ Police Officers, and each of them, took concrete steps to enter into an agreement to unlawfully use excessive force on all Plaintiffs without notice or cause, and to detain and arrest certain Plaintiffs, knowing they lacked reasonable suspicion and/or probable cause to do so, and for the purpose of violating Plaintiffs' First, Fourth, Ninth, and Fourteenth Amendment rights.

274. Defendants CITY OF SAN JOSÉ, SYKES, and LICCARDO took concrete steps to enter into an agreement with GARCIA, DWYER, YUEN, CURRY, DELGADO and DOES to retroactively justify and cover-up GARCIA, DWYER, YUEN, CURRY,

DELGADO and DOES' unwarranted use of excessive force on all Plaintiffs and to unlawfully detain and arrest certain Plaintiffs for the purpose of violating Plaintiffs' First, Fourth, Ninth, and Fourteenth Amendment rights.

275.     In furtherance of this conspiracy, DWYER, YUEN, CURRY, DELGADO and DOES committed specific overt acts, misusing their police powers for the purpose of violating Plaintiff's rights. They accomplished this goal by using unwarranted, excessive force on all Plaintiffs, including, but not limited to, using flashbang and stinger grenades to break up lawful demonstrations, shooting at individual protestors with impact munitions at close range, and releasing teargas into lawful crowds without notice. Defendants also unlawfully arrested certain Plaintiffs knowing they lacked reasonable suspicion and/or probable cause to do so.

276.     Defendants CITY OF SAN JOSÉ, SYKES, LICCARDO and GARCIA committed additional specific overt acts, misusing their powers as high-ranking city officials for the purpose of violating Plaintiff's rights. They accomplished this goal by issuing an unconstitutional curfew order without adequate notice and directing DWYER, YUEN, CURRY, DELGADO and DOES to enforce the order against Plaintiffs. Further, they covered-up DWYER, YUEN, CURRY, DELGADO and DOES' constitutional violations of Plaintiffs' rights by knowingly issuing an After Action Report which was purposely misleading as to the number of injuries to protestors at the hands of DWYER, YUEN, CURRY, DELGADO and DOES , and falsely claiming that they were reacting to the report of a murder of a federal officer at a protest, which has since been proven to be unrelated to the protests, and more notably, had not been issued prior to Defendant CITY OF SAN JOSÉ Police Officers' violent actions.

277.     Each individual named and unknown Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant.

278.     As a direct and proximate result of the result of the Defendants' conspiracy, Plaintiffs suffered damages as alleged above.

279.     Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT TEN – 42 U.S.C. § 12131 et seq.
## VIOLATION OF TITLE II OF THE A.D.A.

280.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

281.    The Americans with Disabilities Act and its implementing regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 C.F.R. § 35.149. Title II's requirements extend to "anything a public entity does," including arrests and other law enforcement interactions. 8 C.F.R. § 35, app. B. Despite these requirements, Defendants violated the ADA and its implementing regulations in multiple ways.

282.    Defendants have an affirmative obligation to make benefits, services, and programs accessible to people with disabilities. § 35.150. "The general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities." 28 C.F.R. pt. 35, app. B. Defendants, however, have failed to make reasonable modifications that will make law enforcement's actions equally accessible to people with disabilities; indeed, their responses to protests actively deny people with disabilities their rights at protests.

283.    Title II protects people with disabilities against facially neutral policies that burden people with disabilities more than others, by requiring that the public entity provide reasonable modifications to avoid the discrimination unless the public entity can demonstrate that such modifications would result in a fundamental alteration of the program. 28 C.F.R. § 35.130(b)(7); *Crowder v. Kitagaw*, 81 F. 3d 1480 (9th Cir. 1996).

284.    Defendants' use of teargas, pepper balls, and other chemical irritants poses a significant risk of harm or death for people with respiratory and inflammatory conditions.

285.    The lack of clear egress routes for dispersal, and barriers to egress erected by Defendants, violate the rights of people with disabilities who are forced to risk stampedes and trampling from other protesters, law enforcement force, and other grievous harm.

286.    The lack of clear and consistent directions likewise puts Plaintiffs, including those with mobility impairments, at significant risk of harm, arrest, and violence.

287.    Defendants subjected Plaintiff SHAUNN CARTWRIGHT to use of force and arrest because they mistake Plaintiffs' inaction, delayed action, or slowed action in response to orders to disperse and other commands as a refusal to comply.

288.    Further, Defendants' crowd management directives and other measures constitute programs and/or activities under the ADA. By failing to establish crowd management measures that permit protesters with disabilities an opportunity to avoid harm by police, Defendants have denied those people with disabilities meaningful access to their crowd management program/activity.

289.    Pursuant to 42 U.S.C § 12133, Plaintiffs are entitled to declaratory and injunctive relief as well as damages and reasonable attorneys' fees and costs.

**COUNT ELEVEN – 29 U.S.C. §§ 794 et seq.**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**
**(Against All Defendants)**

290.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

291.    Section 504 of the Rehabilitation Act ("Section 504") and its implementing regulations provide that "[N]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . ." 29 U.S.C. § 794. Defendants violate Section 504 in multiple ways. A "program or activity" means "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government, or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 29 U.S.C. 794(b)(1)(A), (B).

292.    Section 504 regulations prohibit discrimination by a recipient of federal funds by denying a qualified person with a disability the opportunity to participate in or benefit from the aid, benefit, or service. 34 C.F.R. § 104.4(1)(i).

293.    Section 504 regulations prohibit discrimination by a recipient of federal funds by affording a qualified person with a disability an opportunity to participate in and benefit from the aid, benefit, or service that is not equal to that afforded others. 34 C.F.R. § 104.4.(1)(ii).

294.    Section 504 regulations prohibit discrimination by a recipient of federal funds by affording a qualified person with a disability an opportunity to participate in and benefit from the aid, benefit, or service that is not as effective as that provided others. 34 C.F.R. § 104.4.(1)(iii).

295.    Section 504 regulations prohibit discrimination by a recipient of federal funds by "providing significant assistance to an agency, organization, or person that discriminates on the basis of [disability] in providing any aid, benefit, or service to beneficiaries of the recipients' program or activity." 34 C.F.R. § 104.4(1)(v).

296.    Section 504 regulations prohibit discrimination by a recipient of federal funds by utilizing "criteria or methods of administration that have the effect of subjecting qualified [persons with disabilities] to discrimination on the basis of [disability]." 34 C.F.R. § 104.4(4).

297.    Section 504 regulations require that recipients of federal financial assistance "shall take appropriate steps to ensure that communications with their . . . beneficiaries are available to persons with impaired vision and hearing." 28 C.F.R. § 41.51(e).

298.    Plaintiffs are otherwise qualified to participate in the services, programs, or activities that are provided to individuals by Defendants. 29 U.S.C. § 794(b).

299.    Defendants all receive federal financial assistance.

300.    Through the acts and omissions described above, Defendants and their agents and employees have and continue to violate the Rehabilitation Act and the regulations promulgated thereunder by excluding Plaintiffs from participation in, denying Plaintiffs the benefits of, and subjecting Plaintiffs based solely by reason of their disability to, discrimination in Defendants' services and activities in managing and regulating protests in San Jose.

301.    Defendants' use of teargas, pepper balls, and other chemical irritants poses a significant risk of harm or death for people with respiratory and inflammatory conditions.

302. The lack of clear egress routes for dispersal, and barriers to egress erected by Defendants, violate the rights of people with disabilities who are forced to risk stampedes and trampling from other protesters, law enforcement force, and other grievous harm.

303. The lack of clear and consistent directions likewise puts Plaintiffs, including those with mobility impairments, at significant risk of harm, arrest, and violence.

304. Defendants subjected Plaintiff SHAUNN CARTWRIGHT to use of force and arrest because they mistake Plaintiffs' inaction, delayed action, or slowed action in response to orders to disperse and other commands as a refusal to comply.

305. Further, Defendants' crowd management directives and other measures constitute programs and/or activities under the Rehabilitation Act. By failing to establish crowd management measures that permit protesters with disabilities an opportunity to avoid harm by police, Defendants have denied those people with disabilities meaningful access to their crowd management program/activity.

306. As set forth above, Defendants have failed to satisfy their affirmative obligation to provide reasonable modifications and auxiliary aids and services that provide equal access, with or without a specific request from a person with a disability.

307. Defendants' failure to provide reasonable modifications was with deliberate indifference and reckless disregard to the rights of Plaintiffs.

308. Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to declaratory and injunctive relief as well as damages and reasonable attorneys' fees and costs.

### COUNT TWELVE – Cal. Civ. Code, § 52.1
### VIOLATION OF THE CALIFORNIA BANE ACT

309. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

310. The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, constituted interference, and attempted interference, by threats, intimidation and coercion, with plaintiffs' peaceable exercise and enjoyment of rights secured by the Constitution and laws of the United States and the State of California, in violation of California Civil Code § 52.1.

311.    As a result of Defendants' wrongful conduct, all of the plaintiffs and damages class members suffered damages as alleged above.

312.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

313.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

### COUNT THIRTEEN – Cal. Civ. Code, § 51.7
### VIOLATION OF THE CALIFORNIA RALPH ACT

314.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

315.    Plaintiffs are informed and believe bias against Plaintiffs' perceived political affiliation with the protest against police violence and police racism, and bias against plaintiffs' perceived race, national origin, and/or religion, were motivating reasons for the defendants' above-described misconduct toward them.

316.    Defendants' above-described conduct violated plaintiffs' rights to be free from violence and intimidation by threat of violence because of their actual or perceived political affiliation and/or viewpoint, in violation of California Civil Code § 51.7.

317.    As a result of Defendants' wrongful conduct, all of the plaintiffs and damages class members suffered damages as alleged above.

318.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

319.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

### COUNT FOURTEEN – ASSAULT AND BATTERY

320.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

321.    Defendants committed assault and battery on each of the plaintiffs, by shooting them with PIW, hitting, shoving, using chemical weapons and other force on them.

322.    Said acts by defendants and/or each of them were unreasonable and excessive uses

of force.

323.    Plaintiffs did not consent to the use of force against them and were injured thereby.

324.    As a result of Defendants' wrongful conduct, all of the plaintiffs and damages class members suffered damages as alleged above.

325.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

326.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

**COUNT FIFTEEN – FALSE ARREST AND FALSE IMPRISONMENT**
**(By PLAINTIFFS NAACP, SJPJC, CARTWRIGHT, LEE, SWIFT, NAEMEH, ARREST DAMAGES CLASS, and INJUNCTIVE RELIEF CLASS AGAINST CITY OF SAN JOSÉ, SYKES, GARCIA, DWYER, AND DOES)**

327.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

328.    Plaintiffs CARTWRIGHT, LEE, SWIFT, NAEMEH, NAACP and SJPJC members and constituents, and the ARREST DAMAGES CLASS were arrested without reasonable suspicion and without probable cause to believe that they had committed any crime.

329.    Said plaintiffs were detained for an unreasonable length of time under unsafe conditions as heretofore alleged.

330.    As a result of Defendants' wrongful conduct, CARTWRIGHT, LEE, SWIFT, NAEMEH, and the arrest damages class members suffered damages as alleged above.

331.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Injunctive Relief Class is entitled to relief from the potential that such violations will recur.

332.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

**COUNT SIXTEEN – NEGLIGENCE**

333.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

334.    Defendants, and/or each of them, individually and/or while acting in concert with one another, owed plaintiffs the duty to use reasonable care to avoid causing foreseeable injury and damage to plaintiffs during the events described in this Complaint. The above-described acts and omissions of defendants breached the duty of care defendants owed to plaintiffs.

335.    In doing the acts and/or omissions as alleged herein, Defendants and/or each of them, breached said duty to use reasonable care and said breach of duty caused, and/or contributed to the cause, of Plaintiffs' injuries and damages as alleged in this Complaint.

336.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## IX. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment against defendants as follows:

1.    For an order certifying the classes defined herein pursuant to Fed.R.Civ.P. 23(b)(2) and (b)(3);

2.    For preliminary and permanent injunctive relief restraining defendants from engaging in the unlawful and unconstitutional actions complained of above;

3.    For a declaratory judgment that defendants' conduct complained of herein violated Plaintiffs' rights under the Constitution and laws of the United States and California;

4.    For past, present, and future general damages for the named individual plaintiffs, Direct Force Damages Class and Arrest Damages Class members, including but not limited to, pain, suffering, permanent disfigurement and/or emotional distress to be determined according to proof;

5.    For past, present and future special damages for the named individual plaintiffs and Direct Force Damages Class and Arrest Damages Class members, including, but not limited to, medical expenses, lost wages, damage to career and/or other out of pocket losses to be determined according to proof;

6.    For punitive damages against the individual defendants and/or each of them, for the named individual plaintiffs, Direct Force Damages Class and Arrest Damages Class members, to be determined according to proof;

7.    For statutory damages and exemplary damages pursuant to Cal. Civil Code §§ 52 and

52.1, to be determined according to proof, and for a $25,000 civil penalty per violation pursuant to Cal. Civil Code § 52, for the named individual plaintiffs, Direct Force Damages Class and Arrest Damages Class members;

8. For pre- and post-judgment interest as permitted by law;

9. For attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52 and 52.1, and/or other authorities, to be determined according to proof;

10. For costs of suit;

11. For such other and further relief as the Court may deem just and proper.

## X. CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

## XI. JURY TRIAL DEMAND

Plaintiffs demand a jury trial.

Dated: March 11, 2021

Respectfully submitted,

/S/
By: Rachel Lederman
ALEXSIS C. BEACH & RACHEL LEDERMAN, Attorneys

LAWYERS COMMITTEE FOR CIVIL RIGHTS
Tifanei Ressl-Moyer

LAW OFFICES OF JAMES B. CHANIN
James B. Chanin

FLYNN LAW OFFICE
R. Michael Flynn

Attorneys for plaintiffs NAACP et al.