1  NORA FRIMANN, City Attorney (93249)
   ARDELL JOHNSON, Assistant City Attorney (95340)
2  YUE-HAN CHOW, Senior Deputy City Attorney (268266)
   MATTHEW PRITCHARD, Senior Deputy City Attorney (284118)
3  Office of the City Attorney
   200 East Santa Clara Street, 16th Floor
4  San José, California 95113-1905
   Telephone Number: (408) 535-1900
5  Facsimile Number: (408) 998-3131
   E-Mail Address:  cao.main@sanjoseca.gov

6

7  Attorneys for Defendants

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11

12 NAACP OF SAN JOSE/SILICON VALLEY,          Case Number:  21-cv-01705-PJH
   et al.
13                                            **DEFENDANT CITY OF SAN JOSE'S**
14              Plaintiffs,                   **NOTICE OF MOTION AND MOTION**
                                              **TO DISMISS**
15       v.

16 CITY OF SAN JOSE, et al.                   Date: August 12, 2021
17                                            Time: 1:30 p.m.
                                              Courtroom:  3, 3rd Floor
18              Defendants.                   Judge: Hon. Phyllis J. Hamilton

19

20

21           <u>**NOTICE OF MOTION AND MOTION TO DISMISS**</u>

22       Please take notice that on or before August 12, 2021 at 1:30 p.m. in the above courtroom,

23 Defendants will and hereby do move to dismiss Plaintiffs' complaint.

24       Defendants bring this motion under Federal Rule of Civil Procedure 12(b)(6).

25

26

27

28

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Background ............................................................................................................... 1

Argument .................................................................................................................. 2

    I.   Plaintiffs do not allege the violation of a clearly established First Amendment right .............. 3

    II.  Plaintiffs do not allege the violation of a clearly established Fourth Amendment right ............................................................................................... 7

        A.  Plaintiffs do not state a clearly established excessive force claim .............................. 7

        B.  Plaintiffs do not state a clearly established wrongful arrest claim.............................. 11

    III.  Plaintiffs do not allege the violation of a clearly established equal protection right ............ 13

    IV.  Plaintiffs do not allege the violation of a clearly established right to freedom of movement.................................................................................................. 16

    V.   Plaintiffs do not state a clearly established violation based on a failure to intervene.......... 17

    VI.  Plaintiffs do not state a clearly established conspiracy claim ................................. 18

    VII. Plaintiffs fail to state a claim for municipal liability against the City of San Jose................................................................................................. 20

    VIII. Plaintiffs fail to state a claim under the ADA or RA ........................................ 23

    IX.   Plaintiffs fail to state a claim under California state law......................................... 25

Conclusion ............................................................................................................... 25

DEFENDANTS' MOTION TO DISMISS                                21-cv-01705-PJH

1825479_2

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Arteaga v. City of Oakley*,
No. 19-CV-05725, 2020 WL 511876 (N.D. Cal. Jan. 31, 2020) ...................................................... 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................... passim

*Bd. of Trustees of Univ. of Alabama v. Garrett*,
531 U.S. 356 (2001) ...................................................................................................... 24

*Blackmore v. City of Phoenix*,
126 F. App'x 778 (9th Cir. 2005) ...................................................................................... 16

*Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*,
727 F.3d 917 (9th Cir. 2013) ........................................................................................... 12

*Brendlin v. California*,
551 U.S. 249 (2007) ........................................................................................................ 7

*Brower v. County of Inyo*,
489 U.S. 593 (1989) ........................................................................................................ 7

*Buck v. City of Albuquerque*,
No. CV 04-1000, 2007 WL 9734037 (D.N.M. Apr. 11, 2007) ...................................................... 7, 9

*Burdett v. Reynoso*,
No. C-06-00720, 2007 WL 2429426 .................................................................................. 12

*Burgess v. Carmichael*,
37 F. App'x 288 (9th Cir. 2002) ....................................................................................... 24

*Burns v. Cty. of King*,
883 F.2d 819 (9th Cir. 1989) ........................................................................................... 18

*Campbell v. Feld Entm't, Inc.*,
75 F.Supp.3d 1193 (N.D. Cal. 2014) .................................................................................. 25

*Cangress v. City of Los Angeles*,
No. 14-cv-1743, 2016 WL 5946878 (C.D. Cal. Mar. 22, 2016) ................................................... 3, 16

ii

*Chadam v. Palo Alto Unified Sch. Dist.*,
  No. 13cv4129, 2014 WL 325323 (N.D. Cal. Jan. 29, 2014) ................................................ 24

*Chavez v. United States*,
  683 F.3d 1102 (9th Cir.2012) ........................................................................................ 12, 20

*Chuman v. Wright*,
  76 F.3d 292 (9th Cir. 1996) ........................................................................................... 16, 19

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ............................................................................................................ 24

*City of Canton v. Harris*,
  489 U.S. 378 (1989) ...................................................................................................... 21, 22

*Coles v. City of Oakland*,
  No. C03-2961, 2005 WL 8177790 (N.D. Cal. Apr. 27, 2005) ............................................. 8

*Connick v. Thompson*,
  563 U.S. 51 (2011) ........................................................................................................ 21, 22

*Conservation Force v. Salazar*,
  646 F.3d 1240 (9th Cir. 2011) ............................................................................................. 2

*Conway v. Cty. of Tuolumne*,
  231 Cal. App. 4th 1005 (Cal. Ct. App. 2014) ................................................................... 25

*Cox v. Ashcroft*,
  603 F. Supp. 2d 1261 (E.D. Cal. 2009) ............................................................................. 18

*Cunningham v. Gates*,
  229 F.3d 1271 (9th Cir. 2000) ...................................................................................... 17, 18

*D.C. v. Wesby*,
  138 S. Ct. 577 (2018) ......................................................................................................... 17

*Daly v. Harris*,
  215 F. Supp. 2d 1098 (D. Haw. 2002) .............................................................................. 17

*Davis v. Powell*,
  901 F. Supp. 2d 1196 (S.D. Cal. 2012) ............................................................................. 18

iii

*Delphix Corp. v. Actifo*, Inc.,
No. 13cv4613, 2014 WL 4628490 (N.D. Cal. Mar. 19, 2014)........................................ 14

*Ellins v. City of Sierra Madre*,
710 F.3d 1049 (9th Cir. 2013)........................................................................................ 4

*Felarca v. Birgeneau*,
891 F.3d 809 (9th Cir. 2018)........................................................................................ 10

*Ford v. City of Yakima*,
706 F.3d 1188 (9th Cir. 2013)........................................................................................ 3

*Gause v. City of Philadelphia*,
No. A00-1052, 2001 WL 1251215 (E.D. Pa. Sept. 27, 2001)........................................ 9

*Gillette v. Delmore*,
979 F.2d 1342 (9th Cir. 1992)...................................................................................... 22

*Gilmore v. Superior Ct.*,
230 Cal. App. 3d 416 (Ct. App. 1991) .......................................................................... 25

*Glover v. D.C.*,
250 A.2d 556 (D.C. Ct. App. 1969) .............................................................................. 17

*Hall v. City of Walnut Creek*,
No. C 19-05716, 2020 WL 408989 (N.D. Cal. Jan. 24, 2020)................................ 23, 24

*Hernandez v. City of San Jose*,
No. 16-CV-03957-LHK, 2016 WL 5944095 (N.D. Cal. Oct. 13, 2016) ........................ 16

*Hui Jie Jin v. Alameda Cty.*,
No. 18-CV-04885, 2019 WL 7831143 (N.D. Cal. Feb. 4, 2019)............................. 23, 24

*Hutchins v. District of Columbia*,
188 F.3d 531 (D.C. Cir 1999) ...................................................................................... 17

*Ibrahim v. Dep't of Homeland Sec.*,
No. 06cv00545, 2009 WL 2246194 (N.D. Cal. July 27, 2009)...................................... 14

*J.P. v. City of Porterville*,
801 F. Supp. 2d 965 (E.D. Cal. 2011) .......................................................................... 25

iv

*Jackson-Moeser v. Armstrong*,
   765 F. App'x 299 (9th Cir. 2019).................................................................................... 7, 8

*Jones v. Williams*,
   297 F.3d 930 (9th Cir. 2002) ........................................................................................... 16

*Juricich v. Cty. of San Mateo*,
   No. 19-CV-06413, 2020 WL 619840 (N.D. Cal. Feb. 10, 2020)................................. 23, 24

*Karim-Panahi v. Los Angeles Police Dep't*,
   839 F.2d 621 (9th Cir. 1988) ........................................................................................... 18

*Keyes v. Washington County*,
   No. 3:15-CV-1987, 2017 WL 3446256 (D. Or. Aug. 10, 2017) .......................................... 9

*Lacey v. Maricopa County*,
   693 F.3d 896 (9th Cir. 2012) ............................................................................................. 3

*Lightbourn v. Cty. of El Paso*,
   118 F.3d 421 (5th Cir. 1997) ........................................................................................... 25

*Lozano v. Cty. of Santa Clara*,
   No. 19-CV-02634, 2019 WL 6841215 (N.D. Cal. Dec. 16, 2019) ................................... 20

*Luchtel v. Hagemann*,
   623 F.3d 975 (9th Cir. 2010) ........................................................................................... 10

*Lyons v. City of Seattle*,
   214 F. App'x 655 (9th Cir. 2006) ..................................................................................... 11

*Marbet v. City of Portland*,
   No. CV 02-1448, 2003 WL 23540258 (D. Or. Sept. 8, 2003) ........................................ 8, 9

*Marks v. Santa Rosa City,*
   *Schs.*, 748 F. App'x 159 (9th Cir. 2019) ......................................................................... 14

*Mattos v. Agarano*,
   661 F.3d 433 (9th Cir. 2011) ..................................................................................... 11, 12

*McCleskey v. Kemp*,
   481 U.S. 279 (1987) ........................................................................................................ 15

*McCoy v. Harrison*,
    341 F.3d 600 (7th Cir. 2003) ................................................................................. 9

*Mendocino Environmental Center v. Mendocino County*,
    192 F.3d 1283 (9th 1999) ..................................................................................... 18

*Menotti v. City of Seattle*,
    409 F.3d 1113 (9th Cir. 2005) ............................................................................ 5, 6

*Molina v. City of St. Louis*,
    No. 4:17-CV-2498, 2021 WL 1222432 (E.D. Mo. Mar. 31, 2021) ............................. 9, 10

*Monell v. Dep't of Soc. Servs. of City of New York*,
    436 U.S. 658 (1978) ......................................................................................... 20, 21

*Moss v. U.S. Secret Serv.*,
    572 F.3d 962 (9th Cir. 2009) ................................................................................. 3

*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012) ............................................................................... 8, 9

*Nunez v. City of San Diego*,
    114 F.3d 935 (9th Cir. 1997) ................................................................................. 16

*O'Toole v. Superior Court*,
    140 Cal.App.4th 488 (2006) ................................................................................. 11

*Pahls v. Thomas*,
    718 F.3d 1210 (10th Cir. 2013) ............................................................................ 16

*Papachristou v. City of Jacksonville*,
    405 U.S. 156 (1972) ........................................................................................... 17

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986) ........................................................................................... 20

*Penaloza v. City of Rialto*,
    836 F. App'x 547 (9th Cir. 2020) ........................................................................... 18

*Pollard v. White*,
    119 F.3d 1430 (9th Cir. 1997) ................................................................................. 1

*Quraishi v. St. Charles County*,
　986 F.3d 831 (8th Cir. 2021).................................................................................. 7, 8

*Recinto v. U.S. Dep't of Veterans*,
　*Affs.*, 706 F.3d 1171 (9th Cir. 2013)........................................................................ 14

*Reese v. County of Sacramento*,
　888 F.3d 1030 (9th Cir. 2018).................................................................................. 25

*Rosenbaum v. City & Cty. of San Francisco*,
　484 F.3d 1142 (9th Cir. 2007).......................................................................... 13, 14

*Rosenbaum v. Washoe County*,
　663 F.3d 1071 (9th Cir. 2011).................................................................................. 11

*Sharer v. Oregon*,
　581 F.3d 1176 (9th Cir. 2009).................................................................................. 25

*Sharp v. Cty. of Orange*,
　871 F.3d 901 (9th Cir. 2017)................................................................................. 8, 17

*Sheehan v. City & Cty. of San Francisco*,
　743 F.3d 1211 (9th Cir. 2014).................................................................................. 24

*Slocum v. Palinkas*,
　50 F. App'x 300 (6th Cir. 2002)................................................................................. 9

*Sorgen v. City & Cty. of San Francisco*,
　No. C 05-03172, 2006 WL 2583683 (N.D. Cal. Sept. 7, 2006)........................ 10

*Talk of the Town v. Dep't of Fin. & Bus. Servs.*,
　343 F.3d 1063 (9th Cir. 2003).................................................................................... 4

*Tennessee v. Garner*,
　471 U.S. 1 (1985) ......................................................................................................... 7

*Thompson v. Rahr*,
　885 F.3d 582 (9th Cir 2018)........................................................................................ 3

*Thornton v. City of St. Helens*,
　425 F.3d 1158 (9th Cir. 2005).................................................................................. 13

vii

*Torres v. Madrid*,
141 S. Ct. 989 (2021) ............................................................................ 7, 9

*Trevino v. Gates*,
99 F.3d 911 (9th Cir. 1996) ........................................................................ 23

*United States v. Chalk*,
441 F.2d 1277 (4th Cir. 1971) .................................................................... 17

*United States v. Redondo-Lemos*,
27 F.3d 439 (9th Cir. 1994) ........................................................................ 15

*Vinson v. Thomas*,
288 F.3d 1145 (9th Cir. 2002) .................................................................... 24

*Vos v. City of Newport Beach*,
892 F.3d 1024 (9th Cir. 2018) .................................................................... 24

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .................................................................................... 5

*White v. Pauly*,
137 S. Ct. 548 (2017) ............................................................................. 8, 10

*Wood v. Moss*,
572 U.S. 744 (2014) .................................................................................... 3

*Wood v. Yordy*,
753 F.3d 899 (9th Cir. 2014) ....................................................................... 4

*Zukle v. Regents of Univ. of California*,
166 F.3d 1041 (9th Cir. 1999) .................................................................... 23

**Constitution**

U.S. Const. amend IV .................................................................................. 7

**Statutes**

29 U.S.C. §§ 794 ..................................................................................... 2, 23

42 U.S.C. § 1983 ....................................................................................... 2, 3

42 U.S.C. § 12132 ................................................................................................ 23

42 U.S.C. §§ 12131 ................................................................................................. 2

Cal. Civ. Code § 51.7 ............................................................................................. 2

Cal. Civ. Code § 52 ................................................................................................ 2

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ................................................... passim

**Other Authorities**

Restatement 2d of Torts § 141 (1965) ................................................................ 25

**Introduction**

May of 2020 saw protests on an unprecedented scale throughout the United States.  The City of San Jose was no exception.  As in other cities, protests in San Jose involved both violent and non-violent elements.  The City saw businesses vandalized and looted, government buildings destroyed, and police officers assaulted.  Amid this chaos, the City of San Jose declared a state of emergency, pursuant to which it imposed a limited nighttime curfew.  The City's police officers also deployed to the area of protests to restore order.  These officers formed lines, ordered the crowd to disperse, and ultimately used force to effect dispersal.  This suit challenges the lawfulness of the City's response.  Advancing no fewer than fourteen different legal theories, see *Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir. 1997) (disapproving practice of "throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court"), Plaintiffs claim that the nighttime curfew and police uses of force violated the Constitution and state law.  On the facts alleged, they did not.  The majority of Plaintiffs' claims rely on the theory that San Jose police officers harbored discriminatory animus against them, but no fact in the complaint substantiates that outlandish assertion.  The remainder of Plaintiffs' theories depend on inapplicable legal principles and are not cognizable.  Plaintiffs thus fail to state a claim, and the individually named defendants are entitled to qualified immunity as a matter of law.  Defendants respectfully request that the Court dismiss the complaint.  Fed. R. Civ. P. 12(b)(6).

**Background**

According to the factual allegations of Plaintiffs' complaint, each of Plaintiffs variously participated in protests taking place near San Jose City Hall on May 29, 30, and 31, 2020.  The protests involved both peaceful and violent demonstrators.  Compl. ¶ 4.  Plaintiffs deny that any of them engaged in violence, though police officers reported frozen bottles being thrown at them as weapons, as well as vandalism and looting that caused hundreds of thousands of dollars worth of property damage. *Id.* ¶¶ 107, 185.  Officers with the San Jose Police Department ("SJPD") formed skirmish lines and then used force while attempting to disperse the crowd of protesters.  The officers' force included the use of batons to "jab" members of the crowd, as well as impact munitions, teargas, and other projectile devices.  *Id.* ¶ 53.  Some Plaintiffs were injured as a result of these crowd-control efforts.  Although officers issued dispersal orders, Plaintiffs allege they did not hear them clearly or at all before the

1   officers used force to effect dispersal.  *Id.* ¶ 67.  On May 31, San Jose City Manager David Sykes

2   declared a state of emergency and imposed a citywide 8:30 p.m.–5:30 p.m. curfew that applied to all

3   persons in the City.  *Id.* ¶¶ 111, 118; Request for Judicial Notice and Incorporation by Reference

4   ("RFJN"), Ex. A.  Some of Plaintiffs were arrested for violating the curfew.  *Id.* ¶ 118.

5       Following the protests, SJPD issued an After Action Report ("AAR").  *Id.* ¶ 171; RFJN, Ex. B.

6   The AAR documented the events of the protests and made recommendations for the future.  *See* RFJN,

7   Ex. B.  The AAR reported that the first several days of protest were chaotic and violent.  *Id.*  Members

8   of the protest crowd destroyed property, assaulted police officers, and disrupted traffic.  *Id.*  The AAR

9   concluded that the police response did not fully control these chaotic events in a way that satisfied the

10  broader community, and it therefore recommended that police officers' previously "minimal and

11  infrequent" crowd-control training be increased.  *Id.*

12                                  <u>**Argument**</u>

13      Plaintiffs allege fourteen substantive claims.  The first seven are under 42 U.S.C. § 1983 and

14  allege the following violations: (1) the First Amendment; (2) the Fourth Amendment for "excessive

15  force"; (3)  the Fourth Amendment for "wrongful arrest"; (4) the Equal Protection Clause; (5) the

16  "freedom of movement" under the Fourth, Ninth, and Fourteenth Amendments; (6) a "failure to

17  intervene"; and (7) conspiracy.  Compl. ¶¶ 234-279.  Plaintiffs further allege violations based on (8) the

18  Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*; (9) the Rehabilitation Act

19  ("RA") 29 U.S.C. §§ 794 *et seq.*; (10) the California Bane Act, Cal. Civ. Code § 52; (11) the California

20  Ralph Act, Cal. Civ. Code § 51.7; (12) assault and battery; (13) false arrest; and (14) negligence.

21  Compl. ¶¶ 280-336.

22      To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint

23  must plead "sufficient facts 'to state a facially plausible claim to relief.'"  *Conservation Force v.*

24  *Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011).  "A claim has facial plausibility when the plaintiff pleads

25  factual content that allows the court to draw the reasonable inference that the defendant is liable for the

26  misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Dismissal under Rule 12(b)(6) "is

27  proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a

28  cognizable legal theory."  *Conservation Force*, 646 F.3d at 1242 (internal quotations omitted). Because

1    Plaintiffs bring their § 1983 claims against government officials in their individual capacities, Plaintiffs

2    must overcome the defense of qualified immunity.  The qualified immunity analysis "involves two

3    distinct steps."  *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir 2018).  The court first determines

4    whether the facts alleged "show that 'the [alleged] conduct violated a constitutional right.'"  *Id.*  The

5    court then asks "whether 'the right was clearly established' at the time of the alleged violation."  *Id.*;

6    *see also Wood v. Moss*, 572 U.S. 744, 757 (2014) (requiring a plaintiff to allege facts establishing the

7    violation of a clearly established right to overcome a Rule 12(b)(6) motion to dismiss).

8    **I.      Plaintiffs do not allege the violation of a clearly established First Amendment right**

9            Plaintiffs allege their First Amendment claim against unnamed individual police officers and

10   the City of San Jose.  As can best be determined, Plaintiffs advance two First Amendment theories:

11   (1) invidious viewpoint discrimination, based on the argument that San Jose police officers used force

12   against them because of their participation in the protests; and (2) suppression of speech, based on the

13   City's nighttime curfew order.  Compl. ¶¶ 235-36.  Neither theory has merit.

14           As to the first, "[w]here the claim is invidious discrimination in contravention of the First and

15   Fourteenth Amendments . . . the plaintiff must plead and prove that the defendant acted with a

16   discriminatory purpose."  *See Iqbal*, 556 U.S. at 676.  Thus, Plaintiffs must allege facts plausibly

17   establishing that each of the named SJPD officers intentionally and unlawfully targeted Plaintiffs based

18   on their political affiliation or expression, and that deterring such expression "was a but-for cause of

19   [the alleged] unlawful conduct."  *Cangress v. City of Los Angeles*, No. 14-cv-1743, 2016 WL 5946878,

20   at *5 (C.D. Cal. Mar. 22, 2016) (citing *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013));

21   *see also Lacey v. Maricopa County*, 693 F.3d 896, 916 (9th Cir. 2012).  Plaintiffs allege no such facts.

22           Plaintiffs' assertion that officers arrested or used force against several individuals at the protests

23   based on their "association with" or participation in the protest (Compl. ¶ 235) is sheer speculation.

24   *See Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) ("The bald allegation of impermissible

25   motive on the [defendant-official's] part, standing alone, is conclusory . . . .").  Plaintiffs do not allege

26   that any police officer who arrested or used force against a protester made remarks to suggest hostility

27   toward Plaintiffs' views or affiliation while doing so.  Nor do they allege that officers permitted one

28   viewpoint while suppressing others, or targeted protesters but left counter-protesters alone.  Plaintiffs

allege only that they were at a protest and that officers used force against them during crowd-control efforts and made curfew arrests. That does not plausibly establish viewpoint discrimination, especially given the "obvious alternative explanation for" the police actions. *Iqbal*, 556 U.S. at 682 ("As between the obvious alternative explanation for the arrests . . . and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion."). Plaintiffs' speculative assertion of retaliatory animus is insufficient to state a claim. *See Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014) ("[M]ere speculation that defendants acted out of retaliation is not sufficient").

As to Plaintiff's curfew theory, it is unclear against whom they allege liability. Plaintiffs name City Manager David Sykes, Mayor Sam Liccardo, and Chief of Police Edgardo Garcia as the officials responsible for the curfew, but as a matter of law, only the City Manager had authority to impose the curfew at issue. Like many municipalities in California, San Jose's City Charter creates a "'city manager' form of governance'" in which all executive power in the City resides in the City Manager. *See Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013); SAN JOSE, CAL., CITY CHARTER § 701 ("The City Manager shall be the chief administrative officer of the City.").[1] The City Manager's actions neither require nor can be affected by the "approval" of the Mayor, who is simply the "eleventh member" of the City Council, *id.* §§ 500–501, or of the Chief of Police, who is a subordinate department official, *id.* § 801 (providing that any City department head is "subject to the direction and supervision of the City Manager"). This includes the power to declare and implement emergency measures, such as curfews. SAN JOSE, CAL., MUN. CODE §§ 8.08.200-250. Because no person outside the City Manager could have had anything to do with the allege curfew, Plaintiffs' claim against any other City official fails at the outset.

Regardless, the City's nighttime curfew did not violate the First Amendment. Plaintiffs do not allege that the curfew order regulated speech. It was, rather, a speech-neutral restriction on particular conduct, i.e., physical presence on City streets during the specified nighttime hours. The government's enforcement of such "a generally applicable law does not trigger First Amendment scrutiny, even where the sanction results in a burden on expression." *Talk of the Town v. Dep't of Fin. & Bus. Servs.*,

---

[1] The San Jose City Charter is available at https://www.sanjoseca.gov/your-government/departments/city-clerk/city-charter. The City's municipal code is available at https://library.municode.com/ca/san_jose/codes/code_of_ordinances.

DEFENDANTS' MOTION TO DISMISS

1    343 F.3d 1063, 1069 (9th Cir. 2003).  Even if it did, such a content-neutral regulation would at most be

2    subject to the intermediate scrutiny of "time, place, and manner" restrictions, which are constitutional

3    so long as they are "narrowly tailored to serve a significant governmental interest [and] leave open

4    ample alternative channels for communication."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791

5    (1989).  The City's nighttime curfew easily passes that test.

6           First, the City had a strong interest in restoring order amid the chaos, property destruction, and

7    assaults that had been taking place before imposition of the curfew.  *See Menotti v. City of Seattle*, 409

8    F.3d 1113, 1131 (9th Cir. 2005) ("No one could seriously dispute that the government has a significant

9    interest in maintaining public order; indeed this is a core duty that the government owes its citizens.")

10   Second, the curfew order was "narrowly tailored" to serve this significant governmental interest.  A

11   content-neutral regulation "need not be the least restrictive or least intrusive means" of serving the

12   governmental interest.  *Ward*, 491 U.S. at 798.  Rather, "the requirement of narrow tailoring is satisfied

13   so long as the regulation promotes a substantial government interest that would be achieved less

14   effectively absent the regulation." *Id.* at 799 (cleaned up).  The City's curfew was so limited.  Despite

15   the violence and property destruction the protests had wrought, the City did not restrict protest activity

16   or otherwise limit protesters' presence for the vast majority of time when such protests might occur.

17   Instead, the City simply delineated a set number of hours during which there would be a respite from

18   all activity in public spaces.  City officials could reasonably have determined that the designated time

19   period—8:30 p.m. to 5:30 a.m.—was not only when criminal activity would be most likely but also

20   when the fewest people would likely be involved in protest or other activity.  The limited, content-

21   neutral restriction on physical presence during the designated hours was reasonable and promoted the

22   City's interest in restoring peace during a time of heightened disorder.  *See id.*

23          Finally, on its face, the curfew left open "ample alternative channels" for the protesters'

24   expressive activity.  The curfew limited physical presence in public spaces on May 31 only during the

25   nine-hour late-night period when crimes were most likely.  That limitation did not impede Plaintiffs'

26   ability to express their message.  Protesters were free to demonstrate unrestricted on any day when the

27   declared curfew was not in effect, as well as all day and much of the night on May 31 when it was in

28   effect.  Plaintiffs give no reason why their political message required protest activity during the late-

DEFENDANTS' MOTION TO DISMISS

night hours of May 31 rather than over the fifteen hours between 5:30 and 8:30 on that day, or at any time on any other day.  That is because there is no such reason; nothing about the City's curfew prevented Plaintiffs from broadcasting their message in the forum of their choice.

The Ninth Circuit's decision in *Menotti v. City of Seattle* is instructive.  There, the City of Seattle responded to violent protests against the World Trade Organization ("WTO") by imposing a curfew that prohibited any protest activity in the downtown area where WTO delegates were conducting their business.  409 F.3d at 1125.  As in this case, the protesters argued that the city's curfew violated the First Amendment as an overbroad restriction on speech activity.  *Id.* at 1126.  The Ninth Circuit disagreed.  The court noted that the city's police officers had no way "to distinguish, minute by minute, those protesters with benign intentions and those with violent intentions."  *Id.* at 1134.  The city's limited curfew accounted for this problem by restricting all activity that might lead to violence or property destruction.  *See id.* at 1137.  Although it was "plausible" that the curfew "was not the least restrictive means of achieving the City's goal, that is not what Supreme Court precedent requires."  *Id.*  Because "the governmental interest [at issue] (security of the downtown area) would have been achieved less effectively absent [the curfew order]," the court held that the order was sufficiently "narrowly tailored" to satisfy intermediate scrutiny.  *See id.*

The court further held that the curfew left open ample alternative channels of communication, despite that protesters were not able to "deliver their message directly to the delegates" who were the target of their protests.  *See id.* at 1138.  As the court noted, "the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a 'reasonable opportunity' for communication."  *Id.* at 1141.  The city complied with that requirement by allowing protest activity to take place outside the designated area, even if that was "not ideal for protesters" who wanted to demonstrate in the area where delegates would more likely see them.  *Id.*

As in *Menotti*, the City's limited curfew order here directly advanced the important governmental interest in security and order, and that interest "would have been achieved less effectively absent [the curfew order]."  *See id.* at 1137.  Indeed, although the City's curfew applied to all public spaces for the hours it was in effect, it was less restrictive than the curfew in *Menotti* in that it did not prevent protesters from expressing their message in the area of their choosing, all day if they

DEFENDANTS' MOTION TO DISMISS

21-cv-01705-PJH

1825479_2

desired.  *Cf. id.*  Some protesters may have wanted, for reasons unknown, to protest in the middle of the night rather than during the day, "but there is no authority suggesting that protestors have an absolute right to protest at any time and at any place, or in any manner of their choosing."  *Id.* at 1138–39.  Even if less than "ideal for [those] protesters," it was more than enough for First Amendment purposes that the curfew allowed unlimited protest activity during all hours except those few designated.  *See id.*

## II.   Plaintiffs do not allege the violation of a clearly established Fourth Amendment right

To state a Fourth Amendment claim, Plaintiffs must plead facts showing both that each of them was "seized" and that the seizure was unreasonable.  *See* U.S. Const. amend IV; *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Plaintiffs allege two claims under this theory, apparently against all Defendants: one for excessive force, and another for "wrongful arrest."  Neither claim has merit.

### A.  Plaintiffs do not state a clearly established excessive force claim

A threshold requirement for Plaintiffs' excessive force claim is that they plead facts showing they were seized.  "A seizure requires the use of force with intent to restrain, as opposed to force applied . . . for some other purpose."  *Torres v. Madrid*, 141 S. Ct. 989, 991 (2021).  The relevant question "is whether the challenged conduct [by police] objectively manifests an intent to restrain." *Id.*; *see also Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) (holding that to constitute a seizure, a "detention or taking [of a person by police] must be willful").  The facts alleged must establish such intent "unambiguous[ly]."  *Jackson-Moeser v. Armstrong*, 765 F. App'x 299, 299 (9th Cir. 2019) (citing *Brendlin v. California*, 551 U.S. 249, 255 (2007)).

Plaintiffs' complaint establishes that the vast majority of them were not seized.  The facts alleged—that officers used impact munitions and like devices in the midst of a chaotic and violent protest—do not objectively evince "an unambiguous intent to restrain."  *Id.*  They evince the opposite: that the officers' alleged use of force was intended *not* to restrain but to *disperse*.  *See Jackson-Moeser*, 765 F. App'x at 299 (holding that the use of "baton strike[s]" to "push protesters off the freeway" did not show an intent to restrain and so did not constitute a seizure); *Quraishi v. St. Charles County*, 986 F.3d 831, 840 (8th Cir. 2021) (holding that reporters at a protest were not clearly seized by the use of tear gas because "[t]hey were dispersed" rather than restrained); *Buck v. City of Albuquerque*, No. CV 04-1000, 2007 WL 9734037, at *31 (D.N.M. Apr. 11, 2007) (holding that police did not seize

DEFENDANTS' MOTION TO DISMISS

21-cv-01705-PJH

1825479_2

protesters with tear gas because it "was used not to take control of its target, but rather to cause the target to disperse"). By definition, force used to repel is not force used to restrain. Plaintiffs thus fail to allege a seizure as to these individual protestors, and their excessive force claim fails at the outset.

At a minimum, the defendant police officers are entitled to qualified immunity on Plaintiffs' excessive force claim. "For a right to be clearly established" as necessary to overcome the defense of qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Plaintiffs "must point to prior case law that articulates a constitutional rule specific enough to alert *these* [officers] *in this case* that *their particular conduct* was unlawful." *Sharp v. Cty. of Orange,* 871 F.3d 901, 911 (9th Cir. 2017) (all emphasis in original). Plaintiffs cannot meet that burden here.

Case law has been ambiguous regarding the precise circumstances under which police uses of force can constitute a seizure, particularly in the crowd-control context. The Ninth Circuit held in *Nelson v. City of Davis*, 685 F.3d 867, 874, 877 (9th Cir. 2012), that police officers seized partygoers when the officers "blocked their means of egress" from an apartment and then shot them with "pepperballs." The court rejected the officers' contention that the partygoers were not seized given that their "intent was to disperse the crowd," but it did so on the understanding that the officers' argument was about their subjective intentions, observing that the "Supreme Court has repeatedly held that the Fourth Amendment analysis is not a subjective one." *Id.* at 877. At least two district court decisions before *Nelson* came to similar conclusions. *See Marbet v. City of Portland*, No. CV 02-1448, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003); *Coles v. City of Oakland*, No. C03-2961, 2005 WL 8177790, at *3 (N.D. Cal. Apr. 27, 2005).

More recent decisions come out differently. In *Jackson-Moeseer*, decided in April 2019, the Ninth Circuit held that police officers did not seize protesters when they used baton strikes against them, because the objectively demonstrated intent of the strikes was to push the "protesters off the freeway." 765 F. App'x at 299. The Eight Circuit similarly held in the January 2021 *Quraishi* decision that several people in a crowd of protesters were not clearly seized when police officers shot tear gas at them, given that the purpose of the teargas was to "disperse" rather than arrest or restrain. 986 F.3d at 840. Other courts have likewise held that the use of force against a person does not constitute a seizure

DEFENDANTS' MOTION TO DISMISS

21-cv-01705-PJH

1825479_2

where it objectively does not show an intent to restrain.  *See Buck*, 2007 WL 9734037 at *31; *Molina v. City of St. Louis*, No. 4:17-CV-2498, 2021 WL 1222432, at *11 (E.D. Mo. Mar. 31, 2021) (police officers did not clearly seize a man whom they shot and bruised with a teargas canister); *see also Keyes v. Washington County*, No. 3:15-CV-1987, 2017 WL 3446256, at *5 (D. Or. Aug. 10, 2017) (police officer hitting plaintiff in the face and knocking her to the ground without arresting or detaining her was not a seizure because it "did not show an intent to take control of the plaintiff or restrain her"); *McCoy v. Harrison*, 341 F.3d 600, 606 (7th Cir. 2003) (same); *Slocum v. Palinkas*, 50 F. App'x 300, 302 (6th Cir. 2002) (same where officer threw plaintiff to the ground); *Gause v. City of Philadelphia*, No. A00-1052, 2001 WL 1251215, at *2–3 (E.D. Pa. Sept. 27, 2001) (same during a "near riot").

To the extent there was any tension among these cases before the Supreme Court's March 2021 decision in *Torres v. Madrid*, that decision largely resolved it.  The Court there clarified that "the appropriate inquiry" when analyzing whether a seizure has occurred is not simply whether a person's freedom of movement was limited but "whether the challenged conduct *objectively* manifests an intent to restrain."  *Id.* at 998.  The Court found such an intent is present where police officers shoot a person to prevent her from getting away, as in the case before it.  *Id.* at 999.  But the Court "stress[ed]" that not "every physical contact between [officers and] the public [is] a Fourth Amendment seizure."  *Id.* at 998.  Neither "[a]accidental force" nor "force intentionally applied *for some other purpose*" than to restrain, the Court held, will "qualify."  *Id.* (emphasis added).  The Court did not outline the situations in which force is used for "some other purpose," but in language foreshadowing the issue in this case, the Court explicitly declined to find that the deployment of "pepper spray, flash-bang grenades," and similar uses of significant non-lethal force could ever evince the necessary intent to restrain.  *Id.*

Applying *Torres*'s "objective intent to restrain" standard precludes the conclusion that a police officer seizes a person by using non-lethal projectiles as a method of crowd-control.  By definition, and invariably, that use of force can never objectively show an intent to restrain, because its very purpose is to achieve the opposite result of dispersal.  It is, in the words of the *Torres* Court, force used for "some other purpose" that cannot "qualify" as a seizure.  *See id.*  Thus, to the extent *Nelson*, *Marbet*, or any other decision created ambiguity on the question, *Torres* dispelled it: a use of force constitutes a seizure only when it objectively demonstrates an intent to arrest or restrain.  At a minimum, the very fact that

DEFENDANTS' MOTION TO DISMISS

1   *Torres* had to clarify that a seizure always requires an objectively manifested intent to restrain and

2   expressly declined to hold that the use of the very types of non-lethal munitions at issue here could

3   evince an intent to restrain further underscores the previous lack of clarity on that proposition.  It

4   follows that the question was not "beyond debate" and thus not clearly established for quailed

5   immunity purposes.  *White*, 137 S. Ct. at 552; *see also Molina*, 2021 WL 1222432 at *11 (relying on

6   *Torres* to grant police officers qualified immunity on excessive force claim).

7          As to those few protesters who were allegedly seized, the only one against whom Plaintiffs

8   claim officers used force near in time to an arrest is Plaintiff Swift.  But even there, Plaintiffs'

9   allegations show that the officers who used a baton were doing so only to move a crowd back (the

10  officers were literally commanding "Move" at the crowd).  Compl. ¶ 91.  It was only after these

11  attempts at  dispersal, when officers determined Swift did not comply, that Officer Curry allegedly

12  grabbed Swift to take her behind the police line and placed her under arrest.  *Id.* ¶ 92.  The officers'

13  baton strikes therefore did not evince an intent to restrain, regardless of the later seizure.

14         In any event, even if Plaintiffs established that officers used force with the intent to arrest Swift,

15  their allegations do not clearly establish that the force was constitutionally excessive.  A police officer

16  "need not use the least intrusive means" of force available, and "[n]ot every push or shove . . . violates

17  the Fourth Amendment."  *Luchtel v. Hagemann*, 623 F.3d 975, 982 (9th Cir. 2010).  Plaintiffs'

18  allegations are only that a police officer used his baton several times in the middle of a chaotic crowd

19  to arrest a person who did not comply with his order to disperse.  It is not beyond debate that using the

20  relatively mild force of two or three baton strikes to gain compliance over a subject who appears to be

21  defying officers' lawful commands in the midst of a hostile crowd violates the Fourth Amendment.

22  *See Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018) (police officers did not use excessive force

23  by striking demonstrators with a baton because the officers were "substantially outnumbered" by the

24  demonstrators, who "refused to obey [their] commands to disperse"); *Sorgen v. City & Cty. of San*

25  *Francisco*, No. C 05-03172, 2006 WL 2583683, at *7 (N.D. Cal. Sept. 7, 2006) (officer reasonably

26  used baton several times to strike a man who did not follow commands to "move back," as the officer

27  faced a "tense situation" and the baton "only caused temporary bruises and no serious injury").  This is

28  no less true if the officers were mistaken about whether Swift was complying.  *See Mattos v. Agarano*,

DEFENDANTS' MOTION TO DISMISS

1   661 F.3d 433, 440 (9th Cir. 2011) ("Qualified immunity shields an officer from liability even if his or

2   her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of

3   law and fact.") (cleaned up).  The officers are therefore entitled to qualified immunity even if Plaintiffs

4   can establish they used force in seizing Swift.

5       **B.  Plaintiffs do not state a clearly established wrongful arrest claim**

6           For their Fourth Amendment "wrongful arrest" and state false arrest claims, Plaintiffs must

7   show that each of Defendants arrested them without probable or reasonable cause.  *Rosenbaum v.*

8   *Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011); *O'Toole v. Superior Court*, 140 Cal.App.4th

9   488, 510-11 (2006).  And qualified immunity applies if an officer "reasonably *believed* there to have

10  been probable cause" for an arrest—"that is, whether reasonable officers could disagree as to the

11  legality of the arrest." *Rosenbaum*, 663 F.3d at 1076 (citations omitted).  Likewise in the state context,

12  an officer may be entitled to immunity under Penal Code section 847(b) if an officer "had reasonable

13  cause to believe [a person's] arrest was lawful."  *O'Toole*, 140 Cal.App.4th at 510-11.

14          Plaintiffs' claim fails because the facts alleged establish probable and reasonable cause as to

15  every arrest made.  Although Plaintiffs argue that there "was no probable cause" to arrest Cartwright,

16  Lee, Swift, and Naemeh, Compl. ¶ 246, no factual allegation establishes that absence of probable

17  cause.  Plaintiffs note that these individuals were arrested for "failure to obey a curfew, failure to

18  disperse, failure to follow a lawful order of a police officer, and/or unlawful assembly," Compl. ¶ 247,

19  yet Plaintiffs do not allege that any of them was *not* committing those crimes at the time of arrest.  On

20  the contrary, it is manifest from Plaintiffs' allegations generally that officers had issued unlawful

21  assembly and dispersal orders, and told demonstrators arrested on curfew violations that they had to go

22  home, before they made any of the alleged arrests.  Compl. ¶¶ 55, 67, 118 (collectively establishing

23  that unlawful assembly was announced as early as 4:00 or 5:00 p.m. on May 29, and that curfew was in

24  effect when any Plaintiff was arrested for violating it).  Even if, as Plaintiffs claim, some of the

25  demonstrators did not hear unlawful assembly or dispersal announcements clear enough to make them

26  out, that does not alter the conclusion that officers made those announcements and thus had probable

27  and reasonable cause to believe that the protesters who thereafter remained were in violation of the law.

28  *See Lyons v. City of Seattle*, 214 F. App'x 655, 657 (9th Cir. 2006) (holding that police officers

DEFENDANTS' MOTION TO DISMISS

1   lawfully arrested protesters even where the protesters "did not hear" dispersal orders, because "[s]aying

2   one did not hear an order is not the same as saying an order was not given").

3          What is more, Plaintiffs' allegations establish additional bases for probable and reasonable

4   cause to arrest Swift and Naemeh.  Officers reasonably perceived that Swift did not comply with

5   officers' orders to "move" and disperse.  Compl. ¶¶ 91-92.  And officers detained and arrested Naemeh

6   along with 30-40 other protestors on the belief that he had been throwing frozen water bottles.  Compl.

7   ¶¶ 106-07.  Again, Plaintiffs do not allege that frozen water bottles had *not* been thrown at officers

8   from the crowd of which Naemeh was a part.  Their failure to allege facts establishing the absence of

9   probable cause for this assaultive conduct is an additional reason their wrongful arrest claim as to

10   Naemeh fails.  *See Burdett v. Reynoso*, No. C-06-00720, 2007 WL 2429426, a *21 (N.D. Cal. Aug. 23,

11   2007) (finding officer reasonably believed plaintiff knocked over a police motorcycle given that the

12   situation was chaotic and not all protestors were complying with police orders).  At a minimum,

13   qualified immunity would protect the officers from liability for that decision, even if it were determined

14   in hindsight that they were mistaken as to some issue of fact or law.  *See Mattos*, 661 F.3d at 440.

15          To the extent Plaintiffs mean to argue that the arrests for violating curfew were unconstitutional

16   because the curfew was unlawful, the argument fails both because the curfew was *not* unlawful (as

17   established *supra*) and because even if it were unlawful, Plaintiffs allege no basis from which to

18   conclude the police officers had reason to know that.  Defendants would thus be entitled to qualified

19   immunity for their reasonable but mistaken belief.  *See id.*

20          Plaintiffs' "wrongful arrest" claim against Defendants Sykes, Garcia, and Dwyer fails for the

21   additional reason that they allege no facts to suggest any of them participated in, were present for, or

22   were otherwise aware of unlawful arrests.  Their conclusory and threadbare assertion that these

23   commanding officers "caused, set in motion, supervised, directed, approved, acquiesced, and/or failed

24   to intervene" (*e.g.*, Compl. ¶ 31) in others' purported "constitutional violations" is without basis in

25   alleged fact and therefore disregarded.  *See Iqbal*, 556 U.S. at 678; *Chavez v. United States*, 683 F.3d

26   1102, 1110 (9th Cir.2012) (rejecting "wholly conclusory allegation that the supervisory defendants

27   'personally reviewed and, thus, knowingly ordered, directed, sanctioned or permitted'" constitutional

28   violation); *Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d

DEFENDANTS' MOTION TO DISMISS

917, 927 (9th Cir. 2013) ("information and belief" allegations that supervisors "directed" other defendants to take unconstitutional allegations were conclusory and failed to state a claim).

### III. Plaintiffs do not allege the violation of a clearly established equal protection right

Plaintiffs' equal protection claim is based on the accusation that San Jose police officers acted with "racial animus" when undertaking their law-enforcement duties during the protest.  To state an equal protection claim for discriminatory enforcement, Plaintiffs must plead facts clearly establishing (1) that police officers' enforcement efforts "had a discriminatory effect" on Plaintiffs due to their race or other protected status; and (2) that "the police were motivated by a discriminatory purpose." *Rosenbaum v. City & Cty. of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007).  The facts necessary to make the first showing are that members of a protected racial or ethnic class were arrested and subjected to force while "similarly situated individuals" were not.  *See id.*  The second requires Plaintiffs to allege facts showing that officers took the actions they did "at least in part because of, not merely in spite of, [their] adverse effects upon an identifiable group."  *Id.* (internal quotations omitted).

Plaintiffs allege exactly zero factual content to substantiate the grave claim that the named San Jose police officers targeted protesters based on their ethnicity.  As an initial matter, it is unclear what group or class Plaintiffs claim San Jose police targeted.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005) ("The first step in equal protection analysis is to identify the [defendants' asserted] classification of groups.")  Their complaint includes the headline-grabbing statement that officers "targeted Black, Indigenous, and other people of color," but Plaintiffs do not even claim that any of them is "Black" or "Indigenous," and they do not otherwise define "other people of color."  On the contrary, the complaint tags each Plaintiff with the racial or ethnic label "Latinx," "Asian," or "white" (along with "mixed ethnicity"), then claims that police officers violated the constitutional and statutory rights of each of them equally.  Compl. ¶¶ 16-27.  Plaintiffs' equal protection claim is incoherent and self-defeating from the outset.  *See Thornton*, 425 F.3d at 1166 (holding that equal protection claim requires that officials targeted a group "comprised of similarly situated persons" and "will not lie by conflating all persons not injured into a preferred class receiving better treatment").

Even if Plaintiffs had defined a cognizable class for equal protection purposes, they do not allege facts to show that "similarly situated" members outside that class—i.e., other ethnic or racial

groups in the same circumstances—were *not* arrested or subjected to force.  *See Rosenbaum*, 484 F.3d

at 1152.  Plaintiffs state their "belie[f] that [City police officers] have never used the amount" of force

on display at their protest, Compl. ¶ 158, but Plaintiffs' beliefs are not relevant to the Rule 12(b)(6)

analysis; only factual allegations are.  *See Iqbal*, 556 U.S. at 678; *Delphix Corp. v. Actifo*, Inc., No.

13cv4613, 2014 WL 4628490, at *2 (N.D. Cal. Mar. 19, 2014) (observing that the use of "information

and belief" as to some allegations but not others shows "that plaintiff likely lacks knowledge of

underlying facts . . . and is instead engaging in speculation to an undue degree").

Nor do Plaintiffs allege facts that could give rise to the inference that any named police officer

harbored racial animus and thus acted against a particular person "because of" his or her membership in

a racial or ethnic group.  *Rosenbaum*, 484 F.3d at 1152.  Plaintiffs do not allege that any police officers

used racial slurs or otherwise engaged in acts suggestive of hidden discriminatory animus.  *See, e.g.*,

*Marks v. Santa Rosa City Schs.*, 748 F. App'x 159, 161 (9th Cir. 2019) (dismissing equal protection

claim where the "complaint d[id] not allege any overtly racially motivated conduct, nor d[id] it contain

allegations that could support a reasonable inference of discriminatory intent") (citing *Iqbal*, 556 U.S.

at 678–79); *Ibrahim v. Dep't of Homeland Sec.*, No. 06cv00545, 2009 WL 2246194, at *9 (N.D. Cal.

July 27, 2009) (rejecting plaintiff's "information and belief" allegation that the defendants detained her

based on racial and religious animus).  The one fact Plaintiffs allege to this effect—that a police officer

deliberately mispronounced "Mahmoudreza" as "Mohammed" instead of using a shortened version of

the former, Compl. ¶ 107—does not suffice plausibly to establish that racial animus motivated that

Plaintiff's arrest or any other police action.  Rather, as with their claim of invidious viewpoint

discrimination, Plaintiffs' equal protection claim is predicated on baseless speculation.  It fails for the

same reason.  *See Iqbal*, 556 U.S. at 680 (rejecting conclusory allegations of racial/religious animus);

*Recinto v. U.S. Dep't of Veterans Affs.*, 706 F.3d 1171, 1177 (9th Cir. 2013) ("To avoid dismissal, a

plaintiff must plausibly suggest the existence of a discriminatory purpose.").

Further sensationalizing their pleading, Plaintiffs recite general statistics—many of them

compiled or published by the City itself—about past and present racial disparities in certain law-

enforcement encounters.  The statistics report that black and Hispanic people in San Jose and elsewhere

have been stopped, searched, or arrested/cited at a rate higher than their proportional representation in

DEFENDANTS' MOTION TO DISMISS

the population.[2]  Plaintiffs omit from their recitation that the disparate arrest rates for black people in San Jose were lower than any other jurisdiction in the San Francisco Bay Area, and indeed lower than the national average (under which black people in 2018 were five times more likely to be arrested than white people, compared to San Jose's reported rate of three times).  Compl. ¶ 164.  Plaintiffs likewise do not mention conclusions from the cited sources that statistical disparities often disappear when factors such as criminality, neighborhood demographics relative to frequency of calls for service, and like considerations are taken into account through regression analyses.  *Id.* ¶¶ 162-64.

Plaintiffs' apparent purpose in citing this raw data without further context is to tar all police in San Jose as racists and thus argue that racial animus must have impelled the defendant-officers' actions at the protest.  Compl. ¶ 165 (accusing SJPD of "discriminatory policing" and "targeting people of color").  The argument is frivolous and improper.  The disparate impact of criminal law enforcement efforts—a disparity of nationwide scope informed by a near-limitless set of complicated historical, political, and other social-science factors—does not prove discriminatory intent by the nation's law enforcement officers, much less discriminatory intent by *these* San Jose police officers *in this case* relative to *these Plaintiffs*.  *See*, *e.g.*, *United States v. Redondo-Lemos*, 27 F.3d 439, 443 (9th Cir. 1994) (holding that raw statistical data on disparities in the criminal justice context cannot prove intentional discrimination because they fail to take account of the individual facts of the case).  If it did, then every one of the countless arrests, detentions, stops, or other law-enforcement actions police undertake every day in the City would constitute an equal protection violation.  *Cf. McCleskey v. Kemp*, 481 U.S. 279, 293 (1987) ("[Appellant's] claim that [] statistics [regarding racial disparities] are sufficient proof of discrimination, without regard to the facts of a particular case, would extend to all [comparable] cases in [the state] . . . .").  No principle of law countenances that absurd conclusion.  *See id.*

Likewise irrelevant is Plaintiffs' allegation that in an unrelated context, at a different time, and in a private forum, some former or current San Jose police officers expressed opinions critical of the

---

[2] Plaintiffs' recitation of the statistics is inaccurate.  For example, Plaintiffs state that black drivers were "9 times more likely, and Latinx drivers 3.4 times more likely," to be stopped than white drivers. Compl. ¶ 163.  The study they cite in fact reports that "Black motorists were between 1.6 and 1.9 times more likely to be stopped compared to their representation" in the population.  *See id.* and study cited therein.  The figure was 1.7 to 2.6 for Hispanic drivers.  *Id.*  The study further finds that white drivers were more likely to be issued a traffic citation than black drivers.  *Id.*

DEFENDANTS' MOTION TO DISMISS

1   Black Lives Matter political movement or the religion of Islam.  Compl. ¶ 167.  Again, it is unclear

2   what significance the allegation is meant to have here.  The SJPD is not a monolith—it employs about

3   1,400 people, representing a kaleidoscope of possible viewpoints and political affiliations, see

4   https://www.sjpd.org/about-us/inside-sjpd/department-information—and liability under § 1983 is not a

5   guilt-by-association proposition.  *See Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996) (rejecting

6   "team effort" theory of § 1983 liability); *Blackmore v. City of Phoenix*, 126 F. App'x 778, 782 (9th Cir.

7   2005) ("Section 1983 liability . . . cannot be based on a group liability theory.") (citing *Jones v.*

8   *Williams*, 297 F.3d 930 (9th Cir. 2002)); *Cangress*, 2016 WL 5946878 at *6 (rejecting First

9   Amendment claim based on allegation of hostile "blog posts" by other police officers because the

10  "animosity of one non-policymaking officer in a large police force" did not suggest department-wide

11  viewpoint discrimination); *Pahls v. Thomas*, 718 F.3d 1210, 1231–32 (10th Cir. 2013).  That other

12  officers criticized certain religions or political movements, even distastefully, does not support the

13  notion that the officers in this case harbored discriminatory animus toward Plaintiffs (or anyone else).

14  *Cf. Hernandez v. City of San Jose*, No. 16-CV-03957-LHK, 2016 WL 5944095, at *5 (N.D. Cal. Oct.

15  13, 2016) (allegations of political differences between mayor and protesters do not "plausibly suggest'"

16  discriminatory animus in police crowd-control efforts).

17      As is true of this lawsuit generally, Plaintiffs' reference to private online discussions, as well as

18  their facile invocation of raw demographic statistics, invites this Court to wade into important but

19  fundamentally political discussions about complex social issues.  The Court should decline the

20  invitation.  The only relevant question in this proceeding is whether Plaintiffs have alleged facts

21  plausibly showing that any individually named police officer acted with racial animus against any

22  Plaintiff.  Not a single alleged fact supports that conclusion, so Plaintiffs' equal protection claim fails.

23  **IV.    Plaintiffs do not allege the violation of a clearly established right to freedom of movement**

24      There is no clearly established right to "freedom of movement" as a standalone cause of action.

25  Rather, courts have found only that unduly vague laws or laws that target a particular class of people in

26  a way that restricts the "fundamental right of free movement" violate the Due Process or Equal

27  Protection Clauses.  *See Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (invalidating

28  juvenile curfew law because it restricted minors' freedom of movement based on their status as such);

*Papachristou v. City of Jacksonville*, 405 U.S. 156, 164, 168 (1972) (invalidating loitering law as void for vagueness).  In other words, while there might be a constitutional right against class-based or unduly vague laws that burden the freedom of movement, there is no free-standing constitutional claim based merely on a government restriction over a person's movement.  Otherwise, every governmental road closure or similar restriction of access to a given area would plant the seeds for a constitutional case.  *See, e.g.*, *Daly v. Harris*, 215 F. Supp. 2d 1098, 1111 (D. Haw. 2002) (holding that there is no "fundamental right" to access certain public beaches, and observing that the right to intrastate travel is "most appropriately addressed [as part of an] Equal Protection challenge").

Even assuming there were some vague and unmoored constitutional right to intrastate travel, *but see Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir 1999) ("[It is] rather doubtful that substantive due process . . . can be so lightly extended [as to include such a right].")), Plaintiffs have not alleged the violation of that right, much less clearly so as necessary to overcome qualified immunity. The City's curfew was an emergency provision promulgated in the midst of extraordinary unrest, including assaults and massive looting and vandalism.  *See* RFJN, Ex. A; Compl. ¶¶ 107, 185.  No substantive due process or other constitutional principle prohibits a city from addressing such widespread social unrest with a narrowly tailored curfew that limits public presence for a designated set of nighttime hours.  *See United States v. Chalk*, 441 F.2d 1277, 1280 (4th Cir. 1971) (rejecting constitutional challenges to curfew ordinances because mayor validly invoked state of emergency and "[c]ontrol of civil disorders" was within his power"); *Glover v. D.C.*, 250 A.2d 556, 560 (D.C. Ct. App. 1969) (rejecting argument that curfew from 5:30 p.m. to 6:30 a.m. violated the "freedom to travel" because it was "not unreasonable" during a period of civil disturbance).  Even if Plaintiffs could make out their novel "freedom of movement" claim, Defendant Sykes (the only person who had the authority to establish the curfew) would be entitled to qualified immunity, given the intrinsically amorphous nature of the claimed right and the lack of any case finding a constitutional violation under comparable circumstances.  *See Sharp*, 871 F.3d at 911; *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018).

**V.      Plaintiffs do not state a clearly established violation based on a failure to intervene**

The Ninth Circuit has recognized a limited Fourth Amendment duty requiring police officers to "intercede when their fellow officers violate the" Constitution in their presence.  *See Cunningham v.*

*Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).  "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede."  *Id.*  Plaintiffs have not stated a claim against any defendant under this limited theory.  First, as established, Plaintiffs have not alleged a violation of their constitutional rights.  Second, though Plaintiffs assert the claim against Defendants "Sykes, Garcia, Dwyer, Yuen, Curry, [and] Delgado," Plaintiffs do not allege any facts to show that any of those individuals was present at the time of another police officer's allegedly unconstitutional act.  Compl. ¶¶ 263-69.  Nor do Plaintiffs explain how or in what way any of those defendants could have intervened in a way to stop other police officers' actions.  Because Plaintiffs allege no facts to show that the officers had the "opportunity to intercede," Plaintiffs' claim fails.  *Cunningham*, 229 F.3d at 1289; *Penaloza v. City of Rialto*, 836 F. App'x 547, 549 (9th Cir. 2020) (granting police officers qualified immunity because "the law does not clearly establish when an officer must intervene").

## VI.   Plaintiffs do not state a clearly established conspiracy claim

"To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate the existence of an agreement or meeting of minds to violate constitutional rights."  *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1301 (9th 1999) (internal quotations omitted).  "To state a [conspiracy] claim . . . the plaintiff must state specific facts to support the existence of the claimed conspiracy."  *Burns v. Cty. of King*, 883 F.2d 819, 821 (9th Cir. 1989); *Davis v. Powell*, 901 F. Supp. 2d 1196, 1217 (S.D. Cal. 2012) (same); *see also Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988) ("A mere allegation of conspiracy without factual specificity is insufficient" to state a claim).  Thus, vague and conclusory conspiracy claims that include no allegations regarding each defendant's role in the common objective of the alleged conspiracy are subject to dismissal.  *Davis,* 901 F. Supp. 2d at 1217; *Cox v. Ashcroft*, 603 F. Supp. 2d 1261, 1271–72 (E.D. Cal. 2009) ("Claims based on vague and conclusory allegations, which fail to specify each defendant's role in the alleged conspiracy, are subject to dismissal.").  Yet Plaintiffs here rely on just such vague and conclusory assertions.  They simply assert that "all Defendants" (Compl. ¶ 271) violated their rights pursuant to a broad conspiracy and leave it at that.  Their claim thus fails.

Indeed, Plaintiffs' allegations undermine their theory that there was a conspiracy among officers to violate the Constitution.  Plaintiffs reference at length police commanders' observation that

there was "a lack of continuity in communicating mission objectives and tactical plans," which in turn caused a lack of "clear and consistent directions." Compl. ¶¶ 191, 286, 303. There cannot have been a "meeting of the minds" in which officers agreed to use excessive force otherwise violate the Constitution if, as Plaintiffs allege, the officers were unable even to communicate or plan effectively.

Plaintiffs' assertion that commanding officers sought to "justify and cover-up" constitutional violations is vague and baseless. Compl. ¶ 274. No fact in the complaint suggests that any officer knew about constitutional violations and had a "meeting of the mind" about justifying them. And no fact substantiates Plaintiffs' bald assertion that the officers took "concrete steps" to accomplish such a "cover-up." *Id.* On the contrary, the AAR Plaintiffs have incorporated in their complaint explicitly stated that it would "not address whether specific allegations of misconduct or excessive force used during these events were within policy as that analysis is currently being made as part of an ongoing Internal Affairs investigation." RFJN, Ex. B at 21. Nor did the document misreport the number of injuries at the protests; it stated explicitly that it was "not possible to quantify the exact number of injuries sustained by participants" and that "[t]his does not mean there were not more people injured" outside of those documented in police reports due to people melting back into the crowd. *Id.* at 119, 121. Plaintiffs' observation that the AAR misreported a singe fact—i.e., that a federal officer was killed on May 29 instead of beforehand—out of the seventeen intelligence bulletins and news reports it mentions does not remotely evince a "purpose of violating Plaintiff's [sic] rights." Compl. ¶ 276. Even if that report was wrong, and the federal officer was in fact killed a day later, the killing still took place before most protest activity. *See* Compl. ¶¶ 20, 23, 26. It is hardly surprising that the authors of the AAR would group the report of that killing with the seventeen other incidents that informed the context in which the San Jose protests took place. Regardless, any mistake in the AAR—a debriefing document written months after the protests by unknown SJPD personnel—has no bearing on the question whether any named defendant in this case conspired to violate Plaintiffs' rights.

The entirety of Plaintiffs' conspiracy claim relies on the *ipso facto* conclusion that, because Plaintiffs allege several officers violated their rights, those officers must all have agreed in concert to do so. That specious and conclusory statement does not suffice to state a conspiracy claim. *Chuman*, 76 F.3d at 295 (rejecting conspiracy theory that "lump[s] all the defendants together" rather than basing

1   liability on each defendant's "own conduct"); *Chavez*, 683 F.3d at 1110 (rejecting allegations that

2   supervising officers ordered and participated in constitutional violations as "wholly conclusory").

3   **VII.    Plaintiffs fail to state a claim for municipal liability against the City of San Jose**

4           With the exception of their claim for "failure to intervene," Plaintiffs appear to assert all of their

5   § 1983 claims indiscriminately against the City of San Jose as well as the individually named

6   defendants.  These claims against the City fail because Plaintiffs have not established a violation of the

7   Constitution under any of their § 1983 theories, but even if Plaintiffs had stated a claim against any

8   individual defendant, Plaintiffs have not pleaded facts to establish municipal liability.

9           A city is not liable for the constitutional torts of its agents unless its final policymakers have

10  consciously adopted a policy that actually and proximately caused the alleged violation.  *See Pembaur*

11  *v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (citing *Monell v. Dep't of Soc. Servs. of City of New*

12  *York*, 436 U.S. 658, 691 (1978)).  "A 'policy' consists of a policy statement, ordinance, regulation, or

13  decision officially adopted and promulgated by [the city's policymaking] officers."  *Lozano v. Cty. of*

14  *Santa Clara*, No. 19-CV-02634, 2019 WL 6841215, at *17 (N.D. Cal. Dec. 16, 2019).  "In order to

15  withstand a motion to dismiss for failure to state a claim, a *Monell* claim must consist of more than

16  mere 'formulaic recitations of the existence of unlawful policies, conducts or habits.'"  *Arteaga v. City*

17  *of Oakley*, No. 19-CV-05725, 2020 WL 511876, at *6 (N.D. Cal. Jan. 31, 2020).  The plaintiff must

18  "plead sufficient facts" regarding a "specific" policy "to allow the defendant to effectively defend itself

19  . . . ." *Lozano*, 2019 WL 6841215 at *17.

20          No facts in the complaint remotely substantiate the notion that the City had a conscious policy

21  to cause excessive force, unlawful arrests, viewpoint and ethnic discrimination, or conspiracies to

22  commit the same.  To the extent it can be discerned from Plaintiffs' kitchen-sink approach, the

23  complaint appears to advance two theories of *Monell* liability: that the City had inadequate "training,

24  supervision, and command" policies, and that the City had a "custom" of allowing constitutional

25  violations through "the abuse of police authority."  Compl. ¶¶ 191-95.[3]  Both theories are meritless.

26  _____

27  [3] Plaintiffs also allege that the City is liable for the May 31 nighttime curfew.  Unlike Plaintiffs' other,
    conclusory *Monell* allegations, Plaintiffs' complaint does include facts to establish that the curfew was

28  promulgated by a final policymaker (the City Manager) and therefore represented City policy.  But as
    established *supra*, that policy did not violate the Constitution, so Plaintiffs' *Monell* claim fails.

The claim that a municipality failed to enact necessary training or supervision policies is generally indistinguishable from *respondeat superior* liability, which *Monell* and its progeny prohibit. *See City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (observing that, absent heightened showing of culpability and causation, imposing city liability for omissions "would result in *de facto respondeat superior* liability on municipalities"). Failure-to-train or -supervise claims are therefore the "most tenuous" of *Monell* theories. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Liability can almost never be predicated on a single event. *See id.* at 62. Rather, a plaintiff must generally allege a "pattern of similar constitutional violations by untrained employees" sufficient to place city policymakers on notice that "training is deficient in a particular respect." *Id.* This pattern must necessarily have taken place *before* the events giving rise to the alleged constitutional violation—otherwise, the city's "decisionmakers can hardly be said to have [been on notice of] and deliberately chosen a training program that will cause [constitutional] violations." *Connick*, 563 U.S. at 62. The exception is the "rare" case where the need for a particular training program is "so patently obvious" that the failure to institute it shows "deliberate indifference"—a "stringent standard of fault[] requiring proof that a municipal actor disregarded a known or obvious consequence of his action"—even without a prior pattern of violations. *See id.* at 62–64.

Plaintiffs do not allege a single instance before the May 2020 protests in which the City's officials violated the First and Fourth Amendment (or any other) rights of protesters, much less a "pattern" of such violations so pronounced that the need for a special training program would have been clear to City policymakers before the May 2020 protest. *Connick*, 563 U.S. at 62. Nor is this the "rare" case in which it was "patently obvious" that the failure to institute additional training would invariably result in constitutional violations of the sort alleged. *See id.*.

Plaintiffs argue that the City's policymakers should have known that the failure to institute some unspecified additional training before equipping police officers with impact munitions would necessarily cause all the constitutional violations they claim. Compl. ¶¶ 191-92. Plaintiffs do not explain how additional training regarding the use of impact munitions could have anything to do with viewpoint discrimination, equal protection, unlawful arrest, conspiracy, or any other particular claim they allege. They argue only that more training was necessary because impact munitions "can cause

DEFENDANTS' MOTION TO DISMISS

serious injury or death." Compl. ¶ 192.  But so too can guns, tasers, batons, and other force options available to police officers in crowd-control situations.  Plaintiffs do not (and could not) allege that police officers in San Jose are untrained in the use of force options generally, including the constitutional rules governing the use of non-lethal force.  It is far from obvious that a police officer, despite training in force generally, would not know how constitutionally to employ one particular species of that force—impact munitions—absent additional, special training on that one specific instrument.  It follows that City policymakers cannot have been aware to a "moral certainty that their police officers" would violate the Constitution simply by having the option of using projectiles during crowd-control efforts.  *See Harris*, 489 U.S. at 390 n.10.

What is more, Plaintiffs do not allege facts to show that SJPD's training program before the May 2020 protests was constitutionally inadequate, much less to the degree that it would have been "patently obvious" to policymaking officials.  *Connick*, 563 U.S. at 64.  Plaintiffs instead rely on the contention that the City "admitted in its" AAR that officers "were inadequately trained and supervised." Compl. ¶ 191.  Plaintiffs misrepresent the conclusions of the AAR.  That document reported only that police officers' training before May 2020 was "minimal and infrequent" *relative to* the herculean task of providing crowd-control during a largescale riot.  *See* RFJN, Ex. B.  In so concluding, the AAR echoes Plaintiffs' characterization of the protest event as "one of the largest" in U.S. history. Compl. ¶ 1.  It is precisely because the scale and ferocity of protests were so unprecedented that the AAR recommended additional crowd-control training going forward.  *See* RFJN, Ex. B.  In concluding that officers were insufficiently prepared to deal with violent riots, the AAR did not lend credence to the unrelated proposition that a lack of training caused officers to violate anyone's constitutional rights, much less that any City policymaker was aware *before* the protests of that possibility.  Yet that notice to policymakers is necessary for any failure-to-train or -supervise theory.  The theory fails here, as Plaintiffs allege no fact to establish notice to and deliberate indifference by the City Manager or any other policymaking official.

Plaintiffs' "informal custom" theory fares no better.  "To prevail on [such a] theory," a plaintiff must establish "the existence of a widespread practice" in the city that "is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Gillette v. Delmore*, 979 F.2d 1342, 1348

DEFENDANTS' MOTION TO DISMISS

21-cv-01705-PJH

1825479_2

(9th Cir. 1992).  As with a failure-to-train theory, this significant showing generally requires factual allegations "of repeated constitutional violations" over a sufficiently long period "for which the errant municipal officials were not discharged or reprimanded."  *Id.*; *see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom . . . must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy" in the city).  Plaintiffs allege none of these facts.  They instead rely on the information-and-belief assertion (i.e., speculation) that San Jose policymakers were on notice of "repeated violations of [] constitutional rights" by police officers in the past.  Plaintiffs' speculation does not suffice to advance their outlandish and baseless assertion that the City has a custom of allowing police brutality.

## VIII.   Plaintiffs fail to state a claim under the ADA or RA

Title II of the ADA prohibits governments from discriminating against persons with disabilities by "exclud[ing]" them from participation in government "programs, services, or activities."  42 U.S.C. § 12132 (1990).  Similarly, the RA prohibits public entities from "exclud[ing]" disabled persons from "any program or activity receiving Federal financial assistance."  29 U.S.C. 794 (2016).  "There is no significant difference in analysis" between the ADA and RA.  *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045, n.11 (9th Cir. 1999).  A plaintiff relying on a "reasonable accommodation" theory of ADA liability "bears the initial burden of alleging, and ultimately proving, that a reasonable accommodation exists."  *Hui Jie Jin v. Alameda Cty.*, No. 18-CV-04885, 2019 WL 7831143, at *8 (N.D. Cal. Feb. 4, 2019).  The plaintiff must further establish that the alleged failure to accommodate "caused her to suffer greater injury or indignity than others" who are not disabled.  *Juricich v. Cty. of San Mateo*, No. 19-CV-06413, 2020 WL 619840, at *6 (N.D. Cal. Feb. 10, 2020).  And where (as here) the plaintiff seeks damages, she must allege facts establishing not just a failure to accommodate but "intentional discrimination on the part of the defendant" officers.  *Hall v. City of Walnut Creek*, No. C 19-05716, 2020 WL 408989, at *5 (N.D. Cal. Jan. 24, 2020).

The only ADA or RA claim Plaintiffs have standing to assert is that police officers failed to accommodate a single protester—Plaintiff Cartwright—when they pushed her during crowd-control efforts, including two pushes after she said she had a "brain injury."  Compl. ¶ 74.  That allegation does not state a cognizable claim against the City. Although Ninth Circuit authority holds that Title II can

require accommodation during arrests, see *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211 (9th Cir. 2014), the court has only ever applied the Act to require police officers to use less than deadly force under circumstances where the officers had the time to deliberate and offer an accommodation that would obviate the need for such deadly force.  *See id.*; *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018).  That scenario bears no resemblance to what Plaintiffs allege here.

Plaintiffs do not proffer facts to show "a reasonable accommodation exist[ed]" at the time Cartwright was pushed.  *Hui Jie Jin*, 2019 WL 7831143 at *8.  Nor could they.  Plaintiffs' accommodation theory would mean that, the moment a person being maneuvered by police officers utters anything about being injured, the ADA imposes on those officers the obligation immediately to halt their crowd-control efforts and come up with some other way to accomplish their legitimate law-enforcement ends.  The ADA does not contemplate that level of judicial micro-management over police tactics, which is why the Ninth Circuit has only ever applied the Act to require officers to avoid deadly confrontations under circumstances allowing for reasoned deliberation.  Plaintiffs likewise fail to allege facts establishing that Cartwright "suffer[ed] greater injury or indignity than" would any non-disabled person whom police officers push, *Juricich*, 2020 WL 619840 at *6, and Plaintiffs do not even attempt to allege that the officer who pushed Cartwright was intentionally discriminating against the disabled, see *Hall*, 2020 WL 408989, at *5.  On the contrary, Plaintiffs allege that the officer's use of force was the result of a "mistake."  Compl. ¶ 287.  Plaintiffs ADA and RA claims thus fail.[4]

Moreover, if the ADA applied to impose such onerous requirements on municipal law enforcement, it would violate the federalism principles enshrined in the Tenth Amendment.  *See City of Boerne v. Flores*, 521 U.S. 507, 519 (1997); *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366 (2001); *Chadam v. Palo Alto Unified Sch. Dist.*, No. 13cv4129, 2014 WL 325323 (N.D. Cal. Jan. 29, 2014).  And Plaintiffs fail to allege facts showing that the SJPD—the particular department to which their allegations pertain—received federal funds during the period at issue as necessary for their RA claim.  Plaintiffs' allegation that "Defendants all received federal financial assistance" is

---

[4] Plaintiffs purport to bring their ADA and RA claims against "all Defendants," Compl. ¶¶ 279-89, but a plaintiff "may sue only a 'public entity' [under the Acts], not government officials in their individual capacities." *Burgess v. Carmichael*, 37 F. App'x 288, 292 (9th Cir. 2002) (citing *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002).

conclusory and categorically insufficient.  *See Sharer v. Oregon*, 581 F.3d 1176, 1180 (9th Cir. 2009); *Lightbourn v. Cty. of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997) ("[A] plaintiff must allege that the specific program or activity," not just a public entity generally, receives "federal financial assistance").

## IX.   Plaintiffs fail to state a claim under California state law

Plaintiffs' state-law claims rely on the same allegations and theories of liability as in their federal claims under § 1983 and fail for the same reasons.  *See Reese v. County of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018) (Bane Act and excessive force are coextensive except insofar as the former also requires a showing of specific intent.); *Campbell v. Feld Entm't, Inc.*, 75 F.Supp.3d 1193, 1205 (N.D. Cal. 2014) (Ralph Act requires invidious viewpoint animus); *J.P. v. City of Porterville*, 801 F. Supp. 2d 965, 990 (E.D. Cal. 2011) ("Battery is a state law tort counterpart to [an] excessive force claim."); Compl. ¶¶ 328-335 (predicating false arrest and negligence claims on identical allegations and theories as Fourth Amendment claims).  California immunity provisions also bar Plaintiffs' claims.

"California's common law has long provided personal immunity from lawsuits challenging a governmental official's discretionary acts within the scope of his or her authority." *Conway v. Cty. of Tuolumne*, 231 Cal. App. 4th 1005, 1014 (Cal. Ct. App. 2014).  This immunity extends to decisions by police officials about how best to fulfill government's law-enforcement function in a given case, including the decision by police authorities to use tear gas.  *See id.*  Like the use of tear gas to effect arrest, the decision by police officers to use one particular crowd-control tactic—i.e., projectiles to disperse a crowd—is a discretionary act that entails significant law enforcement judgment and expertise.  It is therefore protected by discretionary-act immunity.  *See id.* at 1017–18.  Additionally under California law, an officer's use of force against a person who is part of an unlawful assembly is a privileged act and is thus not amenable to tort liability.  *See Gilmore v. Superior Ct.*, 230 Cal. App. 3d 416, 421 (Ct. App. 1991) ("A privileged act is by definition one for which the actor is absolved of any tort liability, whether premised on the theory of negligence or of intent."); Restatement 2d of Torts § 141 (1965) ("[A] peace officer . . . is privileged to use force against another . . . for the purpose of terminating or preventing the review of an affray or an equally serious breach of the peace . . . .").

## Conclusion

Defendants respectfully request that the Court dismiss the complaint.  Fed. R. Civ. P. 12(b)(6).

Respectfully submitted,

NORA FRIMANN, City Attorney

Dated:  June 7, 2021

By:  ____/s/*Matthew Prtichard*_____
        MATTHEW PRITCHARD
        Sr. Deputy City Attorney

Attorneys for Defendants

DEFENDANTS' MOTION TO DISMISS

21-cv-01705-PJH

1825479_2