UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NAACP OF SAN JOSE/ SILICON VALLEY, et al.,

　　　　　　Plaintiffs,

　　v.

CITY OF SAN JOSE, et al.,

　　　　　　Defendants.

Case No. 21-cv-1705-PJH

**ORDER RE MOTION TO DISMISS**

Re: Dkt. No. 27

Defendants' motion to dismiss came on for hearing before this court on August 12, 2021. Plaintiffs NAACP of San Jose/Silicon Valley, San Jose Peace and Justice Center, M. Michael Acosta, Joseph Cañas, Leslie Vasquez, Peter Allen, Shaunn Cartwright, Yessica Riles, Jose Gustavo Flores Rodriguez, Alex Lee, Joseph Maldonado, Cindy Cuellar, Mahmoudreza Naemeh, and Megan Swift appeared through their counsel, Rachel Lederman, Tifanei Ressl-Moyer, and James Chanin. Defendants City of San Jose, Sam Liccardo, Edgardo Garcia, David Sykes, Jason Dwyer, Ronnie Lopez, Lee Tassio, Jared Yuen, Sean Michael Curry, and Fnu Delgado appeared through their counsel, Matthew Pritchard and Yue-Han Chow. Having read the papers filed by the parties and carefully considered their arguments and relevant authority, and good cause appearing, the court hereby rules as follows.

## BACKGROUND

This is a civil rights case. The allegations all arise out of last summer's protests in response to the killing of George Floyd. Specifically, between May 29 and May 31, 2020, plaintiffs participated in protests in San Jose to "express their view that police brutality

and institutionalized racism must end," and now "seek redress for the violation of their constitutional rights to assemble, protest, and be free from racial discrimination, disability discrimination, excessive force, and wrongful arrest." Dkt. 3 (Complaint), ¶¶ 2, 3.

There are two "organization plaintiffs" and twelve individual plaintiffs in this case. The organization plaintiffs are (1) the National Association for the Advancement of Colored People of San Jose/Silicon Valley ("NAACP"), and (2) the San Jose Peace and Justice Center ("SJPJC"). Both organizations allege in the complaint that their constituents' rights to speech and assembly were violated, and that the organizations plan to assist and participate in similar protests in the future and are "fearful that the same unlawful police actions in response to these and similar protests of institutional racism and police brutality will be repeated absent injunctive relief." Dkt. 3, ¶¶ 14, 15. Both organizations are plaintiffs for equitable relief only. Dkt. 37 at 1, n.2.

Now, the twelve individual plaintiffs. First is Michael Acosta, a 49-year-old engineering manager of mixed ethnicity. Dkt. 3, ¶ 16. Acosta was attempting to shop at Walmart or Target on May 29, 2020, but discovered they were both closed. Id., ¶ 80. As he was driving back home, he "became aware that a large demonstration was going on" and "wanted to show solidarity with the Black Lives Matter movement." Id. Acosta was in a crowd of people when police officers allegedly "threw a flash bang grenade and/or stinger grenades." Id., ¶ 83. A San Jose police officer then "shot Acosta in the eye with an impact munition," causing him to lose all vision as he "fell to one knee." Id., ¶ 84. Police officers did not come to his aid, but other protestors helped bandage his eye. Id., ¶ 85. Acosta went to the hospital later that night, and underwent surgery to "completely remove his eye globe as a result of being shot." Id., ¶ 87.

The second individual plaintiff is Joseph Cañas, a 26-year-old musician of mixed ethnicity. Dkt. 3, ¶ 17. Cañas was at the protest on May 29, 2020, "peacefully playing his guitar" when he "heard an announcement from the police, but could not make out the words." Id., ¶ 55. The complaint alleges that a San Jose police officer (either defendant Jared Yuen, or a 'Doe' officer) "shot Mr. Cañas in the eye with an impact munition,

causing searing pain and permanently damaging his vision." Id.

The third individual plaintiff is Leslie Vasquez, a 32-year-old Latinx woman who works in the maternity and children's division of a hospital. Dkt. 3, ¶ 18. Vasquez was at the protest with her sister, Yessica Riles, who is also a plaintiff in this case. Vasquez and Riles attended the protest on May 29, 2020. When the police arrived, Vasquez and Riles "became separated in the crowd." Id., ¶ 61. Vasquez "saw police were shooting a young woman with impact munitions" and "tried to help the woman." Id., ¶ 62. When Vasquez tried to help, she was shot "in the groin at close range" by defendant Jared Yuen or a 'Doe' defendant. Id. Another officer "hit [her] in the stomach with his baton multiple times and pushed her, even though she put her hands up." Id., ¶ 63.

Yessica Riles is listed as the sixth individual plaintiff in the complaint, but the court includes her factual allegations here because they overlap with Vasquez's. Riles is a 41-year-old Latinx labor and delivery nurse. Dkt. 3, ¶ 21. After being separated from Vasquez, Riles went looking for her, and saw her "standing in front of the police line with her hands up." Id., ¶ 64. Riles also "put her hands up too in a gesture of 'don't shoot,'" but a San Jose police officer "took aim and shot her, too, in the abdomen with an impact munition." Id. ¶ 65. Riles further alleges that she was shot in the groin and pelvic region. Id. Riles further alleges that police "failed to give clear warnings before using force," and that she heard police give an amplified dispersal order "only after they had already shot her and multiple others." Id., ¶ 67.

The fourth individual plaintiff is Peter Allen, a 43-year-old white communications specialist. Dkt. 3, ¶ 19. Allen attended the protest on May 29, 2020, and "observed the crowd was peaceful and posed no threat to the police." Id., ¶ 95. The police then "suddenly . . . charged the demonstrators while throwing explosive flashbangs and/or OC blast stinger grenades into the crowd." Id., ¶ 96. Allen "tried to back away but before he could do so," a San Jose police officer "shoved him forcefully to the ground with his baton." Id. Allen tried to stand up and back away, but the same officer "used his baton to shove him to the ground again." Id. Allen then stood up and "jogged away from the

3

police line." Id., ¶ 97. When he was about 20 yards away, "he turned to face them with his hands up in a gesture of 'don't shoot' while backing away from them," and a San Jose police officer "proceeded to shoot him in the left upper thigh with an impact munition." Id. An officer then "shot him again, this time in the left upper chest with an impact munition." Id., ¶ 98.

The fifth individual plaintiff is Shaunn Cartwright, a 51-year-old disabled, white woman who "attended the San Jose demonstrations on May 29, 30, and 31, 2020 as a legal observer." Dkt. 3, ¶ 20. Cartwright "suffers from trigeminal neuralgia and has a brain implant to treat this that runs on a battery implanted in her chest." Id. Her right knee was surgically replaced in October 2019, and her left knee also needed replacement at the time of the May 2020 protests. Id. On May 29, 2020, Cartwright observed San Jose police officers "shooting impact munitions into the crowd of demonstrators," and also saw officers "throw two people, including a young teen girl, to the ground [] and beat them with batons." Id., ¶ 74. Cartwright "attempted to take photographs to document and discourage this police use of force," but defendant police officer Fnu Delgado or a 'Doe' officer "shoved her in the chest very forcefully." Id. Cartwright told the officer that she had a brain injury, but "he shoved her twice more." Id.

On May 30, 2020, Cartwright observed the police using chemical agents against the protestors, and she "stayed in what she thought was a safe spot against a wall" because she was physically unable to run. Dkt. 3, ¶ 102. A San Jose police officer then "shot at her four times in quick succession with impact munitions," striking her right knee, as well as her calf and finger. Id.

On May 31, 2020, Cartwright went to the protest to "distribute a legal hotline number to demonstrators and again serve as a legal observer." Dkt. 3, ¶ 116. She was wearing a "green 'legal observer' hat and a face mask to protect her and others from COVID-19." Id. That same day, at around 5:30pm, the City of San Jose had announced a curfew to go into effect at 8:30pm that night. At around 8:30pm, Cartwright was "peacefully talking on the sidewalk" with medics and journalists, when San Jose police

4

officers "threatened them with arrest telling them that they were going to be made examples of and were going to jail for violating the curfew." Id., ¶ 118. Cartwright "explained that she was a legal observer and that others were medics and journalists," but they were arrested later that night. Id. Cartwright then alleges that she was held in a patrol car with two officers who were not wearing masks, then was forced to sit in a bus with people without masks, and then was dropped off in a mall parking lot at 1am, after public transportation had stopped running, and "with no way to get home, and despite the still ongoing curfew." Id., ¶¶ 119-120.

The sixth individual plaintiff is Yessica Riles, who was already discussed above.

The seventh individual plaintiff is Jose Gustavo Flores Rodriguez (referred to as "Gustavo Flores" in the complaint), a 48-year-old Latinx commercial driver. Dkt. 3, ¶ 22. Flores was present at the May 29, 2020 protest, and heard one San Jose police officer "tell the other [] officers, softly, 'get ready to shoot!'" Id., ¶ 69. The officers did not make any announcement or warning to the crowd, so Flores "tried to warn the other demonstrators, walking down the front line of demonstrators suggesting that they put their hands up in a gesture of 'don't shoot' to show they were unarmed [and] did not pose a threat." Id. While Flores was doing so, a San Jose police officer "shot him in the groin and testicle with an impact munition." Id. Flores fell to the ground, and as he got up, he saw the officer reloading his gun. Id., ¶ 70. As Flores was trying to walk away, someone warned that the officer was aiming at him again, and when Flores turned to look, the officer shot him in his left collarbone with another impact munition. Id.

The eighth individual plaintiff is Alex Lee, a 25-year-old Asian member of the California state assembly[1]. Dkt. 3, ¶ 23. Lee attended the protest on May 29, 2020, and observed officers shoot "impact munitions, explosive grenades, and chemical agents at the demonstrators," who were not "threatening the police in any way." Id., ¶ 99. The next night, Lee also observed police firing "munitions, grenades, and chemical agents" into a

---

[1] Lee was elected to the assembly in the 2020 general election, he was a candidate at the time of the protests.

crowd without warning, and was struck by a tear gas canister or grenade.  Id., ¶¶ 100-101.  The day after that, on May 31, Lee was standing with plaintiff Cartwright and medics and journalists when he was arrested for violating curfew.  Id., ¶ 118.

The ninth individual plaintiff is Joseph Maldonado, a 33-year-old Latinx technology administrator.  Dkt. 3, ¶ 24.  On May 29, 2020, Maldonado attended the protest and "observed only peaceful demonstrating – nothing that would justify the use of chemical weapons – but noticed that the police put on gas masks."  Id., ¶ 76.  The officers then "launched a chemical agent, most likely teargas, into the crowd," causing Maldonado to experience "an intense burning sensation."  Id., ¶ 77.

The tenth individual plaintiff is Cindy Cuellar, a 22-year-old Latinx recent graduate of San Jose State University.  Dkt. 3, ¶ 25.  Cuellar attended the May 29, 2020 protest and saw officers "shoot impact munitions into the crowd," hitting a friend of hers who is a journalist.  Id., ¶ 57-58.  When Cuellar went to her friend's aid, an officer shot Cuellar in her left calf.  Id., ¶ 58.

The eleventh individual plaintiff is Mahmoudreza Naemeh, a 30-year-old Iranian chemical analyst.  Dkt. 3, ¶ 26.  Naemeh attended the May 30 protest and saw officers block an intersection with a line of officers.  Id., ¶ 104.  Naemeh "walked backward on the sidewalk away from the police with his hands up," but an officer "shot him in the shin just below his knee with an impact munition."  Id.  Naemeh walked away, looking for his friend who was giving him a ride home, and came upon a small group of demonstrators.  Id., ¶¶ 105-106.  A group of San Jose police officers "charged towards them on foot and motorcycles . . . surrounding the demonstrators so they could not leave."  Id., ¶ 106.  Naemeh was tackled and arrested along with 30-40 other people.  Id.

An officer told Naemeh that "he was the person responsible for throwing frozen water bottles," which Naemeh denied.  Dkt. 3, ¶ 107.  When Naemeh provided his identification, an officer asked how to pronounce his name, and Naemeh said to call him "Reza" (short for Mahmoudreza).  Id.  The officers continued to call him "Mohammed," even after he corrected them and asked to be called "Reza."  Id.  Naemeh further alleges

that a 'Doe' officer photographed him, but not any other arrestees, which "felt like an act of intimidation." Id. Naemeh further alleges that officers removed his face mask without consent, and that he was held in two enclosed vehicles with other people who were not wearing masks. Id., ¶ 108. After approximately three hours in custody, Naemeh was released without being charged with a crime. Id., ¶¶ 108, 110.

The twelfth individual plaintiff is Megan Swift, a 49-year-old white community organizer. Dkt. 3, ¶ 27. On May 29, 2020, Swift "heard about the police violence" and went to the demonstration "with water and first aid materials, including gauze and gloves" in order to "bring aid in support of the racial justice demonstrators." Id., ¶ 89. When she arrived, she saw the police "charge the crowd with guns and/or launchers raised, while throwing explosive flashbang and/or OC blast stinger grenades into the crowd." Id., ¶ 90. She then saw officers form a line and march towards her and other demonstrators, yelling "move." Id., ¶ 91. Swift "tried to comply by stepping back," but defendant officer Sean Michael Curry and/or a 'Doe' officer "stepped out of the police line multiple times to strike Swift hard in two-handed blows with his club." Id. A nearby demonstrator yelled at the officer to stop hitting Swift. The officer hit Swift one more time, then "grabbed her and dragged her through and behind the police line," then handcuffed her with her hands behind her back. Id., ¶ 92. Swift was detained for three hours, then released without being charged with any crime. Id., ¶ 93-94.

Named as defendants are one organization defendant (the City of San Jose), nine individual defendants, and then Doe defendants. The nine individual defendants are as follows: (1) Sam Liccardo, mayor of San Jose at all relevant times, (2) David Sykes, city manager of San Jose at all relevant times, (3) Edgardo Garcia, police chief of the San Jose Police Department at all relevant times, (4) Jason Dwyer, a captain with the San Jose Police Department and the 'special operations commander' during the May 2020 protests, (5) Ronnie Lopez, a sergeant with the San Jose Police Department, (6) Lee Tassio, a sergeant with the San Jose Police Department, (7) Jared Yuen, an officer with the San Jose Police Department who is alleged to have participated in the conduct

related to plaintiffs Cañas and Vasquez, (8) Sean Michael Curry[2], an officer with the San Jose Police Department who is alleged to have participated in the conduct related to plaintiff Swift, and (9) Fnu Delgado, an officer with the San Jose Police Department who is alleged to have participated in the conduct related to plaintiff Cartwright.

The complaint purports to assert sixteen causes of action, though the first is for "injunctive relief" and the second is for "declaratory relief," which are types of remedies rather than standalone causes of action. That leaves fourteen substantive causes of action to be analyzed on this motion.

After briefing was complete, but before the motion to dismiss hearing, the court issued an order noting that "the complaint is unclear in stating which claims are being asserted by which plaintiffs against which defendants," and directing plaintiffs to file a chart providing a more specific identification of claims, plaintiffs, and defendants. See Dkt. 35. Plaintiffs filed their chart the next day. See Dkt. 37. In most instances, the chart narrowed the scope of asserted claims. For instance, the complaint states that the eleventh cause of action is asserted against all defendants, whereas the claim chart narrows the claim such that it is asserted against only the City of San Jose. However, in other instances, the claim chart purports to widen the scope of asserted plaintiffs or defendants. For instance, the complaint limits the seventh cause of action to a subset of plaintiffs and defendants, whereas the claim chart purports to expand the cause of action such that it is asserted by all plaintiffs against all defendants. The court will not accept any attempt to add new plaintiffs or defendants to any claim, and will incorporate plaintiffs' chart only to the extent that it narrows the number of plaintiffs or defendants.

The fourteen substantive causes of action are as follows (using the numbering of the complaint):

---

[2] The court notes that the heading of the complaint lists "Sean Michael Curry," while the body of the complaint refers to Stephen Michael Curry. Because the name listed on the court's docket is Sean Michael Curry, the court will use that name unless a correction is filed on the docket.

(3) violation of First Amendment rights under section 1983, asserted by all plaintiffs against all defendants,

(4) excessive force in violation of the Fourth and Fourteenth Amendments, under section 1983, asserted by all plaintiffs against all defendants,

(5) wrongful arrest in violation of the Fourth and Fourteenth Amendments, under section 1983, asserted by plaintiffs Cartwright, Lee, Swift, Naemeh, NAACP, and SJPJC, against defendants City of San Jose, Sykes, Garcia, and Dwyer,[3]

(6) violation of the Fourteenth Amendment right to equal protection, under section 1983, asserted by plaintiffs Acosta, Cañas, Vasquez, Riles, Flores, Lee, Maldonado, Cuellar, Naemeh, NAACP, and SJPJC, against all defendants,

(7) violation of the right to freedom of movement under the Fourth, Ninth, and Fourteenth Amendment, under section 1983[4], asserted by plaintiffs NAACP, SJPJC, Lee, and Cartwright, against defendants City of San Jose, Liccardo, Sykes, and Garcia,[5]

(8) failure to intervene under section 1983, asserted by all plaintiffs against defendants Sykes, Garcia, Dwyer, Yuen, Curry, and Delgado,[6]

(9) conspiracy to deprive plaintiffs of their constitutional rights, under section 1983, asserted by all plaintiffs against all defendants,

(10) violation of Title II of the Americans with Disabilities Act, asserted by plaintiffs Cartwright and SJPJC against defendant City of San Jose,

(11) violation of section 504 of the Rehabilitation Act, asserted by plaintiffs Cartwright and SJPJC against defendant City of San Jose,

(12) violation of the California Bane Act, asserted by all plaintiffs against all defendants,

(13) violation of the California Ralph Act, asserted by all plaintiffs against all defendants,

(14) assault and battery under state law, asserted by all plaintiffs against all defendants,

---

[3] Plaintiffs' claim chart also includes Liccardo, Lopez, Tassio, and Curry as defendants, but because they were not named as a defendants on this claim in the complaint, they will not be added now.

[4] The complaint cites to section 1982, but that appears to be a typo.

[5] As mentioned above, the claim chart purports to expand this claim to be asserted by all plaintiffs against all defendants, but that attempted expansion is rejected.

[6] Plaintiffs' chart purports to add the City of San Jose as a defendant on this claim, but the City was not named on this cause of action in the complaint, and will not be added now.

(15) false arrest and false imprisonment under state law, asserted by plaintiffs Cartwright, Lee, Swift, Naemeh, NAACP, and SJPJC, against defendants City of San Jose, Sykes, Garcia, and Dwyer,[7] and

(16) negligence under state law, asserted by all plaintiffs against all defendants.

Defendants now move to dismiss the entirety of the complaint.

## DISCUSSION

A.    Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Review is limited to the contents of the complaint. Allarcom Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995). To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). The court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007).

However, legally conclusory statements, not supported by actual factual allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and quotations omitted). A claim has facial plausibility when the plaintiff pleads factual

---

[7] As with the fifth cause of action for wrongful arrest under federal law, plaintiffs' chart purports to add Liccardo, Lopez, Tassio, and Curry as defendants, but that attempt is rejected.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).  In the event dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  See Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

Review is generally limited to the contents of the complaint, although the court can also consider a document on which the complaint relies if the document is central to the claims asserted in the complaint, and no party questions the authenticity of the document.  See Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007).  The court may consider matters that are properly the subject of judicial notice, Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001), and may also consider exhibits attached to the complaint, see Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents referenced extensively in the complaint and documents that form the basis of a the plaintiff's claims.  See No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

B.    Analysis

1.    Qualified immunity

Before addressing the causes of action individually, the court notes that much of defendants' motion is based on qualified immunity.  The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

United States District Court
Northern District of California

While courts may consider qualified immunity at the pleadings stage, the Ninth Circuit has noted that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making." <u>Keates v. Kolie</u>, 883 F.3d 1228, 1234 (9th Cir. 2018) (citing <u>Kwai Fun Wong v. United States</u>, 373 F.3d 952, 956-57 (9th Cir. 2004)). The Ninth Circuit has also observed that, by considering qualified immunity at the pleadings stage, "the courts may be called upon to decide far-reaching constitutional questions on a nonexistent factual record." <u>Kwai Fun Wong</u>, 373 F.3d at 957.

Moreover, as seen above in the Background section of this order, many of the factual allegations are specific to each plaintiff and not amenable to a blanket ruling of qualified immunity. For those reasons, the court is inclined to consider defendants' qualified immunity arguments at the summary judgment stage, when the court will have the benefit of a developed factual record. While defendants may ultimately prevail on many of the arguments it makes now with respect to qualified immunity, because the qualified immunity analysis often turns on the specific facts of each alleged violation, the court finds that the qualified immunity arguments are better suited to summary judgment.

2. <u>Municipal and supervisory liability</u>

Defendants' motion also presents a threshold issue regarding municipal and supervisory liability. Because these issues are raised in connection with many of the individual causes of action, the court will first address the parties' arguments here.

Under <u>Monell v. Dept. of Soc. Servs. of City of New York</u>, a city is not liable for the torts of its agents unless the city's policymakers adopted a policy or custom that was the "moving force" behind the alleged violations. <u>Monell</u>, 436 U.S. 658, 691 (1978). The inadequacy of police training may serve as the basis for liability, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989).

Defendants argue that there was no policy or custom behind the alleged violations, and further argue that plaintiffs' "failure to train" theory is not viable because plaintiffs do

not allege facts showing that the training program before May 2020 was constitutionally inadequate.

Plaintiffs point to the following three categories of allegations: (1) defendants adopted specific policies for a curfew and to allow expanded use of dangerous riot weapons, (2) defendants encouraged, tolerated, and ratified a series of racist policing and excessive force incidents over the years, and (3) defendants failed to train officers despite obvious knowledge of a culture of white supremacist racism and history of excessive force. See Dkt. 32 at 19. Plaintiffs also point to the complaint's allegations that city policymakers "changed its policies days before the May 29, 2020 demonstration to allow use of additional chemical agent devices and allow use of impact munitions that it had previously prohibited in crowd control situations." Dkt. 3, ¶ 192. Plaintiffs argue that these allegations support all three theories of Monell liability as used in the Ninth Circuit: (1) an unconstitutional custom or policy, (2) deliberately indifferent omission, such as a failure to train, and (3) a final policymaker's involvement in, or ratification of, the conduct underlying the violation of rights. See Clouthier v. County of Contra Costa, 591 F.3d 1232, 1249-50 (9th Cir. 2010).

As to the individual supervisory defendants, the Ninth Circuit has held that supervisors may be liable for the constitutional violations of their subordinates "when culpable action, or inaction, is directly attributed to them." 652 F.3d 1202, 1205 (9th Cir. 2011). A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Id. at 1207. The supervisor need not be "directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury." Id. at 1205. "Rather, the supervisor's participation could include his own culpable action or inaction in the training, supervision, or control of his subordinates, his acquiescence in the constitutional deprivations of which the complaint is made, or conduct that showed a reckless or callous indifference to the rights of others." Id. at

13

1205-06.

Plaintiffs argue that the complaint provides specific allegations regarding the personal involvement of the supervisory defendants, and argue that such allegations are sufficient at the pleadings stage of the case. Specifically, the complaint alleges that defendants Liccardo, Garcia, and Sykes caused the constitutional violations by "equipping inadequately trained officers with highly dangerous impact munitions, explosive grenades, and chemical weapons," and "approving the use" of those weapons at the demonstrations, "which resulted in such weapons being used in an unconstitutional [and] excessive manner." Dkt. 3, ¶ 193. Plaintiffs also allege that Liccardo, Garcia, and Sykes made "the decision to declare a curfew on May 31, which was unconstitutional," and "used as a pretext to wrongfully arrest 70 people." Id., ¶ 190.

Plaintiffs further allege that Dwyer, Lopez, and Tassio were "supervising and giving direct orders at the scene." Dkt. 32 at 18. Plaintiffs cite an order from another court in this district, in a case also arising out of last year's protests:

> [I]n a more typical police case, involving an isolated incident of alleged misconduct against one or two citizens, it is hard to infer that the conduct of a police officer is attributable to the municipality. And in such a case, it might be a stretch to infer—merely from a police chief's after-the-fact general defense of the officer—that the municipality is responsible for the officer's conduct.
> …
> This case involves a different situation. The complaint suggests that the Black Lives Matter protests (along with the activity that spun off from the protests) gripped Santa Rosa, prompting the full attention of the entire police department, from the police chief to command staff to line officers. In times like that, when the department is executing an organized, department-wide response, one can presume that the police chief was in control of his department, either directing that response himself or—at the very least—ratifying the actions of his subordinates. Therefore, it becomes easier to infer that the repeated conduct of individual police officers is really the conduct of the department, particularly when the police chief makes comments that could be interpreted as suggesting that the officers who used force did not meaningfully deviate from the department's plan for how to control the crowds.
> …
> In requesting dismissal of this claim, the City appears to ask the Court to draw an inference that the police chief was not meaningfully aware of either

14

> the department's plan for responding to the protests or the degree to which the conduct of the officers involved in these high-profile incidents conformed to that plan. <u>It would not be appropriate to draw that inference at this stage of the case</u>, where the allegations in the complaint must be presumed true and all reasonable inferences must be drawn in the plaintiffs' favor. <u>Instead, it is reasonable to infer that the conduct of the individual officers was directed or ratified by the police chief</u>.

<u>Martinez v. City of Santa Rosa</u>, 499 F.Supp.3d 748, 750 (N.D. Cal. 2020) (emphasis added).

The court finds <u>Martinez</u> to be persuasive in the context of the present case. All of the plaintiffs in this case were either targeted with impact munitions or chemical agents and/or arrested under a challenged curfew order. Plaintiffs have alleged that "defendants adopted specific policies for a curfew and to allow expanded use of dangerous riot weapons," and at the pleadings stage, these allegations are sufficient. While defendants may ultimately succeed in showing that the supervisory defendants did not actually have any role in causing the alleged violations, any such showing requires the development of a factual record.

Moreover, specifically as to the "failure to train' allegations, the court points out that defendants' own "after-action report," of which defendants have requested judicial notice[8], specifically states that "crowd control training has been minimal and infrequent" and that "commanders lacked sufficient training and experience" in crowd control. Dkt. 27-1 at 4.

As with qualified immunity, defendants may ultimately prevail on this issue after the development of a factual record. However, at this stage of the case, the court will not issue a blanket dismissal for all municipal and supervisory defendants.

3. <u>Third cause of action (violation of the First Amendment)</u>

Defendants' motion points out that plaintiffs' third cause of action advances two First Amendment theories: (1) viewpoint discrimination, based on the argument that their participation in the protests was a substantial or motivating factor in the use of force, and

---

[8] Defendants' request for judicial notice is GRANTED to the extent the report is cited in plaintiffs' complaint.

(2) suppression of speech based on the curfew order.  See also Dkt. 3, ¶¶ 235, 236.  The court will address the two theories separately.

a.  Viewpoint discrimination

To demonstrate a First Amendment violation, plaintiffs must allege (1) they were engaged in a constitutionally protected activity, (2) the defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendants' conduct. See Index Newspapers LLC v. U.S. Marshals Service, 977 F.3d 817, 827 (9th Cir. 2020); Pinard v. Clatskanie Sch. Dist., 467 F.3d 755, 770 (9th Cir. 2006).

Defendants appear to challenge only the third element, arguing that plaintiffs "allege no facts plausibly establishing that the officers' force was motivated by invidious speech-based animus rather than legitimate law-enforcement purposes."  Dkt. 33 at 1. Defendants further argue that any allegations regarding animus are "sheer speculation" because "plaintiffs do not allege that any police officer who arrested or used force against a protestor made remarks to suggest hostility towards plaintiffs' views or affiliation while doing so."  Dkt. 27 at 3.

Plaintiffs respond by arguing that the third element can be demonstrated "through direct or circumstantial evidence" and "involves questions of fact that normally should be left for trial."  Index Newspapers, 977 F.3d at 827.

Plaintiffs then cite numerous cases dealing with the same issue in the context of the 2020 protests and finding in the plaintiffs' favor.  For instance, another court in this district concluded that the alleged "aggressive conduct" by officers, "such as shooting a reporter with a rubber bullet even though it does not appear she was engaged in illegal activity or posed a threat of any kind, raises a serious question as to whether some of the uses of force described in those declarations was in reaction to the anti-police message of the protests and aimed at intimidating protestors to deter such speech."  Anti Police-Terror Project v. City of Oakland, 477 F.Supp.3d 1066, 1088 (N.D. Cal. 2020).

Another district court case noted that "officers indiscriminately used force against

16

peaceful protestors on multiple occasions," including "continu[ing] to fire tear gas canisters as people attempted to leave the protest area." Based on those allegations, the court concluded that "preventing criminal activity . . . was not the sole purpose of [officers'] use of force," and that they instead "may have been substantially motivated by an intent to interfere with plaintiffs' constitutionally protected expression." Don't Shoot Portland v. City of Portland, 465 F.Supp.3d 1150, 1155-56 (D. Or. 2020).

In another case arising out of the police response to the 2020 protests, the court relied on the allegation that officers "indiscriminately threw an excessive amount of chemical agents at peaceful protests" in concluding that the protected activity was a substantial or motivating factor of the use of force. Black Lives Matter Seattle-King County v. City of Seattle, 466 F.Supp.3d 1206, 1214 (W.D. Wash. 2020) ("The use of indiscriminate weapons against all protestors – not just the violent ones – supports the inference that SPD's actions were substantially motivated by the plaintiffs' protected First Amendment activity.").

In addition to those cases, plaintiffs cite to the allegations of the complaint, which support the inference that their protected activity was a substantial or motivating factor of the use of force. Specifically, they point to allegations that officers shot impact munitions and chemical weapons at people who were kneeling on the ground praying, standing with their hands up, playing the guitar, trying to walk away, or otherwise peacefully demonstrating. See, e.g., Dkt. 3, ¶¶ 52, 55, 63, 90. The complaint also cites to a video of defendant Yuen where he "appeared visibly excited and eager to shoot demonstrators" as he shouted "Let's get this motherfucker!" and "Shut up, bitch!" to a woman who asked him a question. Id., ¶ 181. In the complaint, plaintiff Swift also alleges that she saw officers "take a group selfie" and "making jokes about George Floyd's death." Id., ¶ 180.

In their reply, defendants seek to distinguish the 2020 cases cited by plaintiffs by arguing that those court were conducting a preliminary injunction analysis and are therefore inapplicable.

Overall, as to the argument that defendants violated plaintiffs' First Amendment

rights by using force against them because of their participation in the protests (i.e., because of their viewpoint), plaintiffs have sufficiently alleged a claim for pleading purposes.  The cited district court cases are persuasive, and defendants' argument to distinguish them based on their procedural posture is rejected.  If anything, the different procedural posture makes them even more persuasive, because on a motion for preliminary injunction, the court does not take all of plaintiff's allegations as true, but rather weighs the credibility of the evidence from both sides.  On this motion, where the court is to take all of plaintiffs' allegations as true, including their allegations as to the substantial or motivating factor behind the defendants' conduct, the court concludes that plaintiffs have adequately alleged a claim for a First Amendment violation based on viewpoint discrimination.  As other district courts have noted, given that the protestors were specifically protesting police misconduct, it is reasonable to allege that the protestors' viewpoint was a substantial or motivating cause – even if not necessarily the sole cause – behind the defendants' conduct.  Defendants also argue that plaintiffs have not alleged the violation of a clearly established First Amendment right, but that qualified immunity argument will be considered on summary judgment, for the reasons set forth above.

Accordingly, the court DENIES defendants' motion to dismiss the viewpoint discrimination-related portion of plaintiffs' third cause of action.

      b.  Curfew

Even in a public forum, the government "may impose reasonable restrictions on the time, place, or manner of protected speech."  Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  To be constitutional, those restrictions must be: (1) "without reference to the content of the regulated speech," i.e., content neutral, (2) "narrowly tailored to serve a significant government interest," and must (3) "leave open ample alternative channels for communication of the information."  Id.

In this case, the curfew order stated that "no person shall be upon the public street, avenue, alley, park, or other public place or unimproved public realty within the

limits of the City of San Jose" from the hours from 8:30pm to 5:00am.  Dkt. 30, Ex. A.[9]

The curfew order states that it "shall not apply to police officers, peace officers,

firefighters, or other emergency personnel or civilians engaged in police, emergency,

government work, delivery services, or utility services, nor shall it apply to authorized

representatives of any news service, newspaper, or radio or television station or network,

nor shall it apply to individuals seeking or providing medical care or care for family

members or others."  Id.

Defendants argue, and plaintiffs do not dispute, that the curfew was content

neutral.  Thus, the analysis turns on whether plaintiffs have adequately alleged that the

curfew was not narrowly tailored and/or that it did not leave open ample alternative

channels for communication.

Defendants' briefing largely relies on one case, a Ninth Circuit case arising out of

the World Trade Organization ("WTO") protests in Seattle in 1999 and the curfew that

was ordered in response.  See Menotti v. City of Seattle, 409 F.3d 1113 (9th Cir. 2005).

And at the hearing, defendants' counsel stated that "the analysis really begins and ends

with the Menotti decision."  Dkt. 44 at 9.

However, critically, Menotti was decided on summary judgment, where the district

court had an evidentiary record by which to evaluate whether the challenged curfew was

narrowly tailored and whether it left open ample alternative channels for communication.

409 F.3d at 1119.  In contrast, on the present motion to dismiss for failure to state a

claim, the court has no evidentiary record before it, and thus does not have adequate

means of determining whether the challenged curfew was narrowly tailored or whether it

left open ample alternative channels for communication.  That reason alone warrants

denial of defendants' motion to dismiss plaintiffs' third cause of action as to the curfew.

For instance, there are no facts in the record about the location and scope of any

---

[9] Plaintiffs have requested judicial notice of the curfew order, and defendants have
requested judicial notice of the emergency order preceding the curfew order.  Both
requests are GRANTED.  See Dkt. 30, 27-1.

looting and/or violence, which would inform the court's analysis of whether the curfew order was narrowly tailored to the government interest in preventing property damage. Defendants' argument appears to presume that simply by invoking the specter of property damage, a citywide curfew order was automatically warranted as a matter of law. The court cannot rule on the issue of whether the curfew order was narrowly tailored without more facts regarding the nature of the disorder which the curfew sought to prevent. The court further notes that the curfew was not ordered until May 31, 2020, two days after the demonstrations had begun, suggesting that the course of events during the first two days of demonstrations had prompted defendants to issue the curfew order. However, without a factual record to establish the specific events of those two days, the court cannot make a determination as to whether curfew order passed constitutional muster.

Moreover, even if the court were to compare the facts of <u>Menotti</u> to the facts set forth in the present case, it would still appear that <u>Menotti</u> is distinguishable. Whereas the curfew order challenged in this case applied to the entire city of San Jose, the <u>Menotti</u> court emphasized that the restriction "merely restricted access within a well-defined security zone to facilitate a public event" and "did not apply generally to the City of Seattle." 409 F.3d at 1138. The <u>Menotti</u> court further explained that the anti-WTO protestors had the "ability to communicate directly across the street from most WTO venues." <u>Id.</u> In contrast, the curfew order challenged in this case applied to the entire 178 square miles of the city of San Jose. Dkt. 32 at 10.

While plaintiffs have stated a viable claim as to the constitutionality of the curfew, defendants argue that "as a matter of law, only the City Manager [Sykes] had authority to impose the curfew at issue," citing the city charter and municipal code. Dkt. 27 at 4. Defendants thus argue that the other supervisory defendants should be dismissed from any claim arising out of the curfew. However, as discussed above, plaintiffs' complaint does allege that Liccardo and Garcia were also personally involved in the curfew's issuance, and given the citywide response to the protests as explained in <u>Martinez</u>,

20

plaintiffs' allegations are sufficient for purposes of this motion. While defendants may later present evidence showing that only the city manager was involved in issuing the curfew order, at this stage of the case, plaintiffs have adequately alleged that defendants Liccardo and Garcia were also involved.

Accordingly, the court DENIES defendants' motion to dismiss the curfew-related portion of plaintiffs' third cause of action as to defendants Sykes, Liccardo, Garcia, and the City of San Jose, but GRANTS defendants' motion to dismiss this claim with prejudice as to the remaining defendants, as the complaint does not allege that any other individual defendants were involved in issuing the curfew. While the complaint did name all defendants as part of its third cause of action, the complaint made no distinction between the viewpoint discrimination-related and curfew-related portions of the claim. On the viewpoint discrimination-related portion, plaintiffs did make allegations as to all defendants, but on the curfew-related portion, they did not. Nor did plaintiffs' opposition brief present any reason why the non-supervisory defendants should be considered responsible for issuing the curfew order. Thus, as to the curfew-related portion of the third cause of action, no leave to amend is granted as to the dismissed defendants.

### 4. Fourth cause of action (excessive force)

The next claim is the fourth cause of action, for excessive force in violation of the Fourth and Fourteenth Amendments. Excessive force claims are governed by the "reasonableness" standard of the Fourth Amendment, which looks to whether the "nature and quality of the intrusion on the individual's Fourth Amendment interests" is balanced against the "countervailing government interests." Graham v. Connor, 490 U.S. 386, 395 (1989). In evaluating the government's interest, courts look at (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Young v. City of Los Angeles, 655 F.3d 1156, 1163 (9th Cir. 2011).

Defendants' motion starts by arguing that a viable excessive force claim depends

on a threshold showing that plaintiffs were actually seized, and defendants argue that "the vast majority of them were not seized." Defendants focus on a recent Supreme Court case, Torres v. Madrid, which they argue supports their position. 141 S.Ct. 989 (2021).

In their opposition, plaintiffs argue that defendants have mischaracterized Torres. In Torres, the only issue before the Court was whether a use of force qualifies as a "seizure" if the force fails to stop the person. 141 S.Ct. at 993. Specifically, in Torres, a woman was shot, but the shot did not subdue her, and officers argued that she could not have been "seized" because she did not actually yield to the force. Id. at 994. The Court rejected that argument. Id. at 1003.

Plaintiffs instead point the court to Nelson v. City of Davis, 685 F.3d 867 (9th Cir. 2012). In Nelson, police officers shot pepperball guns (paintball guns that fire rounds containing pepper spray) into a crowd with the stated purpose of dispersing them. Id. at 873. The plaintiff was struck in the eye, and asserted a Fourth Amendment excessive force claim. The officers argued that the plaintiff was not actually seized, but the court rejected that argument, holding that "[a] person is seized by the police . . . when the officer by means of physical force or show of authority terminates or restrains the freedom of movement through means intentionally applied." Id. at 875 (citing Brendlin v. California, 551 U.S. 249, 254 (2007)). The court noted that the plaintiff was "hit in the eye by a projectile filled with pepper spray" and "rendered immobile until he was removed by an unknown individual," and on those facts, the plaintiff "was both an object of intentional governmental force and his freedom of movement was limited as a result." Id. at 875-76. The Nelson court then went on to explain that:

> Regardless of whether Nelson was the specific object of governmental force, he and his fellow students were the undifferentiated objects of shots intentionally fired by the officers in the direction of that group. Although the officers may have intended that the projectiles explode over the students' heads or against the wall, the officers' conduct resulted in Nelson being hit by a projectile that they intentionally fired towards a group of which he was a member. Their conduct was intentional, it was aimed towards Nelson and his group, and it resulted in the application of physical force to Nelson's

person as well as the termination of his movement.  Nelson was therefore intentionally seized under the 4th Amendment.

Id. at 877.

The Nelson court then specifically rejected the officers' argument that "their actions could not constitute a seizure because their intent was to disperse the crowd," noting that "the Fourth Amendment regulates conduct rather than thoughts."  685 F.3d at 877.  The court concluded that "[r]egardless of their motives, [the officers'] application of force was a knowing and willful act that terminated Nelson's freedom of movement," and thus, "[i]t unquestionably constituted a seizure under the Fourth Amendment."  Id. at 877-78.

Overall, the court finds that the alleged facts of this case are governed by Nelson, and the Court's decision in Torres does not change that conclusion.  Accordingly, the court concludes that each plaintiff has adequately alleged that they were seized for Fourth Amendment purposes.  Defendants' motion to dismiss is thus DENIED as to the fourth cause of action.  The court also notes that, in the previously-cited district court cases arising out of the 2020 protests, each court found that the challenged conduct did constitute a Fourth Amendment seizure and proceeded to evaluate the merits of plaintiffs' claims under the Graham v. Connor reasonableness standard.  See Anti Police-Terror Project v. City of Oakland, 477 F.Supp.3d at 1086 (citing Graham, 490 U.S. 386, 395 (1989)); Don't Shoot Portland v. City of Portland, 465 F.Supp.3d at 1155 (same); Black Lives Matter Seattle-King County v. City of Seattle, 466 F.Supp.3d at 1214 (same).

5.    Fifth cause of action (wrongful arrest)

Plaintiffs' fifth cause of action, for wrongful arrest, is asserted on behalf of plaintiffs Cartwright, Lee, Naemeh, Swift, NAACP, and SJPJC, and is asserted against defendants Dwyer, Garcia, Sykes, and the City of San Jose.

"[A]n arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983."  Rosenbaum v. Washoe County, 663 F.3d 1071, 1076 (9th Cir. 2011).  "An officer has probable cause to make a warrantless arrest when the facts and circumstances within his knowledge are sufficient for a reasonably prudent

person to believe that the suspect has committed a crime." Id. Importantly, "[t]he analysis involves both fact and law." Id.

Defendants argue that there was probable cause to arrest Cartwright and Lee for curfew violation. Defendants further argue that they had probable cause to arrest Swift based on her alleged failure to move, and probable cause to arrest Naemeh because they believe he was throwing frozen water bottles, and "plaintiffs do not allege that frozen water bottles had not been thrown at officers from the crowd of which Naemeh was a part." Dkt. 27 at 12.

In their opposition, plaintiffs first argue that the arrests were wrongful because they were made pursuant to an unconstitutional curfew order. Plaintiffs then argue that, even if the curfew was legal, there was no probable cause to arrest Cartwright and Lee because Cartwright was a legal observer. They similarly argue that there was no probable cause to arrest Swift and Naemeh based on the allegations of the complaint, and specifically point out that the frozen water bottle allegations regarding Naemeh throwing frozen water bottles are directly contradicted by the complaint.

In reply, defendants urge the court to reject "plaintiffs' self-serving characterization" of their behavior. They argue that the protests "had resulted in widespread theft, arson, and property damage," thereby giving the officers probable cause to arrest Lee and Cartwright. Defendants further argue that "these novel questions are close enough that the officers would be entitled to qualified immunity."

As the Rosenbaum court observed, these false arrest claims require a mixed inquiry of fact and law that precludes dismissal at this stage of the case. To determine whether each of the four arrests were constitutionally valid, the court will need to consider the circumstances of each of the four plaintiffs at the time they were arrested. This consideration needs a developed factual record.

Defendants ask the court to discount the plaintiffs' "self-serving characterization," but that is not for the court to do at this stage. The court takes the allegations as true.

As an example, the parties have raised an express factual dispute with respect to

24

Naemeh and his arrest. Defendants allege he was involved with throwing frozen water bottles, while plaintiffs allege he was not. That dispute cannot be resolved at the pleading stage.

Also, while defendants can argue that, even if the curfew order was unconstitutional, they still believed it was constitutional and therefore believed there was probable cause to arrest plaintiffs – and they may prevail on that argument, but it is a qualified immunity argument, and will be considered only after the court has an evidentiary record before it.

Accordingly, defendants' motion to dismiss is DENIED as to the fifth cause of action.

6.      Sixth cause of action (equal protection)

An equal protection claim for discriminatory enforcement requires plaintiffs to plead that (1) officers' enforcement efforts had a discriminatory effect on plaintiffs due to their race or other protected status, and (2) the police were motivated by a discriminatory purpose. Rosenbaum v. City and County of San Francisco, 484 F.3d 1142, 1152 (9th Cir. 2007).

Defendants argue that there are no facts suggesting that officers targeted protestors based on their ethnicity, or that similarly situated protestors outside that class received better treatment.

In their opposition, plaintiffs offer only a short response to this argument, arguing that "police officers targeted demonstrators seeking accountability for police violence against Black people supports the inference of the defendants' discriminatory impact and purpose." Dkt. 32 at 26. Plaintiffs then state that "[a]lternatively, plaintiffs' First Amendment claim may provide analogous relief." Id.

As discussed above, while plaintiffs' complaint does adequately allege that plaintiffs were targeted for their viewpoint, and while that viewpoint relates to the issue of ethnicity, the complaint does not adequately allege that plaintiffs were targeted for their own ethnicity. Thus, while the court previously concluded that plaintiffs have adequately

pled a First Amendment claim, it now concludes that plaintiffs have not adequately alleged an equal protection clam under the Fourteenth Amendment. Defendants' motion to dismiss the sixth cause of action is GRANTED. Because this claim is substantively similar to plaintiffs' third cause of action for viewpoint discrimination, and because plaintiffs' opposition brief did not set forth reasons why this claim should proceed, and in fact acknowledged that the third cause of action may "provide analogous relief," the dismissal of the sixth cause of action shall be with prejudice.

7.      Seventh cause of action (freedom of movement)

Defendants argue that there is no standalone cause of action for violation of the "freedom of movement," and instead, courts have found laws that unduly restrict movement to violate either the Due Process or Equal Protection clauses.

Plaintiffs argue that "citizens have a fundamental right of free movement" and that the "curfew order was not narrowly tailored nor was it necessary to serve a compelling state interest." The opposition contains only two paragraphs on this claim. Dkt. 32 at 14.

Defendants' reply argues that plaintiffs have "effectively abandoned" this claim.

Plaintiffs have not identified any authority for their argument that there is a standalone cause of action for violation of the freedom of movement. While plaintiffs cite Nunez by Nunez v. City of San Diego, that case recognized a "fundamental right of free movement" only as part of an equal protection claim. 114 F.3d 935, 944 (9th Cir. 1997).

Moreover, this cause of action appears to challenge only the curfew order and related arrests, which are already challenged as part of the third and fifth causes of action. Accordingly, because plaintiffs have not adequately shown a basis for a standalone cause of action for freedom of movement, and because this cause of action is effectively duplicative of the third and fifth causes of action in this case, the court GRANTS defendants' motion to dismiss the seventh cause of action. Because plaintiffs have not identified any authority for treating this claim as a standalone cause of action, the dismissal shall be with prejudice.

8.     Eighth cause of action (failure to intervene)

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."  Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000).  "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intervene."  Id.

Defendants' primary argument is that "plaintiffs do not state a clearly established violation based on a failure to intervene," thus entitling them to qualified immunity.  However, as stated above, the qualified immunity analysis is premature when such analysis depends on the underlying facts.  To determine whether defendants "had an opportunity to intervene," the court first needs the factual record to be developed.  Accordingly, defendants' motion to dismiss is DENIED as to the eighth cause of action.

9.     Ninth cause of action (conspiracy)

"To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate the existence of an agreement or 'meeting of the minds' to violate constitutional rights."  Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1301 (9th Cir. 1999).

Defendants argue that plaintiffs must plead "the existence of an agreement or meeting of the minds to violate constitutional rights" and must go beyond "vague and conclusory conspiracy claims."

The court agrees with defendants that plaintiffs' conspiracy-related allegations are too vague and conclusory to meet the standards for pleading.  Plaintiffs make no attempt to make specific allegations as to what role each defendant played in any conspiracy.  Accordingly, defendants' motion to dismiss the ninth cause of action is GRANTED.  The dismissal shall be without prejudice to reasserting this claim if plaintiffs learn facts through discovery that would show this claim to be viable.

10.     Tenth cause of action (ADA) and eleventh cause of action (Rehabilitation Act)

The Americans with Disabilities Act prohibits disability-based discrimination in the

"services, programs, or activities of a public entity," while the Rehabilitation Act prohibits disability-based discrimination in "any program or activity receiving federal financial assistance." 42 U.S.C. § 12132; 29 U.S.C. § 794. The Ninth Circuit has held that "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." Zukle v. Regents of University of California, 166 F.3d 1041, 1045, n.11 (9th Cir. 1999).

The complaint did not specify which plaintiffs assert these two claims, and also appears to assert the claims against all defendants. See Dkt. 3, ¶¶ 280-308. However, plaintiffs' claim chart states that the ADA and RA claims are asserted only by plaintiff Cartwright, and against only the City of San Jose. Dkt. 37 at 6.

The Ninth Circuit has held that the ADA applies to police officers making arrests. Sheehan v. City & Cty. of San Francisco, 743 F.3d 1211, 1232 (9th Cir. 2014). Specifically, "where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees," such failure to reasonably accommodate violates the ADA. Id. Whether an accommodation is reasonable is ordinarily a question of fact. Id. at 1233.

Defendants argue that the Ninth Circuit has only ever applied the ADA to preclude the use of deadly force on disabled suspects when non-deadly force was feasible, but there is nothing in the Sheehan opinion that so limits its holding.

The complaint alleges that Cartwright has a brain injury as well as injuries to both of her knees, and alleges, in part, that she was "physically unable to run" away from officers shooting impact munitions because of her disability. Dkt. 3, ¶¶ 20, 102. While defendants challenge the reasonableness of any possible accommodations, that inquiry is a question of fact and cannot be resolved at the pleading stage. Accordingly, defendants' motion to dismiss is DENIED as to the tenth and eleventh causes of action. However, as stated above, only these claims as asserted by plaintiff Cartwright against

28

the City of San Jose remain in the case.

11.    Remaining state law causes of action

Defendants' motion does not present separate arguments on the state law claims, instead taking the position that "plaintiffs' state-law claims rely on the same allegations and theories of liability as in their federal claims under § 1983 and fail for the same reasons."  Dkt. 27 at 25.

As to the twelfth cause of action (Bane Act), defendants argue that it is "coextensive" with an excessive force claim except that the Bane Act also requires a showing of specific intent, but defendants do not challenge that additional requirement in their motion.  Because the court denied defendants' motion to dismiss as to the federal excessive force claim, the court also DENIES defendants' motion to dismiss as to the twelfth cause of action under the Bane Act.

As to the thirteenth cause of action (Ralph Act), defendants argue it is the same as a viewpoint-discrimination claim.  Because the court denied defendants' motion to dismiss as to the federal First Amendment viewpoint-discrimination claim, the court also DENIES defendants' motion to dismiss as to the thirteenth cause of action under the Ralph Act.

As to the fourteenth cause of action for assault and battery, defendants argue it is the same as an excessive force claim.  Because the court denied defendants' motion to dismiss as to the federal excessive force claim, the court also DENIES defendants' motion to dismiss as to the fourteenth cause of action.

As to the fifteenth cause of action for false arrest, defendants argue it is the same as the federal wrongful arrest claim.  Because the court denied defendants' motion to dismiss as to the federal wrongful arrest claim, the court also DENIES defendants' motion to dismiss as to the fifteenth cause of action.

And as to the sixteenth cause of action for negligence, defendants argue it is the same as the Fourth Amendment claim.  Because the court denied defendants' motion to dismiss as to the federal Fourth Amendment claims for excessive force and wrongful

United States District Court
Northern District of California

arrest, the court also DENIES defendants' motion to dismiss as to the sixteenth cause of action.

Defendants then invoke the state-law "discretionary act immunity." However, as with the federal qualified immunity analysis, this analysis is better suited for summary judgment when the factual record will have been developed. See, e.g., Conway v. City of Tuolumne, 231 Cal.App.4th 1005 (2014) (considering discretionary act immunity on a motion for summary judgment).

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is GRANTED in part and DENIED in part. The court summarizes its rulings, and the claims remaining in the case, as follows:

- Defendants' motion to dismiss the third cause of action for violation of the First Amendment is DENIED as to the viewpoint-discrimination claim, and DENIED as to the curfew-related claim as to defendants Sykes, Liccardo, Garcia, and the City of San Jose, but GRANTED without leave to amend as to the curfew-related claims as to all other defendants;

- Defendants' motion to dismiss the fourth cause of action for excessive force is DENIED;

- Defendants' motion to dismiss the fifth cause of action for wrongful arrest is DENIED;

- Defendants' motion to dismiss the sixth cause of action for violation of equal protection is GRANTED without leave to amend;

- Defendants' motion to dismiss the seventh cause of action for violation of the freedom of movement is GRANTED without leave to amend;

- Defendants' motion to dismiss the eighth cause of action for failure to intervene is DENIED;

- Defendants' motion to dismiss the ninth cause of action for conspiracy is GRANTED without prejudice to reasserting this claim with more facts should discovery reveal that it is viable;

- Defendants' motion to dismiss the tenth and eleventh causes of action for violations of the ADA and RA is DENIED;

- Defendants' motion to dismiss the twelfth cause of action for violation of the Bane Act is DENIED;

- Defendants' motion to dismiss the thirteenth cause of action for violation of the Ralph Act is DENIED;

- Defendants' motion to dismiss the fourteenth cause of action for assault and battery is DENIED;

- Defendants' motion to dismiss the fifteenth cause of action for false arrest is DENIED; and

- Defendants' motion to dismiss the sixteenth cause of action for negligence is DENIED.

That leaves the following claims remaining in the case:

- First cause of action for injunctive relief and second cause of action for declaratory relief, which are types of remedies and were not at issue on this motion;

- Third cause of action for First Amendment violation:
    - Viewpoint discrimination claim, asserted by all plaintiffs against all defendants;
    - Curfew-related claim, asserted by all plaintiffs against defendants Sykes, Liccardo, Garcia, and City of San Jose;

- Fourth cause of action for excessive force, asserted by all plaintiffs against all defendants;

- Fifth cause of action for wrongful arrest, asserted by plaintiffs Cartwright, Lee, Naemeh, Swift, NAACP, and SJPJC, against defendants Dwyer, Garcia, Sykes, and City of San Jose;

- Eighth cause of action for failure to intervene, asserted by all plaintiffs against defendants Dwyer, Garcia, Sykes, Yuen, Curry, and Delgado;

- Tenth cause of action for violation of the ADA, asserted by plaintiff Cartwright against defendant City of San Jose;

- Eleventh cause of action for violation of the RA, asserted by plaintiff Cartwright against defendant City of San Jose;

- Twelfth cause of action for violation of the Bane Act, asserted by all plaintiffs against all defendants;

- Thirteenth cause of action for violation of the Ralph Act, asserted by all plaintiffs against all defendants;

- Fourteenth cause of action for assault and battery, asserted by all plaintiffs against all defendants;

- Fifteenth cause of action for false arrest, asserted by plaintiffs Cartwright, Lee, Naemeh, Swift, NAACP, and SJPJC, against defendants Dwyer, Garcia, Sykes, and City of San Jose;

- Sixteenth cause of action for negligence, asserted by all plaintiffs against all defendants.

The court reschedules the case management conference for **October 21, 2021** at **2:00pm**.

        **IT IS SO ORDERED.**

Dated:  September 24, 2021

                    ___/s/ *Phyllis J. Hamilton*___
                    PHYLLIS J. HAMILTON
                    United States District Judge