NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
YUE-HAN CHOW, Senior Deputy City Attorney (268266)
MATTHEW PRITCHARD, Senior Deputy City Attorney (284118)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Facsimile Number: (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NAACP OF SAN JOSE/SILICON VALLEY, et al.<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN JOSE, et al.<br><br>Defendants. | Case Number:  21-cv-01705-PJH<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date: June 1, 2023<br>Time: 1:30 p.m.<br>Courtroom:  3, 3rd Floor<br>Judge: Hon. Phyllis J. Hamilton<br><br>Trial: October 23, 2023 |

## NOTICE OF MOTION

Please take notice that on June 1, 2023, or as soon as this matter can be heard, all Defendants will and hereby do move pursuant to Federal Rule of Civil Procedure 56 for summary judgment on all claims brought by all Plaintiffs.

This motion is based on the attached memorandum of points and authorities, all materials submitted in conjunction herewith, and any other materials or information that should come to the Court's attention as part of this proceeding.

**Statement of Issues to Be Decided**

1. To prove excessive force in violation of the Fourth Amendment, a plaintiff must show that an officer intentionally used force against her with the objective purpose to restrain, and that the force was unreasonable.  Are Defendants entitled to judgment as a matter of law on Plaintiffs' excessive force claims here where: (a) most Plaintiffs were struck by police, if at all, by accident; (b) the circumstances of officers' force in all but one case objectively manifested a purpose to disperse or repel rather than restrain; and (c) in the one case involving a purposeful detention, the officer believed the plaintiff had dangerous objects and pushed him to effect an arrest after the plaintiff tried to run away?

2. The central element of a First Amendment retaliation claim is speech-based animus by the defendant.  Here, no Defendant said anything to express adversity or hostility to Plaintiffs' speech activity, and Plaintiffs have identified no other evidence of retaliatory animus.  Are Defendants entitled to judgment as a matter of law on Plaintiffs' First Amendment retaliation claims?

3. To hold a supervisory official liable for the constitutional violations of a subordinate, a plaintiff must at a minimum prove that the supervisor caused the violations through deliberate indifference, meaning that the supervisor knew his conduct would result in a subordinate violating the Constitution yet consciously chose to allow that violation.  Here, Plaintiffs have no evidence that any supervisory official ordered, authorized, or consciously allowed a subordinate to violate any Plaintiff's constitutional rights.  Are the supervisory officials entitled to judgment as a matter of law on Plaintiff's constitutional claims?

4. Qualified immunity prohibits liability for police officers unless controlling authority or a robust consensus of persuasive authority put them on notice that their particular conduct violated the Constitution.  Here, Plaintiffs can point to no case in which a police officer was held to have violated the Constitution under circumstances resembling those faced by Defendants: i.e., a violent unlawful assembly in which officers are required to disperse the crowd and restore order with force.  Nor have Plaintiffs pointed to any case holding a supervisory official liable in such a context.  Can Plaintiffs overcome the protections of qualified immunity to hold Defendants liable?

5. A city cannot be held liable for the constitutional violations of its employees unless an official policy, endorsed by its highest policymaking officials, caused the violations.  Here, the City had explicit policies that prohibited excessive force and unlawful retaliation and required all officers to be trained specifically in the weapons they used during the unlawful assembly.  There is also no evidence that San Jose officers had engaged in excessive force or unlawful retaliation at any past expressive event.  Is the City of San Jose entitled to judgment as a matter of law on Plaintiffs' municipal liability claim?

6. For a failure-to-accommodate claim, the Americans with Disabilities and Rehabilitation Acts require a plaintiff affirmatively to prove that a reasonable accommodation existed, was known to the city defendant, and was denied.  Here, a police officer pushed Plaintiff Cartwright away three times after she disobeyed his order to get back from a moving police line.  Cartwright said that she had an unspecified brain injury in between one of these pushes, but she did not tell the officer she had a disability or suggest any accommodation he should provide.  Is the City entitled to judgment as a matter of law on Cartwright's federal disability claims?

7. Plaintiffs predicate their state-law claims on the same allegations and theories as their federal constitutional claims.  Are Defendants entitled to judgment as a matter of law on the state-law claims as a result, and if not, do the immunities in California law for police tactical decisions during an unlawful riot independently preclude liability on those claims?

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Factual Background ...................................................................................................... 2

    I.  San Jose Police Department policies on crowd control and the use of force ........................... 2

    II.  San Jose Police Department training on crowd control and the use of force ........................... 4

    III. Violent and disruptive protest activity beginning on May 29, 2020 ........................ 6

    IV. Protest activity and violence continue on May 30, and the City declares an emergency ......... 9

Argument ................................................................................................................... 10

    I.  The individually named officer-Defendants are entitled to judgment as a matter of law on Plaintiffs' § 1983 claims ...................................................................... 10

        A. The non-supervisory Defendants did not violate clearly established Fourth Amendment law ............................................................................... 11

            1.  Cañas v. Yuen ................................................................... 13

            2.  Vasquez v. Yuen & Simonini ............................................ 14

            3.  Riles v. Simonini .............................................................. 17

            4.  Flores-Rodriguez v. Gaona & Grodin ............................... 17

            5.  Cuellar v. Simonini, Adgar, Nguyen, Grodin, & Moran ........................ 19

            6.  Swift v. Curry, Silva, & Ayala ......................................... 21

            7.  Allen v. Yuen ................................................................... 23

            8.  Acosta v. Yuen, Nguyen, & Grodin ................................... 24

            9.  Naemeh v. Orabuena, Weber, & Situ ................................. 27

        B. The non-supervisory Defendants did not violate clearly established First Amendment law ............................................................... 30

        C. The supervisory Defendants did not violate clearly established First or Fourth Amendment law .............................................................. 31

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                                          21-cv-01705-PJH

2009333_2

1. Chief Edgardo Garcia and Assistant Chief David Knopf .......................................... 32

2. Captain Jason Dwyer.............................................................................................. 34

3. Lieutenant Brian Matchett...................................................................................... 36

4. Sergeant Lee Tassio ............................................................................................... 37

5. Sergeant John Lynch .............................................................................................. 38

6. Sergeant Ronnie Lopez .......................................................................................... 39

7. Lieutenant Steven Lagorio ..................................................................................... 40

D. Plaintiffs' failure-to-intervene claim against all Defendants is not cognizable.................. 40

II.   The City is entitled to judgment as a matter of law on Plaintiffs' § 1983 claims.................... 41

A. The City had no express policy to cause or allow unlawful retaliation or excessive force. 42

B.  The City did not have unconstitutional training and supervision policies ........................ 43

C. The City did not have a custom and practice of unlawful retaliation or excessive force.... 46

III. The City is entitled to judgment as a matter of law on Cartwright's disability claims............ 46

IV. Defendants are entitled to judgment as a matter of law on Plaintiff's state-law claims .......... 49

Conclusion ................................................................................................................................ 50

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................ 31, 33

*Bd. of Trustees of Univ. of Alabama v. Garrett,*
   531 U.S. 356 (2001) ..................................................................................... 49

*Black Lives Matter D.C. v. Trump, No. 20-CV-1469,*
   2021 WL 2530722 (D.D.C. June 21, 2021) .................................................. 15

*Bolbol v. City of Daly City,*
   754 F. Supp. 2d 1095 (N.D. Cal. 2010) ....................................................... 50

*Brendlin v. California,*
   551 U.S. 249 (2007) ..................................................................................... 12

*Brower v. County of Inyo,*
   489 U.S. 593 (1989) .......................................................................... 11, 12, 26

*California v. Hodari D.,*
   499 U.S. 621 (1991) ..................................................................................... 11

*Campbell v. Feld Entm't, Inc.,*
   75 F.Supp.3d 1193 (N.D. Cal. 2014) ...................................................... 49, 50

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ................................................................................ 10, 26

*Chadam v. Palo Alto Unified Sch. Dist., No. 13cv4129,*
   2014 WL 325323 (N.D. Cal. Jan. 29, 2014) ............................................... 49

*City of Canton v. Harris,*
   489 U.S. 378 (1989) ..................................................................................... 44

*Connick v. Thompson,*
   563 U.S. 51 (2011) ........................................................................... 32, 44, 45

*Conway v. Cty. of Tuolumne,*
   231 Cal. App. 4th 1005 (Cal. Ct. App. 2014) ............................................. 50

*Cortesluna v. Leon,*
   979 F.3d 645 (9th Cir. 2020) ....................................................................... 41

*Cunningham v. Gates,*
   229 F.3d 1271 (9th Cir. 2000) ..................................................................... 41

*Deshaney v. Winnebago County*
   489 U.S. 189, 196 (1989) ............................................................................. 41

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir. 2001) ................................................................ 10

*Emmons v. City of Escondido*,
  921 F.3d 1172 (9th Cir. 2019) ................................................................ 11

*Felarca v. Birgeneau*,
  891 F.3d 809 (9th Cir. 2018) ............................................................ 12, 16

*Forrester v. City of San Diego*,
  25 F.3d 804 (9th Cir. 1994) ........................................................... *passim*

*Gilmore v. Superior Ct.*,
  230 Cal. App. 3d 416 (Ct. App. 1991) ..................................................... 50

*Graham v. Connor*,
  490 U.S. 386 (1989) ........................................................................... 24, 30

*Luchtel v. Hagemann*,
  623 F.3d 975 (9th Cir. 2010) ............................................................ 23, 24

*Gillette v. Delmore*,
  979 F.2d 1342 (9th Cir. 1992) ................................................................ 46

*Hall v. City of Walnut Creek, No. C-19-05716*,
  2020 WL 408989 (N.D. Cal. Jan. 24, 2020) ............................................ 47

*Howard v. City of Coos Bay*,
  871 F.3d 1032 (9th Cir. 2017) ................................................................ 31

*Hui Jie Jin v. Alameda Cty., No. 18-CV-04885*,
  2019 WL 7831143 (N.D. Cal. Feb. 4, 2019) .......................................... 46

*In re Facebook, Inc. Sec. Litig.*,
  405 F. Supp. 3d 809 (N.D. Cal. 2019) ...................................................... 7

*Index Newspapers LLC v. United States Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020) ................................................................ 30

*Isayeva v. Sacramento Sherriff's Dept.*,
  872 F.3d 938 (9th Cir. 2017) ................................................................ 11

*J.P. v. City of Porterville*,
  801 F. Supp. 2d 965 (E.D. Cal. 2011) ..................................................... 49

*Jackson v. City of Bremerton*,
  268 F.3d 646 (9th Cir. 2001) ................................................................ 42

*Jackson-Moeser v. Armstrong*,
  765 F. App'x 299 (9th Cir. 2019) .................................................. 12, 22, 23

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Juricich v. Cty. of San Mateo, No. 19-CV-06413*,
  2020 WL 619840 (N.D. Cal. Feb. 10, 2020) ............................................. 46

*Kelly v. Drexel Univ.*,
  94 F.3d 102 (3d Cir. 1996) ......................................................................... 47

*L.W. v. Grubbs*,
  92 F.3d 894 (9th Cir. 1996) ....................................................................... *36*

*Leer v. Murphy*,
  844 F.2d 628 (9th Cir. 1988) ..................................................................... 32

*Lozano v. Cty. of Santa Clara, No. 19-CV-02634*,
  2019 WL 6841215 (N.D. Cal. Dec. 16, 2019) ........................................... 42

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................... 26

*McCoy v. Harrison*,
  341 F.3d 600 (7th Cir. 2003) ..................................................................... 23

*Monell v. Dep't of Soc. Servs. of City of New York*,
  436 U.S. 658 (1978) ................................................................................... 41

*Moore v. J.B. Hunt Transp.*,
  221 F.3d 944 (7th Cir. 2000) ..................................................................... 47

*Mullenix v. Luna*,
  577 U.S. 7 (2015) ....................................................................................... 17

*Patel v. Kent Sch. Dist.*,
  648 F.3d 965 (9th Cir. 2011) ..................................................................... 10

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ................................................................................... 10

*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986) ................................................................................... 42

*Penaloza v. City of Rialto*,
  836 F. App'x 547 (9th Cir. 2020) .............................................................. 41

*Quraishi v. St. Charles County*,
  986 F.3d 831 (8th Cir. 2021) ..................................................................... 40

*Reese v. County of Sacramento*,
  888 F.3d 1030 (9th Cir. 2018) ................................................................... 49

*S.R. Nehad v. Browder*,
  929 F.3d 1125 (9th Cir. 2019) ................................................................... 21

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                    21-cv-01705-PJH

2009333_2

*Sanchez v. City of Atherton, No. 22-cv-03106-JSW,*
   2023 U.S. Dist. LEXIS 3763 (N.D. Cal. Jan. 9, 2023) ....................................... 20, 25, 26

*Sharer v. Oregon,*
   581 F.3d 1176 (9th Cir. 2009) ....................................................................................... 49

*Sharp v. Cty. of Orange,*
   871 F.3d 901 (9th Cir. 2017) ................................................................................... 11, 16

*Sheehan v. City & Cnty. of San Francisco,*
   743 F.3d 1211 (9th Cir. 2014) ....................................................................................... 47

*Smith v. County of Santa Cruz, No. 17-CV-05095,*
   2019 WL 2515841 (N.D. Cal. June 17, 2019) ............................................................. 50

*Starr v. Baca,*
   652 F.3d 1202 (9th Cir. 2011) ................................................................................. 32, 36

*Tennessee v. Garner,*
   471 U.S. 1 (1985) .......................................................................................................... 11

*Terebesi v. Torresco,*
   764 F. 3d 217 (2d Cir. 2014) ........................................................................................ 36

*Thompson v. Rahr,*
   885 F.3d 582 (9th Cir. 2018) ........................................................................................ 10

*Torres v. Madrid,*
   141 S. Ct. 989 (2021) ................................................................................................... 12

*Trevino v. Gates,*
   99 F.3d 911 (9th Cir. 1996) .......................................................................................... 46

*Tsao v. Desert Palace, Inc.,*
   698 F.3d 1128–44 (9th Cir. 2012) ................................................................................ 44

*United States v. Koon,*
   34 F.3d 1416 (9th Cir. 1994) ........................................................................................ 41

*United States v. Lockett,*
   919 F.2d 585 (9th Cir. 1990) ................................................................................. 12, 26

*Van Asdale v. Int'l Game Tech.,*
   577 F.3d 989 (9th Cir. 2009) ........................................................................................ 15

*White v. Pauly,*
   137 S. Ct. 548 (2017) ................................................................................................... 11

*Wood v. Moss,*
   572 U.S. 744 (2014) ..................................................................................................... 10

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Zukle v. Regents of Univ. of California,*
   166 F.3d 1041, n.11 (9th Cir. 1999) .................................................................... 46


**Constitution**

U.S. Const. amend. IV ............................................................................................ 11


**Federal Statutes**

29 U.S.C. 794 (2016) ............................................................................................. 46

42 U.S.C. § 1983 ............................................................................................. *passim*

42 U.S.C. § 12132 (1990) ...................................................................................... 46


**Other**

Cal. Code Regs. tit. 11, § 1005 ...................................................................... 4, 5, 6, 7

Cal. Code Regs. tit. 11, § 1950 ................................................................................ 4

*Restatement 2d of Torts*
   § 141 (1965) ........................................................................................................ 50

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                          21-cv-01705-PJH

**Introduction**

On May 29, 2020, what began as a protest in downtown San Jose quickly devolved into a violent riot.  Protesters took over streets and highways, assaulted civilians and police officers, and destroyed public and private property.  In the attempt to restore order, San Jose police declared an unlawful assembly and ordered protesters to disperse.  Few heeded that order.  On the contrary, protesters responded by screaming at and escalating their assaults on police officers, including by knocking one police officer unconscious.  Police responded by using force, both to disperse and move the crowd and also to target those who were actively assaulting officers by throwing objects.  Ultimately, the City had to declare a state of emergency given the rampant lawlessness it faced.

The Plaintiffs in this case were all present amid this violent and unlawful assembly.  Each had been ordered to disperse multiple times yet chose to remain downtown.  And each now claims one or more of the 22 named Defendants used or caused force against him or her in violation of the First and Fourth Amendment (and state law).  Plaintiffs' claims cannot survive summary judgment.

Plaintiffs' excessive force claims against the various Defendants are scattershot and consist largely of guesswork.  Plaintiffs do not know what police officer, if any, was responsible for the violations they assert, so they name multiple officers in multiple claims as part of an undifferentiated monolith.  Yet the undisputed facts are that most Plaintiffs were struck by a police projectile, if at all, by an unknown officer, and even then only by accident.  It follows that these Plaintiffs cannot prove any Defendant intentionally used force against him or her, much less that any officer did so with the objective purpose to restrain (rather than to disperse or repel).  As to the Plaintiffs who have identified officers who intentionally used force, that force was a reasonable response to the officers' reasonable perception that the Plaintiffs had engaged in obstructive or assaultive conduct.  Because no Plaintiff can prove both a seizure and unreasonableness, Plaintiffs' Fourth Amendment claims necessarily fail.

The record precludes Plaintiffs' First Amendment claim for the simple reason that they have no evidence to suggest any Defendant secretly harbored retaliatory animus against them.  Defendants faced hundreds of protesters over the course of the protest.  There is no basis for the inference that, of all these individuals engaging in the same protest activity, Defendants targeted Plaintiffs in particular to punish them for their speech.  Plaintiffs therefore cannot prove unlawful retaliation.

Plaintiffs' claim against the City of San Jose likewise fails.  City policy before May 2020 was explicit and extensive in prohibiting excessive force and viewpoint discrimination.  Training and policy in the City also delineated with particularity the circumstances under which force—including projectile weapons—could be used safely and effectively, in the crowd-control context or any other.  Indeed, it is precisely because the City's policies and training so effectively prevented misconduct during public demonstrations that Plaintiffs have not adduced evidence of a single instance in which a San Jose police officer has every violated a protester's rights through excessive force or unlawful retaliation. Plaintiffs' municipal liability claim is meritless.

The standalone claims of one Plaintiff (Cartwright) under federal disability law based on a purported failure to accommodate must also be dismissed.  Plaintiffs have pointed to no possible accommodation Cartwright was denied at the protest, and indeed Cartwright herself has admitted she neither requested nor was denied accommodation there.  Under no proper conception of applicable federal law did the City violate Cartwright's rights through a failure to accommodate.

Finally, Plaintiffs' state-law claims rely on the same theories and allegations as their federal constitutional claims, so they fail for the same reason.  They fail for the additional reason that state-law immunities preclude liability for tactical decision during a riot of the type Defendants face here.

All Defendants are entitled to judgment as a law.  They request an order so holding.

## Factual Background

### I.    San Jose Police Department policies on crowd control and the use of force

The San Jose Police Department's ("SJPD") policies and training before May 29, 2020 regarding the use of projectile impact weapons ("PIW") and other force during crowd-control events were robust and specific.  The policies were codified in the 2020 SJPD Duty Manual ("DM"), which all police officers were required to know. Tassio Dec., ¶ 1. The DM defined objectively reasonable force and prohibited police officers from using excessive force, whether in a crowd-control situation or any other.  *Id.* ¶ 5.   The DM also contained specific provisions regarding protests, riots, and other crowd-control scenarios.  *Id.* ¶¶ 2-3.  The DM further cautioned police officers that protests and demonstrations are emotional events that require calmness and objectivity, and it explicitly mandated "equal treatment" of any "demonstrators" whom officers encounter.  *Id.* ¶ 2.  Officers were instructed

not to interfere with any person, whether formal media or just a member of the public, who wished to take video or photographs in normally accessible areas.  *Id.* ¶ 3.

Also included in the DM was an outline of the tools commonly available to assist law enforcement in the singular and difficult task of controlling violent crowds.  These tools, which are used by police officers across the country, include: batons, often as part of the effort to move groups of people with a police line; oleoresin capsicum (OC) cannisters; teargas cannisters; and PIW.  The PIW available to SJPD officers and outlined in the DM were the 37mm projectile launcher ("37mm"); 40mm launchers (shooting foam baton rounds ("40mm") and OC rounds); and a beanbag shotgun.  *Id.* ¶ 6 & Ex. 2; Pritchard Dec., Ex. 3, 81:19-25.  Each of these tools is different, and the DM instructed police officers about when it was appropriate or inappropriate to use them.  *Id.*

The 37mm is used as an indirect crowd-control device.  *Id.* Ex. 1 82:11-89:9.  It functions by allowing a police officer to fire a round against the ground in front of a group of people, which impact causes the round to disperse five small foam discs outward.  *Id.* Ex. 2, 55:1-22, 65:24-66:4.  Each of the discs is slightly larger than a quarter.  *See id.*  The 37mm is designed not to cause serious injury; its purpose is more to startle and disorient a crowd than to inflict force—when the 37mm is fired, it emits a loud noise and smoke.  *Id.* Ex. 1 105:9-25.  The action of skipping the projectile off the ground before the discs disperse causes most of the forceful energy of the discs to dissipate, meaning that the force of any impact on a person is significantly minimized.  *Id.* 82:11-89:9.  All officers trained to use 37mm launchers are themselves subjected to its force, meaning that they are personally fired upon and experience the resulting impact.  Tassio Dec., ¶ 15.

The DM specifies that the 37mm may be used for crowd-control only by special operations officers specifically trained on that device, and such officers may deploy it only after (1) an unlawful assembly and dispersal order has been given; (2) a commanding officer has authorized deployment and use of the 37mm; and (3) the 37mm is fired at a sufficient distance from the crowd to ensure the energy of the projectile will have sufficiently dissipated to prevent substantial injury.  Tassio Dec., Ex. 2.

The 40mm (along with the beanbag shotgun), by contrast, is intended to be used not for general crowd control but to target specific individuals.  Pritchard Dec., Ex. 1 at 95:10-20.  The 40mm is used by firing one foam baton directly at a subject.  *Id.*  The DM provides that officers may not use the

3

40mm unless they have completed an approved training course on it, and it prohibits its use except to prevent serious injury.  Tassio Dec., Ex. 2.  The 40mm OC rounds have the same caliber as the 40mm foam baton rounds, but they contain OC powder, the same chemical agent in pepper spray.  Pritchard Dec., Ex. 3 305:21-306:5.  The 40mm OC rounds can be used as a direct impact weapon, in which case they are subject to the same rules and restraints as the 40mm foam batons, but OC rounds are also used indirectly for crowd dispersal purposes.  Pritchard Dec., Ex. 1 114: 2-114:18.  Such indirect use involves the officer firing an OC round against a hard surface near or above an unlawful assembly of people, and the impact of the projectile causes OC powder to release in the area of the crowd.  *Id.*

Teargas is contained in cannisters.  To use it, police officers throw the cannister in the direction of an unlawful assembly, after which it releases a smoky gas.  Pritchard Dec., Ex. 4 112:7-19.  The gas acts as an irritant on the surrounding crowd and is designed to induce its members to leave the area. Pritchard Dec., Ex. 5 78:5-7, 83:6-83:23.

## II.   San Jose Police Department training on crowd control and the use of force

All law enforcement agencies in California must by law comply with the state's Peace Officer Standards and Training, or "POST," requirements.  *E.g.*, Cal. Code Regs. tit. 11, § 1005.  Any person in the state who wishes to become a police officer must be POST certified.  *Id.* § 1950.  Certification entails a rigorous course of training, particularly on issues related to the use of force.  *See* Sciba Dec. ¶¶ 4-8.  Further, to maintain POST certification after it has been granted, officers must successfully complete continuing professionally training requirements every two years.  *Id.* ¶ 4.

The SJPD's training program and requirements before May 2020 exceeded those prescribed by POST.  *Id.* ¶ 6.  All officers with SJPD were required to complete a 26-week Police Academy, which entails approximately 976 hours of training.  *Id.* Officers were taught about the definition and real-world meaning of objectively reasonable force, including the force appropriate in response to different levels of resistance.  *Id.* ¶ 7. Officers were taught the proper way to use different force techniques, from the use of hands and control holds, batons, non-lethal weapons, and firearms.  *Id.* ¶ 6.  In addition to POST certification, SJPD officers were required to complete a four-hour course devoted specifically to the use of PIW.  *Id.* ¶ 9. This special course taught officers how to use PIW properly, under what circumstances they are appropriate, and how best to minimize serious injury.  *Id.*  Officers were taught

about the areas on a person's body they may and may not target, including that PIW should never be fired at a person's head, groin, or other areas that can cause serious injury except where necessary to prevent death or serious bodily injury.  Pritchard Dec., Ex. 6 at 143:23-144:10, 151:19-153:9.

Beyond what officers learned in the Academy, POST and SJPD required them to complete ongoing training.  Sciba Dec., ¶¶ 4, 10.  This training included many of the same topics on the use of force and other issues, including as part of a "defensive tactics update" every two years.  *Id.* ¶ 10.  The defensive tactics update covers the use of PIW, and officers were again taught to avoid the head or groin area with PIW devices.  *Id.* ¶ 12.  In addition, SJPD supplemented these trainings in 2018 by providing all police officers with a training video on the use of 40mm PIW.  *Id.* ¶ 11.  The video discussed the effective range of 40mm projectiles, cautioned about the areas (the head, neck, spine, and groin) that should not be targeted, and warned of the risks 40mm PIW can pose.  *Id.*  The video also directed officers to the DM provisions governing PIW use.  *Id.*

Police officers with SJPD were also trained on crowd control and demonstrations before May 2020.  Officers were taught at the Academy that they have a responsibility to protect every individual's right to free speech and assembly, regardless of the officers' own personal opinions or views.  Tassio Dec., ¶ 9.  The Academy also taught officers about legal observers and members of the media at protests, making clear that all such individuals have a constitutional right to be present and document events.  *Id.*  Officers training also covered dispersal orders, what constitutes an unlawful assembly, and Ninth Circuit case law governing these concepts.  *Id.* ¶ 10.  The SJPD's crowd-control training involved both instruction and simulation exercises.  *Id.*  Officers learned about the difference between passive and active resisters in crowd situations, and the appropriate force that may be used with each.  *Id.*  Officers also participated in simulations where they were required to apply their knowledge.  *Id.*

In addition to this basic training, and beyond POST requirements, SJPD mandated significant training to the groups of officers who will most frequently be involved in crowd-control scenarios, i.e., those in the Special Operations Unit.  *Id.* ¶ 12.  Specifically, Special Operations officers had to complete a six to eight-hour crowd-control training at least once a year.  *Id.*  This special training covered how to control a crowd effectively and safely, including arrest techniques, control tactics, updates on the First Amendment and case law surrounding the use of force, the role of legal observers

5

in crowds, and the proper use of PIW.  *Id.*  Before May 2020, the most recent of these required annual crowd-control trainings took place April 29, 2020 and May 23, 2019.  *Id.*

Every officer-defendant here was POST certified and up-to-date in training requirements during the period of May 29, 2020 to May 30, 2020.  Sciba Dec., ¶¶ 14-27; Moran Dec., ¶ 3.   Every officer-defendant who used a PIW was specifically trained on that device.  *Id.* ¶¶ 17, 19-22, 24, 27; Moran Dec., ¶ 4.  And every officer-defendant who was in Special Operations had received the extra training on crowd-control.  Tassio Dec., ¶¶ 17-23.

### III.   Violent and disruptive protest activity beginning on May 29, 2020

Following the May 25, 2020 death of George Floyd at the hands of Minnesota police officers, there were demonstrations across the country.  Many of these demonstrations became violent and involved widespread looting and destruction of property.  Commanding officers with SJPD were aware of some of these events, but based on prior experiences in San Jose, they did not expect the same levels of violence or disorder to accompany any San Jose protest.  Dwyer Dec., Ex. 1; Pritchard Dec., Ex. 3 at 42:14-43:14, 219:23-220:23; *id.* Ex. 4 at 14:5-16:5, 59:15-60:2.  Nevertheless, at 10:51 p.m. on May 28, 2020, Deputy Chief of Police David Tindall sent an email directing police officials to develop a plan to prepare for protest activity in San Jose.  Dwyer Dec., Ex. 1.  The officials acted quickly to do so, creating an Incident Action Plan that was provided to commanding officers on May 29.  Dwyer Dec., Ex. 2.  The plan was intended "to ensure the safety of persons and property around the event." *Id.* (SJ350063).  The plan further made clear that "[c]rowd management and protecting [F]irst [A]mendment rights of all involved is of the utmost importance."  *Id.*

Because SJPD's commanders did not anticipate significant violence or unrest, their original Incident Action Plan did not call for the mass deployment of all SJPD police officers.  Rather, the Plan called only for select Special Operations units, aided by "Mobile Field Force Teams" consisting of officers trained in crowd-control, to be prepared to respond as needed in the event of particular civil disturbances or unrest.  *Id.* (SJ350067-SJ350069).  But things changed as the day unfolded.

In the early afternoon of May 29, a protest crowd gathered near San Jose City Hall.  Pritchard Dec., Ex. 4 92:5-7.  Shortly after that, demonstrators began to take over streets near City Hall, blocking traffic and creating disorder.  *Id.* Ex. 3 57:16-58:7.  Despite these violations of law, SJPD did not yet

deploy police officers to the location of the protesters for direct crowd control.  *Id.* Ex. 4 44:1-5, 49:17-24.  It was SJPD's goal to remain out of sight in the hope that the crowd's lawlessness would remain relatively limited.  *Id.* Ex. 3 43:4-44:8.  But at around 3:00 p.m., the large crowd of demonstrators walked onto Highway 101 amid moving traffic, creating a significant safety hazard and an incalculably large backlog of stranded motorists.  *Id.* Ex. 4 49:8-12, 63:3-64:24, 102:23-103:14; Neumer Dec., Ex. 1 (SJ002808).  Members of the crowd jumped on motorists' vehicles, smashed their windows, and vandalized their cars.  *Id.* (SJ002810, SJ002834, SJ002839); https://www.ktvu.com/video/689432; *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 828 (N.D. Cal. 2019) (holding judicial notice of "publicly available news articles" is appropriate).

California Highway Patrol deployed to respond to the violent crowd, intending to remove it from the highway, and requested aid from SJPD.  Pritchard Dec., Ex. 3 43:12-19.  A group of SJPD officers were deployed to the area to assist.  *Id.* The officers who arrived were subjected to immediate assaults.  Neumer Dec., Ex. 1 (SJ002839-40).  Members of the crowd threw rocks, bottles, bricks, asphalt, and other objects at them.  Dwyer Dec., ¶ 6.  The window of at least one police vehicle was smashed out, and protesters spray painted others.  Neumer Dec., Ex. 1 (SJ002840-41).

Finally, at 4:31 p.m., SJPD declared the violent crowd an unlawful assembly and ordered it to disperse.  *Id.* (SJ002842).  All such orders were largely ignored.  Police officers formed a line near Santa Clara and Eighth and Ninth Streets and continued to broadcast the unlawful assembly and dispersal order over a long-range acoustic device.  *Id.* (SJ002848). The purpose of this police line was to prevent the unlawful assembly from going back in the direction of the highway and to move it in a controlled way back toward City Hall, where many of the protesters had likely parked their vehicles, in the hope that participants would leave of their own accord.  Pritchard Dec., Ex. 1 199:7-200:2.  Almost immediately after officers formed their line, however, the crowd of protesters rushed up to it, shouting and throwing bottles, rocks, and other objects.  *Id.* 176:7-177:6.  Officers repeated the unlawful assembly announcement to no avail.

At around 5:00 p.m., the Special Operations Division Commander, Captain Jason Dwyer, arrived at the scene.  Pritchard Dec., Ex. 3 129:7-17.  Captain Dwyer witnessed a shocking level of violence and aggression from the moment he arrived.  After being there for just a short period, Captain

Dwyer was struck by a piece of asphalt that some member of the crowd threw over the police line to where Captain Dwyer was standing. *Id.* 31:2-32:9. He also observed many rocks and other objects raining down on other police officers in the area. *Id.* 60:22-61:12, 83:21-84:2. Captain Dwyer informed other commanding officers what he was seeing. *Id.* 166:5-12. Around that same time, a protester punched an officer in the police line in the face and knocked him unconscious. *Id.* 57:15-59:16, 85:12-85:20, 166:5-12.

In fear for the safety of police officers, Captain Dwyer authorized the trained Special Operations officers equipped with the 37mm to use those devices in an effort to back the hostile crowd away from the line of officers and cause them to disperse. Pritchard Dec., Ex. 3 82:17-84:20. The 37mm deployments temporarily caused the crowd to back away, but most in the crowd did not disperse and continued to approach the police line aggressively and throw objects at officers. *Id.* 83:5-84:20. Upon learning of the violent and assaultive actions of the unlawful assembly, Assistant Chief David Knopf authorized the use of teargas as necessary to effect dispersal. *Id.* 100:11-101:3; *id.* Ex. 7 56:18-57:10. Police officers used the teargas, but the unlawful assembly still did not disperse. *Id.* Ex. 5 83:25-84:12. The SJPD also took the extraordinary step of calling for a "Code 30," which is a request for help to all law enforcement agencies in the area. *Id.* Ex. 7 36:10-36:24-38:12-38:20. The Code 30 also directs the deployment of as many SJPD officers as possible. *Id.* Ex. 3 201:5-202:1. Numerous agencies responded to the Code 30, including over a hundred officers from the Santa Clara County Sheriff's Office and the Santa Clara Police Department. *Id.* 67:13-67:24. These officers were, like SJPD, equipped with PIW. *Id.* 304:8-23.

The police line that formed between Eighth and Ninth Streets and Santa Clara subsequently moved west down Santa Clara toward City Hall, repeating the unlawful assembly and dispersal order all the while. *Id.* Ex. 1 172:17-172:25, 176:7-176:16; *id.* Ex. 3 129:7-129:17. Protesters continued to assault police officers by throwing bottles, rocks, mortars, hammers, and other debris. Pritchard Dec., Ex. 3 158-12-19; Neumer Dec., Ex. 3, 18:00:55-18:01:05. Members of the protest also started fires, including of dumpsters, and furniture. Pritchard Dec., Ex. 3 97:5-22; Dwyer Dec., ¶ 7; Pritchard Dec., Ex. 5 141:11-142:3. A UPS truck was looted and a fire was set next to it. Neumer Dec., Ex. 1 (SJ002881); Pritchard Dec., Ex. 5 141-11-25. And a police motorcycle was struck by a protester with a

claw hammer.  Neumer Dec., Ex. 1 (SJ002860).  Some of the officers that were part of the police line were equipped with 40mm PIW.  Pursuant to SJPD policy and training, these officers were only to use their 40mm only to prevent serious injury.  Pritchard Dec., Ex. 3 121:8-122:5; *id.* Ex. 1 74:7-75:4.  In the context of the protest, that meant using the device largely to target individuals who the officers observed throwing objects at or in the direction of the police line.  *Id.* Ex. 1 95:10-20, 98:1-99:15.

The unlawful assembly continued into the late evening on May 29.  The police line continued to move the crowd, including by directing parts of it west and south once the line got to City Hall, still with the objective of causing its members to disperse.  *Id.* Ex. 3 at 136:9-136:19.  Contingents of the unlawful assembly moved to different areas, including a larger group that took over Plaza de Cesar Chavez Park near City Hall and set a number of trash cans there on fire.  *Id.*  Ex. 5 156:5-156:17.  Officers arrested some of the more violent members of the crowd when possible, though such arrests were tactically very challenging given limited police manpower and resources.  *Id.* Ex. 3 at 63:12-65:1.  Late in the evening, after many hours of these efforts, most unlawful assembly members finally dissipated, leaving an aftermath of fires, graffiti, and property damage. Dwyer Dec., Ex. 3.

**IV.    Protest activity and violence continue on May 30, and the City declares an emergency**

The following day likewise saw significant protest activity accompanied by violence and assaults from the crowd.  This time, SJPD attempted to forestall some of the significant issues that had arisen the day before by placing police lines in the area of City Hall.  Pritchard Dec., Ex. 3 144:4-145:15.  Once again, protesters moved toward the police lines, and several began throwing objects at police.  Some were handing out frozen water bottles to be launched at police.  Neumer Decl. Ex. 1 (SJ025732).  At least one protester used a potato gun to launch objects at police.  *Id.* (SJ025743).  Officers attempted to prevent further such assaultive conduct by targeting the responsible individuals with 40mm, but they did not use any force against anyone in the crowd otherwise.  At around 7:00 p.m., protesters lit a nearby dumpster on fire.  *Id.* (SJ025730).

At 7:17 p.m., SJPD declared an unlawful assembly and ordered the crowd to disperse.  Neumer Dec., Ex. 19, 19:17:36-19:17:51.  The crowd responded by throwing more objects at officers.  Officers received information that a person in a paintball mask was carrying frozen water bottles to pass out.  Neumer Dec., Ex. 1 (SJ025732).  Officers continued to experience assaults throughout the night.  It

took until 1:00 a.m. the following morning for SJPD to clear the downtown core.  *Id.* (SJ025761; SJ025765).  On May 31, the City of San Jose declared a state of emergency based on the widespread violence, looting, property damage, and destruction that accompanied the protests.  Dwyer Dec., Ex. 4.

## Argument

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden to show there is no genuine factual dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Defendants need only highlight the absence of evidence supporting Plaintiffs' claims to obtain summary judgment.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  Plaintiffs must then identify admissible evidence establishing a material issue for trial.  Fed. R. Civ. P. 56(c), (e).

The operative First Amended Complaint ("FAC") asserts nine substantive claims by 13 plaintiffs against 23 different defendants: Claims 3, 4, and 5 assert liability against all Defendants by all Plaintiffs under 42 U.S.C. § 1983; Claims 7 and 8 assert liability under federal disability laws on behalf of Plaintiff Cartwright only against the City of San Jose; and Claims 9, 10, 11, and 13 assert claims against all Defendants by all Plaintiffs under California state law.  Dkt. 108.[1]

## I.    The individually named officer-Defendants are entitled to judgment as a matter of law on Plaintiffs' § 1983 claims

"To succeed on a § 1983 claim, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right."  *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011).  "The doctrine of qualified immunity protects government officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *Wood v. Moss*, 572 U.S. 744, 757 (2014) (internal quotations omitted).  The Court analyzes these questions in "two distinct steps," though it may do so "in either order."  *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018) (*citing Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  Both are "questions of law."  *Id.*

---

[1] Because of numbering irregularities, and because Plaintiffs list two "counts" that merely state the relief they seek, the FAC recites claims numbering up to 13, of which only nine are substantive. Plaintiffs have also clarified that the FAC names Defendant Sykes only in his official capacity.

10

Once qualified immunity is pleaded as a defense, "the burden is on the plaintiff to prove" the violation of a clearly established right. *Isayeva v. Sacramento Sherriff's Dept.*, 872 F.3d 938, 946 (9th Cir. 2017); *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019). "For a right to be clearly established" as necessary to overcome the defense of qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Plaintiffs "must point to prior case law that articulates a constitutional rule specific enough to alert *these* [officers] *in this case* that *their particular conduct* was unlawful." *Sharp v. Cty. of Orange,* 871 F.3d 901, 911 (9th Cir. 2017).

As can best be determined from the FAC, Plaintiffs here bring their § 1983 claims against Defendants Garcia, Knopf, Dwyer, Tassio, Matchett, Lynch, Lopez, and Lagorio (hereinafter "supervisory Defendants") under a theory of supervisory liability. Plaintiffs' claims against the remaining Defendants (hereinafter "non-supervisory Defendants") appear to assert theories of direct liability. Plaintiffs predicate their § 1983 claims on two substantive constitutional theories: excessive force in violation of the Fourth Amendment, and speech-based retaliation in violation of the First Amendment. Neither has merit.

### A. The non-supervisory Defendants did not violate clearly established Fourth Amendment law

The Fourth Amendment prohibits "unreasonable . . . seizures." U.S. CONST. amend. IV. This Amendment is not a proscription of any unreasonable law-enforcement conduct; it is concerned only with unreasonable "seizures." *Id.* Thus, to establish a Fourth Amendment violation, a plaintiff must prove two things: (1) that he was seized, and (2) that the seizure was unreasonable. *E.g.*, *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

A person subject to law-enforcement force is only seized within the meaning of the Fourth Amendment when a police officer *intentionally* applies the force for the purpose of "taking possession" of that person. *California v. Hodari D.*, 499 U.S. 621, 624 (1991) ("From the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'"); *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) ("[A] Fourth Amendment seizure . . . [occurs] only when there is a governmental termination of freedom of movement *through means intentionally applied*."). Thus, by definition, a

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

21-cv-01705-PJH

2009333_2

person whom police officers unintentionally or accidentally subject to force while attempting to detain another has not been seized.  *See Brower*, 489 U.S. at 596 ("[T]he Fourth Amendment addresses misuse of power, not . . . accidental effects . . . .") (cleaned up); *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990) ("[A]n innocent bystander struck by a stray bullet . . . would not have [a Fourth Amendment] claim.").  Rather, the plaintiff must have been the intended target of the force, and the force must have been used with the purpose of effecting an actual seizure.  *See id.*

The Supreme Court recently reaffirmed this basic principle, holding that a "seizure requires the use of force with intent to restrain, as opposed to force applied . . . for some other purpose."  *Torres v. Madrid*, 141 S. Ct. 989, 991 (2021).  Thus, the mere fact that a police officer uses force against a person cannot, in itself, establish a seizure.  *Id.*  The relevant Fourth Amendment question "is whether the [force used] objectively manifests an intent to restrain."  *Id.*; *see also Brower*, 489 U.S. at 596 (holding that to constitute a seizure, a "detention or taking [of a person by police] must be willful").  Moreover, a plaintiff seeking to prove that a seizure has occurred must establish this objective intent to restrain "unambiguous[ly]."  *Jackson-Moeser v. Armstrong*, 765 F. App'x 299, 299 (9th Cir. 2019) (citing *Brendlin v. California*, 551 U.S. 249, 255 (2007)).

Once a plaintiff proves she was seized, she must further prove that the seizure was unreasonable.  The Court determines "reasonableness by balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018).  In most cases involving a seizure, where officers are attempting to arrest a particular person, this analysis turns primarily on such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat . . . and whether he is actively resisting arrest."  *Id.* 817.  But the crowd-control context involves additional governmental interests.  In particular, the Ninth Circuit has recognized the important governmental interest in avoiding "organized lawlessness" by "quickly dispersing and removing [] lawbreakers with the least risk of injury to police and others."  *Id.* 818 (cleaned up).  The Ninth Circuit has further observed that the government has a significant "safety interest in controlling a mass of people," especially where "protesters [] substantially outnumber[] officers, refuse[] to obey the officers' commands to disperse, shout[] at the officers, and engage[] the officers in verbal and physical

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    altercations." *Id.* (cleaned up); *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) ("The

2    wholesale commission of common state-law crimes creates dangers that are far from ordinary.  Even in

3    the context of political protest, persistent, organized, premeditated lawlessness menaces in a unique

4    way the capacity of a State to maintain order and preserve the rights of its citizens.").

5        Plaintiffs' excessive force claims here fail under these fundamental principles.  Defendants take

6    the claims of each Plaintiff against the non-supervisory Defendants in turn.

7        ### 1. *Cañas v. Yuen*

8        Plaintiff Cañas was struck in the eye by an unknown object at about 5:00 p.m. on May 29 while

9    he was standing on Santat Clara Street, between Seventh and Eighth Streets.  Pritchard Dec., Ex. 8

10   74:15-22, 84:7-86:12-19 (identifying on video marked PLF 0175 where and when object struck him);

11   Dwyer Dec., ¶ 11.  Before that, Cañas had joined protesters who took over the streets of downtown San

12   Jose and then marched onto Highway 101 to stop moving traffic.  Pritchard Dec., Ex. 8 60:14-61:7.

13   Cañas saw people throwing things at the police line and feared police might respond by using force.  *Id.*

14   56:8-18, 70:24-71:15, 83:5-15.  Cañas also heard police officers issuing the unlawful assembly

15   declaration and dispersal order, and believes he heard a warning that police might use teargas if the

16   crowd did not disperse.  *Id.* 77:5-78:17.  Cañas nevertheless decided not to leave the area because he

17   wanted to play his guitar.  *Id.* 77:8-78:17.   At some point, Cañas noticed what he believed was teargas

18   and "pop" sounds around him, which prompted many in the crowd to run back away from the police

19   line.  *Id.* 84:18-86:9.  Still Cañas remained.  *Id.*  Shortly after this he felt an object hit his eye near the

20   bridge of his nose.  *Id.*  Cañas did not see any police officer fire in his direction, and he has no basis for

21   believing any police officer intentionally fired a projectile at him.  *Id.* 86:25-87:10, 94:12-24.

22       Cañas has alleged that what hit him was a projectile fired by Officer Yuen.  That allegation is

23   false.  Officer Yuen was not at or near Santa Clara between Eighth and Seventh Streets at the time

24   Cañas felt he was hit; he did not arrive at the police line until nearly half an hour later, at which point

25   the line and Officer Yuen were farther west of where Cañas was struck.  Yuen Dec., ¶ 3.  For that

26   matter, Officer Yuen testified that he only used his PIW—a 40mm—to target assaultive suspects and to

27   prevent serious injury.  Pritchard Dec., Ex. 8 76:10-22.  So if Cañas was struck with a police

28   projectile—which is unclear—and was, as he testified, only playing his guitar at the time, there is no

basis for the allegation that Yuen would have targeted him or deliberately struck him.  Finally, even if Cañas had evidenced to suggest Yuen fired a PIW on him, the clear purpose of that PIW use under the circumstances (following a dispersal order) was not to *restrain* but to *disperse*.  It is therefore impossible to say on this record that Yuen intentionally fired on Cañas for the purpose of restraining him, as necessary to show a Fourth Amendment seizure.  *Torres*, 141 S. Ct. at 991.  On the undisputed facts, Officer Yuen is entitled to judgment as a matter of law against Cañas.

### 2. *Vasquez v. Yuen & Simonini*

On May 29, Plaintiff Vasquez joined with protesters standing in the area of Santa Clara and Seventh Streets.  Pritchard Dec., Ex. 9 54:8-14, 61:2-6, 75:9-76:9.  Vasquez saw police officers firing 37mm toward the ground to disperse the crowd away from the police line.  *Id.* 58:10-59:12; Neumer Dec., Ex. 4, 17:07:15-17:08:05 (camera footage depicting Vasquez in green shirt and black jeans).  As Vasquez approached, she saw a woman who ignored officers' orders and separated herself from the crowd to stand defiantly in front of the police line.  *Id.*; Pritchard Dec., Ex. 9 65:7-17.  Vasquez joined the woman, claiming that she was afraid for her given that officers had fired 37mm around her.  *Id.* Vasquez heard the police unlawful assembly and dispersal order over the loudspeaker, but instead of leaving, she walked even closer to the police line.  *Id.* 85:9-12.  Officers ordered Vasquez to move, but she remained where she was.  *Id.* 98:5-8.   At some point after she had been commanded multiple times to disperse or move, Vasquez felt impact in her legs by something that felt similar to being hit by a paintball gun.  *Id.* 51:6-14.  She did not recover any item that she believes hit her.  *Id.* 54:5-7.  Vasquez testified that she left the protest "like 30 minutes" after officer dispersal orders, which she heard when she was in front of the police line at approximately 5:08 p.m.  *Id.* 90:2-19; Neumer Dec., Ex. 4, 17:06:40-17:07:05.  Vasquez did not seek any medical treatment related to any injury sustained at the protest.  Pritchard Dec., Ex. 9 132:3-8.

Vasquez accuses Defendants Yuen and Simonini of striking her with projectiles.  But again, Officer Yuen was not even in the area at the time Vasquez claims she was hit—Vasquez puts that time between about 5:08 and 5:11, *id.* Ex. 28, well before Officer Yuen had arrived—so it is impossible that he fired upon her.  Officer Simonini was in the area of Santa Clara and Seventh Streets on May 29, but Plaintiffs have identified no evidence to suggest Officer Simonini fired upon Plaintiff.  They have

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

21-cv-01705-PJH

2009333_2

identified only body-worn camera footage showing officers firing 37mm around the vicinity of where Vasquez was standing.  *Id.*; Neumer Dec., Ex. 4, 17:08:20-17:13:00.  Moreover, even this footage does not show Vasquez being struck by anything.  Rather, the officers are firing *around* Vasquez toward the crowd behind her.  *See id.*  This is consistent with Officer Simonini's testimony.  When shown the same video Plaintiffs identify at his deposition, Officer Simonini testified that although one officer in the video appeared to be him, he did not fire at Vasquez but rather aimed his 37mm at the ground well beyond and to the left of where she was standing.  Pritchard Dec., Ex. 2 116:1-118:13.  The video reflects this as well—the officer standing to the left of the frame never fires anywhere near where Vasquez is standing.  Neumer Dec., Ex. 4, 17:08:20-17:13:00.  These undisputed facts foreclose Vasquez's claim that Officer Simonini used force against her.

In her discovery responses, Vasquez later claimed that Officer Simonini's body-worn camera also depicts her being struck just after 6:12 p.m.  *See* Pritchard Dec., Ex. 28.  This cannot support her excessive force claim against Officer Simonini for several reasons.  First, Vasquez testified at deposition that she left downtown San Jose within "like 30 minutes" of hearing the police dispersal order at just after 5:00 p.m.  Thus, according to Vasquez own sworn testimony, she was not even in the area at 6:12 p.m. when she claims she was struck. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("[A] party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.") (cleaned up).  Second, the portion of the identified video does not show any projectile striking Vasquez.  Neumer Dec., Ex. 5, 18:12:15-18:13:00.  Rather, it shows Officer Simonini firing a projectile on the ground far to the side of Vasquez in the direction of a hostile crowd.  Although a woman wearing green pants (possibly Vasquez) can be seen to the right of this crowd, that woman is plainly not in the path of Officer Simonini's projectile weapon.  *Id.*  Rather, she is significantly to the right of the frame when Officer Simonini fires.  *Id.*  It is not possible for a fact-finder to conclude based on this video that Officer Simonini struck Vasquez with a projectile.

Third, and finally, even if it were possible for a jury rationally to infer that Officer Simonini used his 37mm in a way that caused Vasquez to be struck with one of its small foam discs, (1) the clear, objective purpose of the force was to disperse, not to restrain, and therefore was not a seizure, *see Black Lives Matter D.C. v. Trump*, No. 20-CV-1469, 2021 WL 2530722, at *20 (D.D.C. June 21, 2021)

1   (holding officers did not seize plaintiffs but the "opposite," as officers "attempted to cause the

2   protesters and fleeing crowd to leave their location, rather than cause them to remain there"); and (2)

3   that minimal force was reasonable under the circumstances.  Before Vasquez claims she was struck, the

4   unlawful assembly in front of the police line where Officer Simonini was situated had been violent and

5   hostile.  In the minutes after 5:00 p.m., officers had been pelted with objects, and one was knocked

6   unconscious.  And roughly ten minutes before Officer Simonini fired his 37mm at 6:12, he witnessed

7   protesters attacking a police officer and engaging in a scuffle, prompting the crowd to close in on the

8   area.  Pritchard Dec., Ex. 2 126:16-127:17.  This scuffle was significant enough that Officer Simonini

9   thought the assaulted officer might need medical attention.  *Id.* 127:20-25; Neumer Dec., Ex. 5,

10  18:11:30-18:12:05.  Seeing the crowd's increasing aggressiveness, and as the police line approached a

11  construction area where protesters were gaining access to dangerous objects that could be used as

12  weapons, Officer Simonini aimed his 37mm to the area behind the closest protesters to back the crowd

13  up and further attempt to cause dispersal.  Pritchard Dec., Ex. 2 130:6-131:6.

14          The relatively minimal force of 37mm smoke and impact by skip-fired foam discs was justified

15  given the significant government interest in "quickly dispersing and removing [] lawbreakers with the

16  least risk of injury to police and others."  *Felarca*, 891 F.3d at 818.  In a chaotic and dangerous

17  situation in which "protesters [] substantially outnumbered officers, refused to obey the officers'

18  commands to disperse, shouted at the officers, and engaged the officers in verbal and physical

19  altercations," Officer Simonini determined that public safety demanded his prompt use of the 37mm to

20  push the crowd back and prevent the situation on the police line from escalating yet further.  *See id.*

21  818.  That decision was reasonable, and his force was not excessive as a matter of law.

22          This conclusion is all the more powerful in light of qualified immunity.  The purpose of the

23  qualified immunity doctrine is to protect officers who are required to make fast public-safety decisions

24  in situations where there is no controlling case law putting them on notice that their particular conduct

25  would be unlawful.  *See Sharp*, 871 F.3d 901 at 911.  Plaintiffs here can point to no case involving

26  remotely similar facts in which a police officer before May 2020 was held to have violated the Fourth

27  Amendment by using a 37mm.  Even if Officer Simonini was mistaken in some aspect of fact or law

28  leading up to his split-second decision to use the 37mm, it cannot be said that his mistake was so

16

1   unreasonable that only the "plainly incompetent or those who knowingly violate the law" would have

2   acted as he did.  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).  He is therefore entitled to qualified

3   immunity under both the first and second prongs of the analysis.  *See id.*

4       **3.  *Riles v. Simonini***

5       Plaintiff Riles attended the protest on May 29.  She walked around the area near City Hall

6   holding burning sage.  Pritchard Dec., Ex. 12 84:1-20.  Riles was still holding the burning sage when

7   she felt something strike her in the abdomen twice.  *Id.*  After this, Riles walked to where she saw her

8   sister standing in front of the police line.  *Id.*; *id.* 67:22-68:14.  She spoke with her sister for a minute or

9   so before leaving for home.  *Id.* 78:4-9.  She did not mention anything to her sister about being struck,

10  nor is there any indication in camera footage of her that she is experiencing any pain or discomfort.  *Id.*

11  76:1-13; Neumer Dec., Ex. 6, 17:21:30-17:22:35 (depicting Riles holding sage next to Vasquez).  Riles

12  did not seek medical treatment for any injuries after the protest.  Pritchard Dec., Ex. 12 86:9-10.

13      Plaintiffs allege that Officer Simonini struck Riles with a projectile, but that allegation is

14  without any basis in the record.  The only evidence Plaintiffs have cited in discovery related to Riles is

15  a three-minute portion of Officer Simonini's body-worn camera video.  *See* Pritchard Dec., Ex. 31.

16  This is puzzling.  Officer Simonini does not fire his 37mm during the entirety of the three-minute clip

17  of video indicated.  *See* Neumer Dec., Ex. 7, 17:20:00-17:23:00.  And Riles leaves the area within 30

18  seconds of the clip ending without a shot ever fired in her direction.  *Id.* 17:23:00-17:23:30.  These

19  undisputed facts demonstrate that Officer Simonini did not use force against Riles, so he is entitled to

20  judgment as a matter of law on her excessive force claim.

21      **4.  *Flores-Rodriguez v. Gaona & Grodin***

22      Plaintiff Flores was part of the crowd blocked Highway 101 traffic and then assaulted SJPD

23  officers in the area.  Pritchard Dec., Ex. 13 40:17-23, 44:17-19.  Once the crowd returned to Santa

24  Clara Street, Flores saw that police officers had lined up, and he walked up to that police line.  *Id.*

25  64:22-25.  The crowd of which Flores was a part pelted police officers with bottles, including one

26  bottle the smashed into the windshield of a police vehicle directly in front of Flores as he was within

27  feet of the police line.  *See id.* Ex. 36, 1:00-3:00.  Flores heard unlawful assembly and dispersal orders

28  but did not leave the area because he was protesting and "documenting [the] situation."  *Id.* Ex. 13

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

65:1-68:11.  After police officers broadcast repeated dispersal orders and shouted at the crowd to "move," Flores yelled out "don't move!"  *Id.* 73:16-74:24.  Protesters then pushed up right against the police line, some engaging in skirmishes with officers there.  *See* Neumer Dec., Ex. 8, 17:03:00-17:04:00.  One of the protesters then approached the police line and, at just before 5:04 p.m., punched a police officer in the face, knocking him unconscious.  Officers in the line deployed 37mm to back the hostile crowd away and rescue the unconscious officer, and initially, much of the crowd backed up to an area farther away from the police line.  *Id.* 17:04:00-17:04:45.

Flores, however, remained close to the police line, pacing in front of officers with a red bandana on his face and something in his hand.  *Id.*  Nearly simultaneously, a bottle and then block of asphalt was thrown in the direction of the police line from the area where Flores was walking, prompting one officer to yell "watch out!"  *Id.* Ex. 2 17:04:30-17:04:50.  Officer Gaona, who was deployed in the area with a 40mm OC PIW and had witnessed the violence of the crowd up to that point, was at a vantage where he would have seen these objects coming from Flores's general direction and heard the officer yell "watch out!"  *Id.*  Almost immediately after the objects were thrown, Flores appeared in front of the police line with an object in his hand.  *Id.*  Officer Gaona then officer fired one 40mm OC round at Flores's thigh at 5:04 p.m.  *Id.*  Flores momentarily knelt to the ground, then continued to walk around the area, and after walking "no more than five steps" Flores felt another impact on his shoulder.  Pritchard Dec., Ex. 13 87:3-5.   Flores believes it was the same officer responsible for this second impact, but camera footage does not show Officer Gaona shooting his 40mm OC until nearly a minute after he struck Flores, and Flores does not appear in the scene when this later round is fired.  *See* Neumer Dec., Ex. 8, 17:04:35-17:05:30.  Flores then departed the area.  Flores testified that he had injuries to his shoulder and testicle, but he did not seek medical treatment for any injury after the protest, and he took no pictures of except to show bruising on his shoulder.

Flores alleges excessive force against Officers Grodin and Gaona.  As to Officer Grodin, there is no basis in the evidentiary record for concluding that he used force against Flores.  Plaintiffs' discovery responses do not identify any video footage besides that of Officer Goana in which Plaintiffs claim Flores's rights were violated, *see* Pritchard Dec., Ex. 29, and there is nothing in Officer Gaona's body-worn camera footage to suggest Officer Grodin appears there or used any force against Flores.

Officer Grodin is accordingly entitled to judgment on this claim.

As to Officer Gaona, his is one of the rare instances in which Plaintiffs have identified an officer who actually struck the Plaintiff with a PIW.  But Flores's excessive force claim fails for two reasons.  First, Officer Gaona did not seize Flores in any possible sense.  Officer Gaona was equipped with 40mm OC rounds, which he used directly only to target dangerous suspects who were throwing things at officers so as to prevent them from doing so.  *Id.* Ex. 14 93:18-94:20.  Thus, when Officer Gaona fired his 40mm OC round at Flores, he did so either in the attempt to disperse OC powder or to prevent Flores from throwing and object at police officers.  The circumstances of that force do not "objectively manifest[] an intent to restrain."  *Torres*, 141 S. Ct. at 991.  They are, objectively, indications of force used for an altogether different purpose: to disperse an unlawful assembly or inflict force to prevent imminent injury by one of its members during an active riot.  *See id.*  At a minimum, it was not clearly established before May 29, 2020 that such force could constitute a seizure within the meaning of the Fourth Amendment.  So Officer Gaona would be entitled to qualified immunity even if the Court were to find that his force amounted to a seizure under the circumstances.

Second, even if Officer Gaona's force constituted a seizure, it was reasonable.  In the moments preceding Officer Gaona's use of the 40mm OC round, he witnessed a large and hostile crowd assaulting police officers with a rain of dangerous objects.  He saw members of the crowd scream at and scuffle with officers.  And he was there when one protester knocked an officer unconscious.  When Flores paced in front of the police line with something in his hands just seconds after a bottle and asphalt were thrown in the direction of police, it would be reasonable for Officer Gaona to conclude that Flores likely threw that bottle and would do so again.  His split-second decision to strike Flores in the thigh with a 40mm OC round and thereby prevent a perceived risk of further objects being thrown at officers was reasonable.  At a minimum, his decision was not so clearly unreasonable as to strip him of the protections of qualified immunity, as Plaintiffs can cite no case in which a police officer was held to have violated the Fourth Amendment under comparable circumstances.

### 5.  *Cuellar v. Simonini, Adgar, Nguyen, Grodin, & Moran*

Plaintiff Cuellar joined protesters in marching onto Highway 101 and blocking traffic on May 29.  Pritchard Dec., Ex. 15 58:1-11.  While on the highway, she saw people destroying motorists'

vehicles by smashing windows and denting cars, vandalizing public property, and destroying police cars. *Id.* 80:2-81:11, 90:7-16. Later, Cuellar was marching somewhere near City Hall—she is not sure exactly where—and heard unlawful assembly announcements. *Id.* 116:5-117:11. She subsequently felt something strike her in the calf. She did not see any officer fire a projectile in her direction and does not believe any struck her struck intentionally. *Id.* 130:17-22. Cuellar sustained bruising, for which she sought medical treatment consisting of one online doctor's visit. *Id.* 149:2-22, 151:15-17.

Though she was struck only once, Cuellar accuses no fewer than five officers of shooting her with a PIW. FAC ¶ 67. The reason for this scattershot allegation is that Plaintiffs have no idea whether a police projectile caused Cuellar's injury, or if so, what police officer with what agency fired the projectile. Rather, Plaintiffs appear to assert that because some SJPD officers in the general vicinity of City Hall were using different PIW around the time Cuellar felt impact on her leg, each of these officers independently can be held liable for her alleged injury. That assertion is wrong for many reasons. The first and simplest is causation. Without knowing anything more than that various individuals were using force at various times in a general area, Cuellar cannot possibly prove that any one of those individuals was responsible for hitting her with a projectile. *Sanchez v. City of Atherton*, No. 22-cv-03106-JSW, 2023 U.S. Dist. LEXIS 3763, at *9 (N.D. Cal. Jan. 9, 2023) (rejecting theory that plaintiff stuck by projectile at protest was "entitled to seek relief for his injury from officers [who] were present at the demonstrations even though he cannot identify which . . . caused his injury"). This is all the more clear given that there was agencies other than SJPD at the protest also using PIW. *Id.*

Second, there is no basis for the conclusion that any SJPD officer who might have used force on Cuellar did so with the objectively manifested purpose of detaining or otherwise restraining her. To know whether the circumstances surrounding a use of force objectively indicate an intent to seize, the Court (and factfinder) must know what those circumstances are. Plaintiffs, however, have none of that information. They do not know what officer used force on Cuellar, what that officer observed, or what was happening around Cuellar at the time she was struck. Indeed, the only facts that are known to the Court—that Cuellar was struck amid a chaotic riot in which protesters were repeatedly ordered to disperse—point strongly to the inference that any force used on Cuellar was for the purpose of dispersal. And this is only if such force was even intentionally directed at Cuellar, which is dubious.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This too precludes an excessive force claim against any of the named Defendants.

Finally, without knowing which officer (if any) struck Cuellar, the Court cannot possibly assess whether the officer doing so acted reasonably.  Again, the calculus for whether a use of force was reasonable turns on the circumstances known *to the officer*.  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) ("Only information known to the officer at the time the conduct occurred is relevant [to reasonableness analysis].").  The Court must balance the governmental interest in force based on what the officer knew at the time against the intrusion on the individual the force caused.  It is impossible to conduct this balancing without knowing anything on one side of the equation, i.e., facts within the officer's perception and knowledge.  Particularly where, as here, every officer named has testified that he did not use force except (1) for the 37mm, to disperse a hostile and violent crowd, and (2) for the 40mm, to target individuals throwing objects at police or otherwise posing a risk of imminent injury, there is no basis in the record for the Court to infer that *any* officer who used force around the time and place where Cuellar was struck did so without adequate cause.  Plaintiffs can therefore show neither that any of the named defendants acted unreasonably nor that clearly established law put them on notice that their conduct was unreasonable.

### 6. *Swift v. Curry, Silva, & Ayala*

Plaintiff Swift left to attend the protest on May 29 later in the evening, at about 7:30 p.m., with a friend.  Pritchard Dec., Ex. 16 72:3-10.  Swift had seen news coverage of the protest and knew police had used teargas to disperse the crowd.  *Id.* 55:24-56:8.  She decided she would join the protesters to show support.  *Id.*  She brought goggles in anticipation of exposure to teargas.  *Id.* 61:10-16.  Swift and her friend drove to downtown and parked their car, after which they walked to Plaza de Cesar Chavez Park.  *Id.* 72:20-22, 74:20-75:4.  When they arrived at the park, Swift saw people facing a line of police.  *Id.* 80:5-11.  She saw a bottle thrown in the direction of the police line.  *Id.* 97:21-25.  The police officers issued an unlawful assembly and dispersal order to the crowd in the park—indeed, this was a portion of the same crowd to which police had been repeating dispersal orders for hours—though Swift claims she could not understand what was being said on the police loudspeaker.  *Id.* 96:25-97:14.  Swift saw police officers using flashbang grenades and PIW, though she did not see any individual who was struck with a PIW.  *Id.* 100:15-101:17.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    Almost everyone in the park responded to the police dispersal orders by leaving, but Swift

2 decided to stand at the entrance of the park to yell at the police.  *Id.*; Neumer Dec., Ex. 9, 20:42:30-

3 20:43:00.  As the officers approached, they stayed in a line intended to slowly advance through the

4 park and clear it of any unlawful assembly members.  *See id.*  The officers yelled "get back!" and

5 "move!" repeatedly, including by issuing that order directly to Swift.  *Id.* 20:42:45-20:44:50.  Swift,

6 however, stood her ground at the entrance, yelling "nuh-uh" and "shame!" at the officers.  *Id.*  The

7 officers continued to slowly advance while commanding Swift to move, pushing Swift in measured

8 movements with their hands or batons when she planted herself in front of them.  *Id.*  The officers

9 ordered Swift to "move!" dozens of times.  *Id.*  Yet after each time the officers said "move!" and

10 pushed Swift, she again resituated herself in front of their moving line, and at times pushed back at the

11 officers.  *Id.*  At one point Swift tussled with Officer Sean Curry by grabbing his baton and knocking

12 his body-worn camera from his chest.  *Id.* Ex. 10, 20:43:10-20:43:15.  Swift testified that her "intent"

13 was to "stay where [she] was and protest" regardless of officer commands.  Pritchard Dec., Ex. 16

14 125:2-127:9.  Finally, after Swift's repeated obstruction of the police line, one of the officers on the

15 line arrested Swift.  Neumer Dec., Ex. 9, 20:44:50-20:45:00; *id.* Ex. 11, 20:43:00-20:44:50

16    Swift's excessive force claim against Officers Curry, Silva,[2] and Ayala is predicated on the

17 officers' use of a baton (or hands) to push her body back as she deliberately obstructed a police line

18 from advancing.  The claim fails.  First, there can be no question that the objectively manifested

19 purpose of the officers' "force" in pushing Swift was to effect dispersal and move her *away*, rather than

20 to stop her movement for the purpose of detention.  *See Jackson-Moeser*, 765 F. App'x at 299 (holding

21 that the use of "baton strike[s]" to "push protesters off the freeway" did not show an intent to restrain

22 and so did not constitute a seizure).  It follows that none of the pushes or shoves forming the basis for

23 Swift's excessive force claim constituted a seizure.  Her claim fails for this reason at the outset.

24    Second, the officers' *de minimis* force in pushing Swift with their hands or batons as she

25 _____

26 [2] Silva should be dismissed for the independent reason that he was not properly added as a defendant.
After orders from the Court dismissing all unnamed defendants, Plaintiffs never sought leave to add
27 Silva in their amended complaint.  *See* Dkt. 70-1; Dkt. 81 at 12:23-25.  In their proposed FAC,
Plaintiffs did not include Silva in the caption but improperly referenced him in body of the pleading.
28 Dkt. 94.  Plaintiffs also never served Silva the First Amended Complaint.  Dkt. 109.  Thus, he was not
properly added, and the statute of limitations would bar any claims against him in any event.  *Id.*

1   willfully and persistently ignored their commands to "move!" and "go back!" was reasonable. "Not

2   every push or shove . . . violates the Fourth Amendment." *Luchtel v. Hagemann*, 623 F.3d 975, 982

3   (9th Cir. 2010). Officers have a "significant" public safety interest in "quickly dispersing and

4   removing" an unlawful assembly, including by using a police line to clear the area where that assembly

5   has gathered. *Forrester*, 25 F.3d at 807 (holding that the use of "pain compliance techniques" to clear

6   demonstrators was reasonable). The minimal force of using a baton or hands to shove a person creating

7   an obstruction for the very purpose of removing the obstruction was reasonable. *Id.* Certainly it was

8   not so obviously unreasonable in light of extant case law that officers here could lose the protection of

9   qualified immunity. The officers are consequently entitled to judgment as a matter of law.

10      **7. *Allen v. Yuen***

11      Plaintiff Allen left his home and walked to Plaza de Cesar Chavez Park sometime between 7:30

12   and 8:00 p.m. on May 29. Pritchard Dec., Ex. 17 45:24-46:2. Like Swift, Allen saw the line of police

13   officers issuing dispersal orders to the crowd from a nearby loudspeaker, though he claims not to have

14   understood it. *Id.* 73:21-74:4. Allen then saw a line of police officers advancing toward the park,

15   throwing flashbang devices in the area. *Id.* 76:7-77:10. Allen understood that officers were deploying

16   the devices "to clear the park." *Id.* 77:16-17. But Allen remained where he was at the park entrance as

17   the officers advanced. *Id.* 85:25-86:8. When the officers got closer to Allen, he heard them ordering

18   him to "move along," "leave, go home." *Id.* 80:19-81:7. Still Allen did not move or leave because he

19   "felt like [he had] every right to be there." *Id.* 85:25-86:11. When the police line arrive to Allen's

20   position, officers pushed him backwards. Neumer Dec., Ex. 12, 20:43:00-20:43:30. Allen did not then

21   leave but joined a group of protesters further into the park.

22      The only force Allen has identified in connection with his excessive force claim is Officer

23   Yuen's pushing him once. Pritchard Dec., Ex. 32. As with Plaintiff Swift, this excessive force claim

24   fails because shoving a person as part of an ongoing effort to move the person back and disperse

25   members of an unlawful assembly from an area is, by any objective measure, not force used with the

26   intent to restrain but rather the opposite—i.e., force the with the intent to repel. *E.g.*, *Jackson-Moeser*,

27   765 F. App'x at 299; *McCoy v. Harrison*, 341 F.3d 600, 606 (7th Cir. 2003) (police officer hitting

28   knocking plaintiff to the ground was not a seizure because there was no objective intent to seize).

23

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    Moreover, the Supreme Court and Ninth Circuit have made clear that mere shoves do not implicate the

2    Fourth Amendment, particularly when there is a strong governmental interest in dispersing an unlawful

3    assembly.  *See Luchtel*, 623 F.3d at 982; *Forrester*, 25 F.3d at 807.  "[E]ven if [such a push or shove]

4    may later seem unnecessary in the peace of a judge's chambers," that does not mean "it violates the

5    Fourth Amendment."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  This is especially clear, again, in

6    light of qualified immunity, as no cases has found excessive force in a similar context involving the

7    enforcement of a dispersal order during a chaotic protest.  Allen does not allege any other force by

8    Officer Yuen—he alleges that some other, unidentified officer struck him with a projectile, FAC

9    ¶ 103—so Officer Yuen is entitled to judgment as a matter of law on his excessive force claim.

10       **8.  *Acosta v. Yuen, Nguyen, & Grodin***

11       Plaintiff Acosta left his home to attend the protest sometime during the evening of May 29.  He

12   was aware beforehand that protesters had taken over the streets around Santa Clara.  Pritchard Dec., Ex.

13   18 40:16-41:23.  Acosta walked toward police he saw in the distance because he wanted to be where

14   things were "going on."  *Id.* 47:14-25.  He eventually encountered a police line across Fourth Street

15   facing toward Third Street.  *Id.* 60:12-61:1.  While Acosta was mere feet from the police line, the

16   police loudspeaker broadcasted an unlawful assembly and dispersal order.  Pritchard Dec. Ex. 35.

17   Acosta assumes he heard this order, but he did not thereafter leave the area.  Pritchard Dec., Ex. 18

18   97:7-21.  He instead walked to the intersection of Third and Santa Clara Streets, where he stopped and

19   took a number of pictures and videos on his phone.  *Id.*; *id.* 110:4-113:24.

20       As Acosta stood at this intersection, the situation around him devolved into chaos.  Acosta

21   testified that the crowd became "much more aggressive and violent."  *Id.* 122:7-18.  An out-of-control

22   SUV suddenly screeched up to the intersection, endangering nearby pedestrians.  Pritchard Dec. Ex. 34,

23   0:30-2:00.  A small group of police officers coming from the direction of Third Street fired their PIW

24   at the SUV, prompting its driver to stop and get out next to where Acosta stood.  *Id.*  As officers

25   attempted to take the driver into custody, nearby protesters rushed up to the scene aggressively.  The

26   officers removed the man from the area, moving to the police line at Fourth Street.  *Id.* at 2:30-3:00.

27   As soon as the officers were no longer next to the SUV, protesters began to destroy it, smashing its

28   windows with skateboards and other objects and attempting to overturn the vehicle with coordinated

24

pushes.  *Id.* 2:45-3:50.  At the same time, other protesters set a large dumpster on fire and the pushed the flaming dumpster into the SUV next to Acosta.  *Id.*; *id.* Ex. 37.

Though Acosta testified that he found these events "shocking," he did not leave the area as they unfolded.  Pritchard Dec., Ex. 18 118:13-120:24.  He instead stood there and took photos and video, including of the destroyed SUV and flaming dumpster.  *Id.*; *id.* Ex. 34, 3:30-50.  As he did so, violence around him escalated.  Police officers attempted to put a stop to it with flashbang grenades and teargas around the violent crowd.  *Id.*  These flashbangs burst all around Acosta, even to the point of causing him to duck to avoid flying debris.  *Id.*  Protesters threw objects at police, including one directly in front of Acosta who threw a teargas canister back at the police line.  *Id.*  Yet even as he was ducking debris and watching the unfolding battle between protesters and police, Acosta continued to stand there and film.  *Id.*  Then, at 7:09 p.m. an object struck Acosta in the eye, causing it serious injury.  *Id.*; FAC ¶ 91.  He did not recover the object and does not know what exactly it was. Pritchard Dec., Ex. 18 140:22-141:9.

Although only one object struck Acosta a single time, Plaintiffs name three different police officers in his excessive force count: Officers Yuen, Nguyen, and Grodin.  This is because Plaintiffs do not know which of these officers, if any, was responsible for the object that struck Acosta's eye.  *See Sanchez*, 2023 U.S. Dist. LEXIS 3763 at *9 (holding that plaintiff at protest cannot "have a valid claim against all Defendants when it is undisputed that only one projectile caused him harm").  Rather, Plaintiffs have named the officers as an undifferentiated troika based solely, it appears, on the opinions of their putative expert, a retired police chief.  This witness concluded based on his review of body-camera footage that Officer Yuen "most likely" fired the projectile that struck Acosta, but that he could not "rule out" Officers Nguyen or Grodin.  *See* Pritchard Dec. ¶¶ 40-42.

All three named Defendants are entitled to judgment as a matter of law on these facts.  As to Officers Nguyen and Grodin, the undisputed facts do not create any triable issue regarding whether they used force on Acosta.  Plaintiffs' own expert has concluded it was Officer Yuen who more likely than not fired a projectile that struck Acosta.  *Id.*  It follows necessarily that it is *less* likely than not that the other two did.  Plaintiffs' own evidence, then, could not prove by a preponderance that Officers Nguyen and Grodin were responsible for the use of force Acosta alleges.  Moreover, even without the

1    opinion testimony Plaintiffs will offer, the record does not create a dispute about whether Officers

2    Nguyen and Grodin fired the projectile that struck Acosta.  The only video evidence on record does not

3    show those officers firing at Acosta, so there is no dispute that they were not responsible for the

4    projectile that struck him.  Even if those officers were in the general area and fired their PIW

5    somewhere near in time to when Acosta was struck, those facts cannot, without more, suffice to create

6    a dispute of material fact or to hold them liable for excessive force.  *Sanchez*, 2023 U.S. Dist. LEXIS

7    3763 at *11 (rejecting excessive force claim based on projectile hitting plaintiff in the eye where he

8    "identified three individual officers by name who deployed rounds around the time and place of his

9    injury, but he cannot allege which of them deployed the injury-causing round"); *Celotex*, 477 U.S. at

10   323; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

11          As to Officer Yuen, Plaintiffs' excessive force claim against him fails (and would fail against

12   the other officers even if they did use force on him) because Plaintiffs can prove neither (1) an

13   intentional seizure nor (2) unreasonableness.  First, it is undisputed on this record that no officer struck

14   Acosta *intentionally*.  On the contrary, if any of these officers fired a round that hit Acosta, it was

15   plainly accidental.  The undisputed facts are that Acosta was struck in the midst of a chaotic scene in

16   which a mob of violent protesters immediately behind and around Acosta were destroying a vehicle,

17   lighting things on fire, throwing objects at officers, and otherwise exhibiting rampant lawlessness.  The

18   flashbangs and other instruments used on the crowd nearly simultaneously with Acosta's being struck

19   were officers' attempt to bring back some semblance of order and safety in the midst of this chaos.  The

20   only reasonable inference from these undisputed facts is that any officer who fired in the direction of

21   Acosta did so to strike one of the many violent protesters in his immediate vicinity and merely struck

22   Acosta by mistake.  Indeed, all officers confirmed in deposition when shown video of Acosta's being

23   struck they would not have fired at Acosta intentionally.  Pritchard Dec., Ex. 8 152:4-153:24; *id.* Ex. 26

24   83:7-12, 148:3-9; *id.* Ex. 27 121:4-122:24.  As a matter of law, such unintentional or collateral force is

25   not a Fourth Amendment seizure, because it does not involve a "termination of freedom of

26   movement *through means intentionally applied*."  *Brower*, 489 U.S. at 596-97; *Lockett*, 919 F.2d at 590

27   n.4 ("[A]n innocent bystander struck by a stray bullet" cannot "have [a Fourth Amendment] claim.").

28          An additional reason why Plaintiffs cannot demonstrate an intentional seizure is that the

circumstances do not permit the inference that police officers' force in firing PIW was, objectively measured, for the purpose of detaining or restraining Acosta (or any other person).  Rather, any such PIW use was for the purpose of repelling violent protesters and preventing them from throwing objects at officers.  This is very different from the typical use of force in a police scenario, where officers deploy weapons or other means for the purpose of apprehending a person suspected of a crime. Because the officers' use of PIW was used objectively not to restrain but for "some other purpose," that force cannot constitute a seizure under the Fourth Amendment.  *See Torres*, 141 S. Ct. at 991.

Finally, even if Plaintiffs were able to show any officer intentionally applied force to Acosta with the purpose of restraining, that force was reasonable under the circumstances.  Again, the context is critical.  Acosta was hit at the locus of perhaps the most violent, lawless activity of the entire protest. A large dumpster on fire, the wanton and open destruction of property, assaults toward police officers (including by lobbing teargas or other objects back at the police line)—these are the hallmarks of an utter breakdown in law and order.  As the Ninth Circuit observed, this type of unmitigated, open lawlessness "creates dangers that are far from ordinary," for it "menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens."  *Forrester*, 25 F.3d at 807. Although the use of 40mm is not without risks, the compelling government interest in restoring order amid such chaos justifies it as against violent lawbreakers.  Officers here therefore acted reasonably in making the split-second decision to use their 40mm in a way they justifiably perceived was needed to regain control of the situation and subdue the violent members of the unlawful assembly.  At a minimum, any mistake in judgment the officers made would be just that—a mistake, which is not sufficient to create Fourth Amendment liability over the protections of qualified immunity.  Plaintiffs can cite no case involving an acutely violent episode amid an ongoing, largescale unlawful assembly in which a police officer has been held to violate the Fourth Amendment by firing a PIW at members of that unlawful assembly.  Qualified immunity therefore precludes liability against Defendants here.

### 9.  *Naemeh v. Orabuena, Weber, & Situ*

Plaintiff Naemeh came to City Hall to protest what he called a "class war" on May 30. Pritchard Dec., Ex. 19 17:6-12, 27:5-28:12.  He brought with him a paintball mask because he expected clashes with police officers and thought it would protect him against teargas.  *Id.* 51:3-6, 54:8-55:20.

Later in the afternoon, Naemeh was in front of City Hall near Fourth Street, where he heard police declare an unlawful assembly and order the crowd to disperse. *Id.* 63:25-64:16. He did not leave because he did not agree with the unlawful assembly declaration and wanted to remain and protest. *Id.* 70:24-71:12. As he walked around the City Hall area, Naemeh had two water bottles in his hands filled with a white substance. *Id.* 68:10-70:1, 86:20-87:10. At some point when he was near the "rocks" and "cement seating areas" in front of City Hall, Naemeh felt impact on his leg from what he believes was a "rubber bullet." *Id.* 75:8-12, 76:11-77:6. He claims he had his hands with the two white water bottles raised at the time. *Id.* 76:14-18. Naemeh later told police officers that the impact to his leg did not "hurt that bad," and that he expected a "rubber bullet to hurt more." *Id.* 162:17-24.

Naemeh then walked around different streets of downtown, often standing in the middle of intersections and blocking traffic. *Id.* 125:16-23. A helicopter unit in the area observing the unlawful assembly broadcast these facts and specifically alerted police officers to the presence of a person in a paintball mask with red laces who had frozen water bottles in his hands. Neumer Dec., Ex. 1 (SJ025732). Among these officers was Officer Situ. Officer Situ was on an arrest team on May 30. Pritchard Dec., Ex. 20 34:18-36:2. Officer Situ received information that Naemeh (by description) was throwing frozen water bottles at police officers, and he was told the area where Naemeh was located. *Id.* 71:3-10. Officer Situ responded to the area and saw Naemeh, fitting the description of the person who had assaulted police officers. *Id.* 86:21-87:11. As soon as Officer Situ arrived in the area, Naemeh ran away. Neumer Dec., Ex. 18, 20:37:45-20:38:45. Officer Situ chased Naemeh and yelled at him to stop, but Naemeh continued to run until he came upon another group of police officers. *Id.* Naemeh then abruptly stopped, and Officer Situ pushed him to the ground so as to take him into custody. *Id.*

Plaintiffs' excessive force claim against Officers Orabuena and Weber is based on their contention that the former fired a projectile that struck Naemeh in the leg. Pritchard Dec., Ex. 30. Plaintiffs point to a segment of video in which, following a radio broadcast about a suspect throwing frozen water bottles near City Hall, Officer Weber told Officer Orabuena that a person in a paintball mask had frozen water bottles in his hands and was behind a large planter. *Id.*; *id.* Ex. 21 22:6-14; Neumer Dec., Ex. 13, 19:21:50-19:22:40. Officer Orabuena determined this person would continue to

assault officers, so he fired two 40mm rounds in that direction with the purpose of causing the suspect to stop hurling dangerous objects and leave.  Pritchard Dec., Ex. 21 97:14-24.

Plaintiffs' claim against these officers fails for several reasons.  First, the obvious purpose of Officer Orabuena's deploying of the 40mm round Naemeh claims hit him was *not* to arrest or restrain but to *repel*.  There is no dispute of fact on this question: the circumstances of Officer Orabuena's 40mm use make clear as an objective matter that it was intended to cause Naemeh to leave the area and desist in throwing frozen water bottles at police officers.  It was therefore not a seizure, which ends the Fourth Amendment inquiry.  Second, even if Officer Orabuena had used his 40mm with the objective intent to restrain Naemeh, that was a reasonable use of force.  Frozen water bottles are the equivalent of large rocks when lobbed at a police officer.  Officer Orabuena had experienced personally frozen water bottles, rocks, and other objects thrown at him, and he was aware of the danger they presented.  *Id.* Ex. 21 22:11-24.  When he discovered a person carrying water bottles and hiding behind planters—a tactic he had observed others who threw things at officers to use—he acted quickly by firing his 40mm at the person so as to cause him to leave the area.  *Id.* 97:14-99:15.  That was not so unreasonable under the circumstances that only the "plainly incompetent" officer or one who "knowingly violates the law" would have understood it to be excessive.  Qualified immunity therefore prohibits liability for that split-second decision.

Finally, as to Officer Weber, it is not a Fourth Amendment violation merely to point out facts to a fellow officer.  Officer Weber told Officer Orabuena that a person had frozen water bottles in his hand.  This is an appropriate thing for a police officer to do during a riot in which people were throwing frozen water bottles at police officers.  Even if Officer Orabuena's subsequent use of his 40mm was somehow improper, that act is not chargeable to Officer Weber, who could not know exactly what his fellow officer would do with the information.  Plaintiff can articulate no law—much less clearly established law—showing such conduct to constitute a Fourth Amendment violation. Officer Weber is therefore entitled to judgment as a matter of law on this independent ground.

Plaintiffs' Fourth Amendment claim against Officer Situ fails as well.  The only force the officer used was to push Naemeh to the ground as Naemeh fled from police officers and evaded arrest. Neumer Dec., Ex. 18, 20:37:45-20:38:45.  That force was reasonable.  Under the applicable *Graham*

factors: (1) Naemeh was suspected of assaulting police officers by throwing frozen water bottles at them, which is dangerous criminal activity, in addition to his repeatedly disregarding dispersal orders; (2) Naemeh's suspected activity of assaulting officers presented a significant threat to them and the public; and (3) Naemeh evaded arrest by fleeing from officers and ignoring their commands that he stop. *Graham*, 490 U.S. at 396. In light of the substantial government interests in arresting Naemeh, the minimal force of pushing him to the ground—resulting in no injury, Neumer Dec., Ex. 18, 20:39:10 (Naemeh stating he was uninjured during arrest)—was easily reasonable as a matter of law. This is no less true because Naemeh stopped for a brief moment before he was pushed. Officer Situ did not have time in the midst of chasing a fleeing suspect to register that Naemeh had stopped before his push, and in any event, he did not have to assume that Naemeh would not resume his flight from officers if not pushed. Particularly in light of qualified immunity, and that Plaintiffs can cite no case finding excessive force under similar circumstances, Plaintiffs' claim against Officer Situ fails.

**B. The non-supervisory Defendants did not violate clearly established First Amendment law**

To succeed on their First Amendment retaliation claims, Plaintiffs must prove (1) "they were engaged in a constitutionally protected activity," (2) Defendants' actions would "chill a person of ordinary firmness from continuing to engage in the protected activity," and (3) "the protected activity was a substantial or motivating factor in [Defendants'] conduct." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020). Plaintiffs retaliation claims fail on the third of these elements, because they can point to no evidence that any Defendant took any action against him or her based on retaliatory or speech-based animus.

As demonstrated above, most Plaintiffs—Cañas, Vasquez, Riles, Cuellar, and Acosta—cannot prove on the undisputed facts that the Defendants they have named intended to use force on them *at all*. *See supra* Argument Section I.A. These Plaintiffs are necessarily unable to make the further evidentiary showing that the named Defendants targeted each of them for force based on retaliatory or speech-based animus (rather than inadvertently in the course of attempting to control a violent crowd or stop imminent assaults). *See id.* For those Plaintiffs who do have evidence that the named Defendants used force against them on purpose—Flores-Rodriguez, Swift, Allen, and Naemeh—the undisputed

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    facts foreclose the inference that those Plaintiffs' speech had anything to do with the officers' actions.

2           This follows from the context of each use of force.  Police officers were facing a violent

3    unlawful assembly that had, following assaults of civilians and police officers, been ordered to disperse

4    multiple times to no avail.  *See id.*  For Flores-Rodriguez, a police officer had just been knocked out,

5    and officers were in the process of being pelted with dangerous objects.  *Id.*  For Swift and Allen,

6    officers were in the process of dispersing an entire park after members of the crowd had shot fireworks

7    and other objects at the police line.  *Id.*  And for Naemeh, officers had received information that he

8    specifically had two frozen water bottles and had been throwing the same at police officers.  *Id.*

9           On the other side of the equation, Plaintiffs cannot adduce a single fact to show that any

10    Defendants harbored speech-based animus against them.  Completely absent from this record is any

11    evidence that any Defendant suggested to Plaintiffs they were not allowed to express any particular

12    idea or message, or that Defendants did anything else to suggest "opposition to [Plaintiffs'] speech" at

13    the protest.  *Howard v. City of Coos Bay*, 871 F.3d 1032, 1045 (9th Cir. 2017) (noting evidence of such

14    opposition among the types of cognizable "[c]ircumstantial evidence" that "can create a 'genuine issue

15    of material fact on the question of retaliatory motive'").  Indeed, every Plaintiff in this case has been

16    given the opportunity at deposition to testify as to any statements or actions by Defendants they

17    witnessed suggesting they were targeted for their message, and none has identified any.  There is

18    simply no basis on which a rational jury could infer these officers used force not for the obvious law-

19    enforcement objectives associated with crowd control but because each officer secretly intended to

20    punish these Plaintiffs in particular—among all the hundreds of other people expressing an identical

21    message—based on their expressive activity.

22        **C.**  **The supervisory Defendants did not violate clearly established First or Fourth**

23             **Amendment law**

24           Because "masters do not answer for the torts of their servants" under § 1983, "the term

25    'supervisory liability' is a misnomer."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  Thus, a police

26    supervisor can never be held "liable for 'knowledge and acquiescence in [his] subordinates'" alleged

27    misconduct.  *Id.*  Rather, a supervisor is liable only for his own affirmative conduct that violates a

28    person's constitutional rights.  *Id.*  The Ninth Circuit has held "in conditions of confinement cases" that

a supervisory official can be held liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011) (cleaned up). The plaintiff in such cases must prove that the supervisor acted with "deliberate indifference," and that his conduct was the "proximate cause of the [plaintiff's] injury." *Id.*[3] "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (cleaned up). When there are multiple supervisory defendants, proof of causation "must be individualized and focus [on] each individual defendant." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

As with much of Plaintiffs' FAC, their allegations against the nine named supervisory Defendants are vague and non-specific. For the vast majority of them, Plaintiffs provide no hint as to the basis for each supervisory Defendants' purported liability. *Contra id.* (requiring specific proof as to each individual named). Nor has discovery made the basis for these claims any clearer. Regardless, the undisputed facts establish that no supervisory Defendant violated any Plaintiff's constitutional rights, much less clearly so as necessary to overcome qualified immunity. Defendants will endeavor to review the claim as to each supervisory Defendant in turn.[4]

### 1. Chief Edgardo Garcia and Assistant Chief David Knopf

Defendant Garcia was the SJPD Chief of Police during May 2020. Other than at the most general level, Chief Garcia was not involved in planning, implementation, or tactics at the protest. Pritchard Dec., Ex. 22 24:24-25:5, 42:12-17. Chief Garcia was aware that a protest was occurring in

---

[3] Except in the unique state-created danger context, the Ninth Circuit has never in a published decision found supervisory liability for "deliberate indifference" outside condition of confinement cases. For the sake of completeness, Defendants will analyze Plaintiffs' claims under the deliberate indifference standard here, but it is their position that, following *Iqbal*, supervisory liability is permissible only when a state actor affirmatively and intentionally causes another harm—*not* when his purported deliberate indifference results in a third party or subordinate causing harm.

[4] Among the Plaintiffs listed in the claims against supervisory Defendants are NAACP of San Jose/ Silicon Valley and San Jose Peace and Justice Center. Though spacing limitations preclude Defendants from briefing the issue, these organizations do not have standing to assert claims, nor do they have standing to pursue equitable relief (the only form of relief they seek). *See* Dkt. 99, pp. 23-25. In any event, these organizations have not alleged nor articulated any basis for the supervisory liability claims in which they are listed, so their claims would fail for the same reasons that apply to all other Plaintiffs.

San Jose on May 29, and he received general updates about the protest from his chain of command. *Id.* 19:6-11.  Chief Garcia considered Assistant Chief ("A.C.") Knopf to be the "operational commander," meaning that he would coordinate the SJPD response to the protest at the highest level. *Id.* 41:11-16. After learning that the protest had become very violent, Chief Garcia and A.C. Knopf discussed the need to declare the crowd an unlawful assembly, which was subsequently done at around 4:30 p.m. *Id.* 27:3-20.  Chief Garcia and A.C. Knopf also talked about teargas, and Chief Garcia agreed that teargas could be used if necessary. *Id.* 31:8-22.  Chief Garcia was not present downtown during any of the protest on May 29; he received updates from his chain of command remotely, and on May 30, he attended a briefing of police officers at the SAP Center. *Id.* 41:17-20, 74:4-5, 111:5-10

As operational commander, A.C. Knopf was provided regular updates regarding the violence at the protest.  Pritchard Dec., Ex. 7 31:4-16.  After protesters took over the highway, assaulted civilians there, threw objects at police, and destroyed property, A.C. Knopf agreed that the crowd should be declared an unlawful assembly and ordered dispersed. *Id.* 56:18-57:10.  He also approved teargas as a crowd-control tool as he learned that protesters had failed to disperse after multiple warnings, escalated assaults against police officers, and knocked one officer unconscious. *Id.*  A.C. Knopf otherwise had no substantive involvement in the tactics or response of SJPD at the protest. *Id.* 33:23-34:7.

Plaintiffs name Chief Garcia and A.C. Knopf in their individual capacities in all their First and Fourth Amendment claims.  The reasons for their doing so on this evidentiary record are a mystery. Neither Chief Garcia nor A.C. Knopf ordered any use of force against any Plaintiff.  They did not instruct or authorize any police officers to use force in any instance, and there is no evidence to suggest they were ever aware of any such use of force before or while it happened.  Chief Garcia was not even at the protests.  Plainly Chief Garcia and A.C. Knopf cannot have proximately caused the violation of any Plaintiff's First or Fourth Amendment rights, whether intentionally or through deliberate indifference based on facts known to them.  A contrary finding would amount to pure vicarious supervisory liability, which case law flatly prohibits. *Iqbal*, 556 U.S. 677.

To the extent Plaintiffs mean to assert supervisory liability against Chief Garcia or A.C. Knopf based solely on their decision to approve an unlawful assembly order or the use of teargas, the assertion is meritless.  It is not unconstitutional for police officers to issue unlawful assembly or dispersal orders

to a violent crowd, and Plaintiffs do not argue otherwise.  Nor is it unconstitutional for police officers to use teargas amid an unlawful assembly.  As with any police force, the use of teargas and other dispersal efforts is only unconstitutional (as relevant here) if the officer employing them does so in retaliation for expressive activity or under circumstances rendering the force excessive in light of the governmental interests at stake.  *See supra* Argument Sections I.A. & I.B.  Thus, Chief Garcia's and/or A.C. Knopf's decision to authorize these valid law-enforcement tools cannot possibly reflect an intention to violate the Constitution, nor does it show they were aware that protesters' constitutional rights would be violated and acquiesced to that possibility, as needed to show deliberate indifference.  The undisputed facts entitled Chief Garcia and A.C. Knopf to judgment as a matter of law.

### 2. *Captain Jason Dwyer*

Defendant Captain Dwyer was head of the Special Operations Unit in May 2020.  Pritchard Dec., Ex. 3 12:8-15, 17:23-18:3, 76:1-10.  He and other police officials were the "incident commanders" at different times of the protest, meaning they coordinated the police response as a whole.  *Id.* 75:25-77:2.  As intermittent incident commander, Captain Dwyer spent most of his time at the SJPD Command Post located in the SAP Center near downtown San Jose, though he was occasionally out in the field so that he could maintain "situational awareness."  *Id.* 77:3-80:17, 321:13-20.  On May 29, Captain Dwyer was provided ongoing updates regarding the unfolding protest, including about the crowd taking over Highway 101 and assaulting innocent bystanders there.  *Id.* 50:7-24, 111:4-8.  Captain Dwyer also learned about assaults to SJPD police officers and destruction of SJPD (and other) property near the highway.  *Id.* 46:21-50:24.  He was informed when SJPD declared the crowd responsible for these acts an unlawful assembly and issued dispersal orders starting at about 4:30 p.m.  *Id.* 54:16-55:3.

Shortly after that, at about 5:00 p.m., Captain Dwyer arrived in the general area of the police line at Santa Clara and Ninth Streets.  *Id.* 44:11-13, 53:4-10.  Once there, Captain Dwyer witnessed immediate and unprecedented violence and hostility from the crowd, including multiple objects being thrown at the police line.  *Id.* 59:17-60:4.  Captain Dwyer was himself struck by at least one such object—a chunk of asphalt that hit his arm.  *Id.* 31:5-10.  Captain Dwyer became aware that a protester had knocked a police officer on the line unconscious.  The situation was one of the scariest and most

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

shocking Captain Dwyer had witnesses in over two decades in law enforcement. *Id.* 286:15-19.
Having seen these levels of aggression and violence from the unlawful assembly, as well as the
crowd's manifest unwillingness to comply with the repeatedly issued dispersal order, Captain Dwyer
authorized police officers to use 37mm. *Id.* 83:21-84:20, 301:14-19. Captain Dwyer also later
authorized use of 40mm OC rounds. *Id.* 329:6-24. He did not order any officer to use any PIW or
instruct any individual police officer to use a PIW in any particular instance. Rather, as the SJPD Duty
Manual explicitly contemplated, he provided authorization for use of the 37mm and 40mm OC rounds
where appropriate and within the strictures of the DM amid a declared unlawful assembly. *Id.* 83:21-
84:20, 86:6-88:3, 121:8-122:5, 138:17-139:1.

     Between 5:30 and 6:30 p.m., Captain Dwyer left the field for the Command Post, where he
remained except for occasional excursions back into the field to attain situational awareness. *Id.* 76:11-
77:6, 321:13-20. When the unlawful assembly moved into Plaza de Cesar Chavez Park, several
members lit various trash cans on fire and launched fireworks at police officers. Pritchard Dec., Ex. 3
205:19-206:25. Upon learning of this Captain Dwyer agreed with Sergeant Lee Tassio that SJPD
officers would attempt dispersing the crowd from the park after further dispersal orders were given. *Id.*

     There is nothing from these undisputed facts, or any others on record, to show Captain Dwyer's
actions or conduct could possibly have amounted to a violation of any Plaintiff's constitutional rights.
He did not order any SJPD officer to use force against any Plaintiff. Indeed, Plaintiffs can point to no
evidence in the record to suggest that Captain Dwyer even *saw* any instance in which a police officer
used force against any Plaintiff. It follows that Captain Dwyer could not have caused any police use of
force that Plaintiffs allege violated their rights.

     To the extent Plaintiffs seek to hold Captain Dwyer liable for other officers' conduct based
merely on the fact that he authorized use of the 37mm (or 40mm OC rounds), they cannot do so. When
Captain Dwyer gave his authorization for the use of particular crowd-control or PIW devices, he did so
against the backdrop of clear SJPD policies prohibiting unreasonable force and delineating the
appropriate circumstances for use of those devices. And he did so only after it became clear police
were faced with a hostile and violent unlawful assembly that had been commanded multiple times to
disperse to no avail. There is no basis in evidence for the inference that Captain Dwyer had reason to

think SJPD officers would use PIW to retaliate against protesters based on viewpoint or under circumstances where such force would be constitutionally unreasonable. So his mere decision to permit the use of those PIW cannot have been tantamount to a conscious decision to allow violations of any Plaintiff's constitutional rights, as necessary to show deliberate indifference. *See Terebesi v. Torresco*, 764 F. 3d 217, 132 n.14 (2d Cir. 2014) (rejecting supervisor liability to "attach to any decision to deploy a tactical team" since it may be properly "properly activated for a number of reasons, some of which [may not be anticipated] in any single case").

The same goes for Captain Dwyer's decision to have SJPD officers disperse the unlawful assembly from Cesar Chavez Park. As with any other decision to cause or allow dispersal efforts, Captain Dwyer was not thereby authorizing unconstitutional conduct as part of those efforts. On the contrary, Captain Dwyer had every reason to presume that subordinate police officers would follow SJPD policies and training by using only appropriate, non-retaliatory force. So even if Plaintiffs could prove that a subordinate officer violated Swift or Allen's (the two Plaintiffs who complain about force at the Park) rights in some respect, they cannot possibly show Captain Dwyer's deliberate indifference was the actual and proximate cause for that violation. *Starr*, 652 F.3d at 1207; *L.W. v. Grubbs,* 92 F.3d 894, 899 (9th Cir. 1996) (holding that supervisors must have "recognized [an] unreasonable risk and actually intended to expose [plaintiffs] to such risks without regard to the consequences") (cleaned up).

### 3. Lieutenant Brian Matchett

Plaintiffs alleged that Lieutenant Matchett violated their rights "by approving the use of force to move the crowd, approving the use of chemical weapons and PIW at the demonstrations, and failing to provide adequate policies, training, supervision or command of the officers" at the protest. FAC ¶ 32. Plaintiffs do not explain when or in what way Lieutenant Matchett authorized any force at the protest, in what location this was undertaken, or in what way this caused a violation of any Plaintiff's rights. Indeed, Plaintiffs have confirmed through discovery that Lieutenant Matchett had no role at the protest in authorizing or using force against any Plaintiff. *E.g.*, Pritchard Dec., Ex. 4 38:14-19, 82:5-17. Rather, he was simply a lieutenant helping to coordinate attendance among and inform different members of the teams under his supervision. He therefore cannot have caused any constitutional violation against any Plaintiff, either intentionally or through deliberate indifference, and he is entitled

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                    21-cv-01705-PJH

2009333_2

1   to judgment as a matter of law.

2   **4. *Sergeant Lee Tassio***

3   Defendant Tassio was a sergeant who was deployed at the protest on May 29 and 30.  On May

4   29, Sergeant Tassio oversaw some police officers who responded to the area of Santa Clara and Eighth

5   Streets and created a police line.  Pritchard Dec., Ex. 1 175:18-177:18.  Sergeant Tassio saw that as

6   soon as police officers arrived at that area, the crowd of protesters that had been declared an unlawful

7   assembly began to advance in the officers' direction.  *Id.*  Officers then formed a line, and Sergeant

8   Tassio witnessed the crowd throw a barrage of objects at police.  *Id.*  Sergeant Tassio was himself hit

9   with bottles, rocks, pieces of wood, and other objects.  *Id.*  He was also aware that an officer on the line

10  was knocked unconscious.  *Id.* 178:13-19.  Sergeant Tassio determined that the use of 37mm was

11  necessary to protect the police officers on the line and cause the crowd to back up and disperse.  *Id.*

12  When Captain Dwyer gave authorization for the 37mm, Sergeant Tassio directed Officer Simonini and

13  another subordinate to use their 37mm when there was sufficient distance with the crowd to do so

14  safely and consistently with SJPD policies and training.  *Id.* 82:5-89:9, 103:03-110:02.

15  Sergeant Tassio also coordinated the efforts of the police line to push the unlawful assembly

16  back toward City Hall with the object of effecting dispersal.  *Id.* 177:15-178:19.  He believed that many

17  in the unlawful assembly would have parked their cars near City Hall and reasoned that they might

18  therefore disperse on their own once pushed there.  *Id.*  Sergeant Tassio remained with the line as it

19  pushed the crowd west toward City Hall.  He later redeployed to the area of Plaza de Cesar Chavez

20  Park, where the core of the unlawful assembly had relocated and continued to engage in violent and

21  assaultive behavior towards officers, as well as starting fires in the park.  *Id.* 183:16-184:7, 205:14-

22  207:15.  Sergeant Tassio helped to coordinate the police line as it advanced toward the park to effect

23  dispersal.  *Id.*  While doing so, he witnessed Plaintiff Swift refusing to comply with multiple officer

24  orders to move and tussling with officers on the line, to which officers responded by pushing Swift.

25  Neumer Dec., Ex. 11, 20:43:00-20:44:50.  Sergeant Tassio instructed officers to arrest Swift after

26  witnessing her conduct.  He then proceeded with the line to continue dispersal of the Park.  *Id.*

27  Only two Plaintiffs allege anything concerning supervisory liability against Sergeant Tassio:

28  Swift and Allen.  Swift claims that Sergeant Tassio violated her rights by "order[ing]" officers to "yell

37

1    'Move' . . . while simultaneously pushing" Swift with their batons.  FAC ¶ 99.  The record, however, is

2    undisputed that Sergeant Tassio did not order police officers to use any force on Swift.  *See* Neumer

3    Dec., Ex. 11, 20:43:00-20:44:50.  Rather, he coordinated the advance of multiple officers in the police

4    line as it moved through the park, and the officers on that line pushed Swift when she failed to comply

5    with their orders to move and get back.  *See id.*  Sergeant Tassio then ordered Swift arrested.  *Id.*  Even

6    if the officers somehow violated Swift's rights in pushing her, Sergeant Tassio did not specifically

7    authorize, order, or set in motion any act he would have known to cause such a violation.  Swift's

8    supervisory liability claim against him therefore fails.

9            As to Allen, he alleges that Sergeant Tassio ordered officers to "charge[]" demonstrators and

10   throw flashbang or similar munitions at the crowd.  FAC ¶ 102.  Again, there is no basis for this

11   allegation in the undisputed factual record.  Plaintiffs can point to no evidence that Tassio ordered,

12   authorized, or caused in any way the force Allen alleges as unconstitutional, and the record shows he

13   did not.  His claim against Sergeant Tassio therefore fails as well.

14           *5.  Sergeant John Lynch*

15           Plaintiffs' only allegations concerning Sergeant Lynch are that he was the supervisor of Officer

16   Bill Nguyen, who Plaintiffs allege fired a projectile that struck Cuellar and Acosta.  The undisputed

17   facts preclude Plaintiffs' claim of supervisory liability based on Officer Nguyen's alleged conduct.

18   First, when Acosta alleges a projectile struck him at 7:09 p.m. near the intersection of Santa Clara and

19   Third Streets, FAC ¶ 91, Sergeant Lynch was in front of the Chevron gas station on Santa Clara and

20   Fourth Streets.  Neumer Dec., Ex. 14, 19:07:45-19:09:30.  Camera footage of Sergeant Lynch

21   throughout this time period show that he did not order, authorize, or even witness Officer Nguyen fire

22   any projectile.  *Id.*  He was, rather, occupied the entire time interacting with drivers in the area and

23   instructing them to leave.  *Id.*  Sergeant Lynch necessarily had nothing to do with the force that Acosta

24   claims resulted in his injury.  He therefore could not have intentionally or through deliberate

25   indifference of supervision violated Acosta's rights.

26           Second, because Plaintiffs have no evidence that Officer Nguyen fired the projectile that

27   Cuellar claims hit her, so too they lack any evidence that Sergeant Lynch could have ordered,

28   authorized, or otherwise caused the officer to fire a projectile at Cuellar in a way that violated her

1    rights.  Plaintiffs have pointed to no camera footage or other source of evidence in discovery to suggest

2    Sergeant Lynch had anything to do with force used on Cuellar (by Officer Nguyen or any other

3    officer).  Sergeant Lynch is therefore entitled to judgment as a matter of law on both Acosta's and

4    Cuellar's supervisory liability claims.

5        **6.   Sergeant Ronnie Lopez**

6            Sergeant Lopez supervised a team of officers serving on the police line on May 29 and 30,

7    which team included Officers Yuen and Situ.  His team was there to assist with moving the crowd and

8    to effect arrests when possible and appropriate.  Plaintiffs Vasquez, Cañas, Acosta, and Allen assert

9    First and Fourth Amendment claims against Sergeant Lopez derivatively by virtue of their claims

10   against Officer Yuen.  FAC ¶ 34.   As shown, however, it is undisputed that Officer Yuen did not use

11   force against Vasquez or Cañas.  Even if he had, Plaintiffs can point to no evidence that Sergeant

12   Lopez ordered, authorized, or was present for any force Officer Yuen used against those Plaintiffs.

13           The same is true for Plaintiffs Acosta and Allen.  Sergeant Lopez did not direct Officer Yuen

14   (or any other officer) to use his PIW in any instance but depended on officers following standard

15   training and procedures regarding the use of those weapons.  Moreover, during the period when Acosta

16   was struck with a projectile—at 7:09 p.m. on May 29—Sergeant Lopez was nowhere near Officer

17   Yuen.  He (like Sergeant Lynch) was instead in the parking lot of a Chevron gas station and focused on

18   clearing that area of people.  Neumer Dec., Ex. 15, 19:06:00-19:09:25.  And he testified that he had no

19   awareness that a person was struck in the eye until well after the protest.  Pritchard Dec., Ex. 23

20   103:17-22.  So it is impossible that Sergeant Lopez had anything to do with Officer Yuen's alleged

21   firing of a projectile that struck Acosta.

22           Likewise with Allen, the only force alleged against Officer Yuen is that the officer pushed him

23   while moving with the police line into the park.  But there is no evidence to suggest Sergeant Lopez

24   ordered Officer Yuen to push Allen, authorized that particular act, or even saw it when it happened.

25   Indeed, when shown footage of Officer Yuen pushing Allen, Sergeant Lopez testified he had no

26   memory of seeing Allen being pushed.  *Id.* 119:16-23, 122:10-17.

27           Finally, Plaintiff Naemeh's claim against Sergeant Lopez is based on his allegation that Officer

28   Situ's used excessive or retaliatory force in pushing him to the ground during his arrest.  Once again,

39

1  Plaintiffs have no evidence that Sergeant Lopez ordered Officer Situ to use any force as part of his

2  arrest, must less that he prescribed the particular force the officer used.  On the contrary, Sergeant

3  Lopez was overseeing an entire team involved in effecting arrests of multiple people in the area where

4  Naemeh was pushed and certainly did not focus his attention on any one of those officers.

5       Sergeant Lopez did nothing to cause excessive force or retaliation by Officers Yuen or Situ.  He

6  is entitled to judgment as a matter of law on Plaintiffs' supervisory liability claims.

7       *7.  Lieutenant Steven Lagorio*

8       Plaintiff Maldonado complains that he was subjected to teargas on May 29.  Maldonado does

9  not know who threw the cannister (if any) that released the teargas near enough to him that he was

10  affected by it, meaning that it could have been an SJPD officer, an officer with another agency, or a

11  member of the crowed (as it was common during the protest that protesters threw teargas cannisters

12  back in the direction of police and sometimes caused the gas to release right next to other protesters).

13  *E.g.*, Neumer Dec., Ex. 16, 18:33:40-18:33:55.  Maldonado did not see any police officer throw teargas

14  in his direction, and he does not even know from which direction the teargas—before wafting toward

15  him from a significant distance—originated.  Pritchard Dec., Ex. 24 51:18-52:3; 126:21-127:14; *id.* Ex.

16  36.  Plainly he cannot make out a valid excessive force or retaliatory claim against any SJPD officer,

17  precluding any derivative such claim against Lieutenant Lagorio.  *See also Quraishi v. St. Charles*

18  *County*, 986 F.3d 831, 834 (8th Cir. 2021) (holding use of teargas is not as seizure).

19       In any event, Plaintiffs have no basis for the assertion that Lieutenant Lagorio had anything to

20  do with the particular teargas cannister that Maldonado claims affected him.  Officers were trained,

21  following the authorization by Assistant Chief Knopf permitting teargas, to use the gas when

22  appropriate without further direction from any superior officer.  Plaintiffs have no evidence to suggest

23  Lieutenant Lagorio ordered the use of teargas that purportedly affected Maldonado, much less that he

24  did so under circumstances evincing knowledge or deliberate indifference that it would be used

25  excessively or as retaliation for expressive activity.  Plaintiff Maldonado's First and Fourth

26  Amendment claims against Lieutenant Lagorio therefore fail on the undisputed facts.

27      **D.  Plaintiffs' failure-to-intervene claim against all Defendants is not cognizable**

28       Plaintiffs' FAC asserts a standalone claim for "failure to intervene" against all Defendants.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This undifferentiated claim is meritless.  For one thing, the theory that a police officer can be held liable for another officer's constitutional torts is not viable outside the custodial context.  In the case giving rise to the "failure to intervene" theory of constitutional liability, *United States v. Koon*, 34 F.3d 1416, 1447 (9th Cir. 1994), the court considered only the claim that police officers failed to protect an inmate from harm while he was incarcerated.  In the dicta of a footnote, the court also mentioned a separate line of case law recognizing a duty to intervene in other contexts, *Id.* 1447 n.25, but that case law all predated the Supreme Court's watershed decision in *Deshaney v. Winnebago County*, 489 U.S. 189, 196 (1989), holding that there can never be constitutional liability based on the failure of state agents to protect a person from harm.  Thus, since *Koons* (and *Deshaney*), the Ninth Circuit has never in a published decision found a police officer liable under a "failure to intervene" theory outside the custodial context.  It follows that Plaintiffs' failure-to-intervene theory of supervisory or officer liability was not clearly established at the time of the events at issue.  See *Penaloza v. City of Rialto*, 836 F. App'x 547, 549 (9th Cir. 2020) (holding that Ninth Circuit case law "does not clearly establish when an officer must intervene," thus mandating qualified immunity for "failure to intervene" claims).

Finally, even if such a theory were viable, a plaintiff can only establish such liability where the defendant establishes that there was an ongoing constitutional violation that the defendant officer was witnessing and that the officer had a "realistic opportunity" to intercede.  *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).  This will never be true where the alleged constitutional violation happened within "a matter of seconds," as is the case with every alleged violation here.  *Cortesluna v. Leon*, 979 F.3d 645, 656 (9th Cir. 2020) ("[T]here is no evidence that [the defendant] knew what the other [officers] would do, and the events unfolded very rapidly—in a matter of seconds.").  Plaintiffs can point to no evidence that any Defendant was (1) in the immediate vicinity of any other officer's allegedly unconstitutional act; (2) had an opportunity not only to recognize that the officer was going to act suddenly but also the knowledge that the act was unconstitutional; and then (3) had the opportunity or ability to stop that unconstitutional act.  Their failure-to-train claims all fail as a matter of law.

## II.     The City is entitled to judgment as a matter of law on Plaintiffs' § 1983 claims

A municipal entity cannot be sued as a "person" under § 1983 unless an "official municipal policy of some nature caused a constitutional tort."  *Monell v. Dep't of Soc. Servs. of City of New York*,

436 U.S. 658, 691 (1978).  This means that "a municipality cannot be made liable by application of the doctrine of *respondeat superior*" for the constitutional violations of its employees.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986).  Rather, a plaintiff must show that the municipality itself caused a constitutional violation through a policy set by its "properly constituted legislative body" or by "officials whose acts or edicts may fairly be said to represent official policy."  *See Id.* 480 (internal quotations omitted).  "A 'policy' consists of a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the city's policymaking] officers."  *Lozano v. Cty. of Santa Clara*, No. 19-CV-02634, 2019 WL 6841215, at *17 (N.D. Cal. Dec. 16, 2019).

Plaintiffs' theory of *Monell* liability here is that the City can be held liable for its employees' alleged violations of the First and Fourth Amendments during the course of a single event—i.e., the George Floyd protest and accompanying riots over the course of May 29 (and in the case of one Plaintiff, May 30).   Plaintiffs must therefore prove (1) that a San Jose police officer unlawfully retaliated against them and used excessive force; and (2) that an official City of San Jose policy caused each of those constitutional violations.  *See Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001).  As established, *supra* Factual Background Section I, Plaintiffs cannot on this record prove that any SJPD officer violated their First and Fourth Amendment rights, so their *Monell* claim fails at the outset.  The claim fails for the additional reason that the City of San Jose had no official policy before May 29, 2020 to cause or allow excessive force or speech-based retaliation by law enforcement.

**A. The City had no express policy to cause or allow unlawful retaliation or excessive force**

Plaintiffs do not appear to challenge any formal or express San Jose policy.  Nor could they. The SJPD's explicit policies and training were exactly contrary to what Plaintiffs allege in their complaint.  Those policies prohibited excessive force and viewpoint discrimination or retaliation.  The City's policies were also that PIW could only be used by trained officers and only under limited conditions.  Thus, for the 37mm, SJPD policy was that they could only be used to effect dispersal of a violent crowd following an unlawful assembly declaration, and even then only through indirect projectiles that skip-fired small foam discs off the ground at a sufficiently safe distance.  And SJPD policy was further to train any police officer who used the 37mm in exactly these methods.  Likewise, for the 40mm, SJPD policy was that their use was prohibited except by trained officers, and even then

1   only to target suspects who presented a direct threat of serious injury, such as when members of the

2   violent unlawful assembly were assaulting police officers.  Indeed, every officer who used PIW at the

3   protest testified that these were SJPD's policies.

4   These are undisputed facts, and there is nothing in this record of any other SJPD policy that

5   could have caused constitutional violations of the sort Plaintiffs claim.  Plaintiffs allege in their FAC

6   that SJPD adopted official policies "to allow use of additional chemical agent devices and . . . impact

7   munitions that it had previously prohibited in crowd control situations," FAC ¶ 179, but it is unclear to

8   what they could be referring.  The violations Plaintiffs claim in this case are in Defendants' use of

9   37mm as a dispersal weapon and the 40mm as a direct targeting device (along with Maldonado's claim

10   related to teargas).  Nothing about the use of those tools Plaintiffs complain about here was changed

11   anytime before the George Floyd protest, and Plaintiffs do not claim otherwise.  Although SJPD altered

12   the language of its DM regarding the use of OC powder during crowd-control events (presumably what

13   Plaintiffs mean to reference in their allegations), *see* Tassio Dec., Ex. 2, no Plaintiff is claiming a

14   constitutional violation based on OC powder.  So that language change is irrelevant.

15   In any event, it would not matter if SJPD policies were changed at some point before the

16   George Floyd protest to permit the use of any particular "chemical agent" or impact munition," because

17   Plaintiffs do not—and cannot—argue that the mere equipping of officers with any munition police used

18   in this case amounted to a constitutional violation in itself.  In other words, Plaintiffs do not claim that

19   every use of a 37mm or 40mm during a protest or riot would amount to excessive force or unlawful

20   speech-based retaliation.  That claim would plainly fail, as PIW (like guns or any other force) can be

21   used both constitutionally and unconstitutionally depending on the intent of or circumstances known to

22   a police officer.  Rather, Plaintiffs' argument is one of omission: they fault SJPD for its alleged failure

23   to prevent constitutional violations by officers using PIW.  As can best be determined, Plaintiffs

24   advance two theories in support of this argument: (1) that the City's training and supervision program

25   was constitutionally deficient; and (2) that the City had a longstanding custom and practice of allowing

26   viewpoint discrimination and excessive force.  *See* FAC ¶¶ 178-183.  Neither theory has merit.

27   **B.  The City did not have unconstitutional training and supervision policies**

28   The theory that a city's inadequate training or supervision of employees led to a constitutional

43

violation is generally indistinguishable from *respondeat superior* liability, which *Monell* and its progeny prohibit.  *See City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (observing that, absent heightened culpability and causation proofs, imposing city liability for omissions "would result in *de facto respondeat superior* liability on municipalities").  "After all, when a municipal employee commits a constitutional tort, it could always be alleged that the municipality failed to enact a policy that would have prevented the tort."  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143–44 (9th Cir. 2012).  Failure-to-train or -supervise claims are therefore the "most tenuous" of *Monell* theories. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  They are only cognizable "in [the] limited circumstance[]" where policymaking officials' "deliberate indifference to [constitutional] rights" caused the claimed violation.  *Id.* at 61.

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Id.* (cleaned up).  To state a claim under this standard, a plaintiff must allege facts showing the city's final policymakers were on "notice that [the city's] omission would likely result in a constitutional violation" and made the "deliberate or conscious choice to countenance the possibility of [that] violation."  *Tsao*, 698 F.3d at 1143–44.  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference," because without the notice that pattern provides the city's "decisionmakers can hardly be said to have deliberately chosen a [training or supervision] program that will cause [such] violations."  *Connick*, 563 U.S. at 62.  The exception is the "rare" case where the need for a particular training or supervision program is "so patently obvious" that the failure to institute it can evince deliberate indifference even without a prior pattern of violations.  *Id.* at 64.

Plaintiffs' failure-to-train/supervise theory fails on all these elements.  First, Plaintiffs have no evidence of a history in San Jose of police officers engaging in unlawful speech-based retaliation or excessive force against protesters.  Indeed, Plaintiffs have not identified a single past instance in which SJPD officers have committed those constitutional violations during a protest, despite being asked to do so specifically in discovery.  *E.g.*, Pritchard Dec., Ex. 28 (failing to identify any instance before the George Floyd protest in which an SJPD officer violated a person's "constitutional right at any protest" or other "expressive event").  Plaintiffs therefore cannot prove a prior "pattern of similar constitutional

violations" as necessary to demonstrate deliberate indifference.  *See Connick*, 563 U.S. at 62.

Nor is this one of the "rare" cases in which the City's final policymakers can be charged with deliberate indifference even in the absence of any prior pattern of violations to put them on notice of a training/supervision policy deficiency.  *Id.* 64.  Before May 29, 2020, SJPD policies and practices regarding officer training in the use of PIW and crowd control were robust and exceeded the requirements of California state law in multiple respects.  *Supra* Sections I & II.  The SJPD's policy manual outlined with specificity when and how PIW, batons, or other force could be used; different crowd-control devices and the restrictions on them; and the significant First Amendment considerations governing protests and expressive activity.  *Id.*  For years before May 2020, officers with SJPD have been trained in crowd control, including annual six-to-eight-hour trainings since at least 2016 in which all Special Operations officers—the officers most significantly involved in crowd-control events— cover topics on the First Amendment, the role of legal observers, proper arrest techniques, the use of PIW, and general crowd-control tactics.  Tassio Dec. ¶¶ 2-23.  This training has included instruction and practice on the use of 40mm since at least 2016 and 37mm since at least 2017.  *Id.* ¶¶ 13, 15. The SJPD even provided an additional specific training video to every police officer (which video was also reviewed in briefings) regarding the use of 40mm PIW.  Sciba Dec. ¶11. And all of this training is in addition to the significant training required of every SJPD officer, including specific training on crowd-control and ongoing training regarding the use of batons, PIW, and other force options.  *Id.*  It is no wonder, given these extensive and longstanding training and supervision policies, that Plaintiffs can point to no prior constitutional violations in the protest context.

It would be unprecedented, and in contravention of all applicable legal standards, to find deliberate indifference on this record.  It could not have been obvious to City policymakers, much less "so patently obvious" as to dispense with all notice requirements, that SJPD's considerable training and supervision program was so deficient that SJPD officers would invariably violate the Constitution in providing crowd control in response to a massive protest event like the George Floyd protest.  *Connick*, 563 U.S. at 64.  Because neither a prior pattern nor a patently obvious deficiency put any City policymaker on notice before May 2020 that SJPD's training and supervision program was so lacking that it would cause unlawful retaliation and excessive force, Plaintiffs cannot prove a *Monell* violation

1    based on this "most tenuous" of theories.  *Id.* at 61.

2    **C.  The City did not have a custom and practice of unlawful retaliation or excessive force**

3            "To prevail on" their theory that the City had a custom and practice of promoting, causing, or

4    allowing excessive force and unlawful retaliation against protesters, Plaintiffs must prove "the

5    existence of a widespread practice" in San Jose that "is so permanent and well settled as to constitute a

6    'custom or usage' with the force of law.'"  *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992).

7    As with a failure-to-train theory, this significant showing generally requires proof "of repeated

8    constitutional violations" over a sufficiently long period "for which the errant municipal officials were

9    not discharged or reprimanded."  *Id.*; *see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)

10   ("Liability for improper custom . . . must be founded upon practices of sufficient duration, frequency

11   and consistency that the conduct has become a traditional method of carrying out policy" in the city).

12           Because Plaintiffs have no evidence of a single prior instance in which SJPD officers have

13   engaged in unlawful speech-based retaliation or excessive force against protesters, it follows that they

14   cannot prove a "permanent and well settled" custom in SJPD of such misconduct.  *Gillette*, 979 F.2d at

15   1348.  Their longstanding custom-and-practice theory thus fails.

16   **III.    The City is entitled to judgment as a matter of law on Cartwright's disability claims**

17           Title II of the Americans with Disabilities Act ("ADA") prohibits governments from

18   discriminating against persons with disabilities by "exclud[ing]" them from participation in

19   government "programs, services, or activities."  42 U.S.C. § 12132 (1990).  The Rehabilitation Act

20   ("RA") does the same thing with regard to "any program or activity receiving Federal financial

21   assistance."  29 U.S.C. 794 (2016).  "There is no significant difference in analysis" between the ADA

22   and RA.  *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045, n.11 (9th Cir. 1999).

23           A plaintiff relying on a "reasonable accommodation" theory of ADA/RA liability "bears the

24   initial burden of . . . proving, that a reasonable accommodation exists."  *Hui Jie Jin v. Alameda Cty.*,

25   No. 18-CV-04885, 2019 WL 7831143, at *8 (N.D. Cal. Feb. 4, 2019).  The plaintiff must further show

26   the alleged failure to accommodate "caused her to suffer greater injury or indignity than others" who

27   are not disabled.  *Juricich v. Cty. of San Mateo*, No. 19-CV-06413, 2020 WL 619840, at *6 (N.D. Cal.

28   Feb. 10, 2020).  And where (as here) the plaintiff seeks damages, she must allege facts establishing not

just a failure to accommodate but "intentional discrimination on the part of the defendant" officers. *Hall v. City of Walnut Creek*, No. C-19-05716, 2020 WL 408989, at *5 (N.D. Cal. Jan. 24, 2020).  The Ninth Circuit has held that Title II can require accommodation during arrests, but as with any other ADA claim, the accommodation must be reasonable under the circumstances, meaning that it cannot interfere with the ordinary function of law enforcement.  *See Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211 (9th Cir. 2014).

The only Plaintiff claiming violation of the ADA or RA here is Cartwright.  Cartwright claims she suffered from a disability in the form of a brain condition called trigeminal neuralgia, and that she had an implant in her chest as a result. She also claims arthritis in her knee, though that is not a qualifying disability.  *E.g.*, *Kelly v. Drexel Univ.*, 94 F.3d 102, 107 (3d Cir. 1996); *Moore v. J.B. Hunt Transp.*, 221 F.3d 944, 951 (7th Cir. 2000).  Plaintiffs appear to argue that the City violated the ADA and RA because, after telling Cartwright to move repeatedly, an SJPD officer pushed her back several times, which caused her to have the battery in her implant checked by medical personnel a week later.

On May 29, Cartwright attended the protest downtown, where she hoped the crowd would be large.  Pritchard Dec., Ex. 25 99:7-18, 114:18-23.  She did not have any concern about attending a protest with a large crowd, despite any physical limitation she might have.  *Id.* 100:8-10.  She believed staying to the side of large crowds sufficiently accounted for any lack of mobility.  *Id.* 102:17-103:13.  While at the protest, Cartwright heard the police issue dispersal orders but disobeyed them because she thought it was important to stay and observe events.  *Id.* 145:4-22, 155:3-16.  After these orders, and after seeing officers use force against the unlawful assembly around her, Cartwright approached a police line near Sixth Street, next to City Hall.  *Id.* 158:9-24.  As she was standing there, several police officers in front of her started advancing as a line, yelling "get back!" and "back!" to Cartwright and others in the area.  Neumer Dec., Ex. 17, 18:02:00-18:02:23 (Cartwright in maroon shirt with purple hair).  Others moved back, but Cartwright did not.  *Id.*  She instead started to shout at the closest officer.  *Id.*  Nothing prevented Cartwright from moving when officers ordered her to, but she intended to stay and observe regardless of officers' orders.  *Id.*; Pritchard Dec., Ex. 25 167:12-24.

The officer near Cartwright then pushed her right shoulder while continuing to order her back.  Neumer Dec., Ex. 17, 18:02:00-18:02:23.  Cartwright responded not by leaving but by yelling at the

1    officer and saying she had a brain injury. *Id.* Cartwright said nothing about any implant or other

2    concern, and again, nothing prevented her from walking away after the officer pushed her. *Id.*;

3    Pritchard Dec., Ex. 25 171:21-172:25. She remained because she wanted to stay and "observe," and

4    because she was "full of adrenaline." *Id.* The officer pushed Cartwright again while ordering her back.

5    Neumer Dec., Ex. 17, 18:02:00-18:02:23. Cartwright again refused to leave because she "thought it

6    was important for [her] to stay there." Pritchard Dec., Ex. 25 176:13-23. The officer pushed

7    Cartwright a third time, after which she finally complied with his commands and left. Neumer Dec.,

8    Ex. 17, 18:02:00-18:02:23. Plaintiffs claim on the basis of this event that the City failed to

9    accommodate Cartwright by pushing her and "mist[aking] [her] inaction, delayed action, or slowed

10   action in response to [officer orders] as a refusal to comply." FAC ¶ 241.

      That is false—by her own testimony, Cartwright's "inaction" explicitly *was* a refusal to comply,

12   and nothing preventing her from leaving when ordered—and the undisputed facts preclude

13   Cartwright's ADA/RA claims, for multiple reasons. First, Cartwright's condition does not affect her

14   ability to hear or understand officer orders, such as "get back!" Pritchard Dec., Ex. 25 69:9-15. Her

15   refusal to move when officers ordered her back thus has nothing to do with any qualifying disability.

      Second, Plaintiffs have identified no reasonable accommodation that the City failed to provide

17   Cartwright on account of a qualifying disability. Nor is there any such. For one thing, an officer

18   cannot provide an accommodation that is not requested. Cartwright did not ask for accommodation or

19   tell police officers she had a device in her chest that might be disrupted if pushed. Her mere utterance

20   about an unspecified brain injury in the middle of a chaotic and noisy crowd-control situation cannot

21   have alerted the City to a disability in need of accommodation. In any event, Plaintiffs' apparent

22   argument that police were required to allow Cartwright to disobey officer orders or to hold up an entire

23   police line as an "accommodation" is meritless. Police officers need not, under the ADA, immediately

24   halt crowd-control efforts against a defiant member of an unlawful assembly simply because that

25   person claims some vague injury. It is unclear what such an accommodation would even look like.

26   Hence Cartwright's admission during deposition, after being given the opportunity to define a needed

27   accommodation, that officers "maybe" did not fail to accommodate her disability. *Id.* 186:2-190:4.

28   Plaintiffs cannot meet their burden of proving a reasonable accommodation existed.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                              21-cv-01705-PJH

                                                                    2009333_2

1    Third, Plaintiffs cannot show Cartwright suffered an injury different from any other non-
2  disabled person (or any injury at all).  Cartwright's implant device was unaffected by her experience,
3  and she continued attending the protest for multiple days afterward.  *Id.* 190:6-193:20, 83:24-84:11.
4  Fourth, Cartwright cannot prove that the officer who pushed her while enforcing an order to move
5  "intentionally discriminated" against her.  There is no factual basis for proving such discriminatory
6  intent; on the contrary, the only possible inference from the undisputed facts is that the officer was
7  merely engaging in crowd-control efforts, as he would with any other defiant member of the crowd.

8    Finally, if the ADA applied to impose such onerous requirements on municipal law
9  enforcement, it would violate the federalism principles of the Tenth Amendment.  *See Bd. of Trustees*
10  *of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366 (2001); *Chadam v. Palo Alto Unified Sch. Dist.*, No.
11  13cv4129, 2014 WL 325323 (N.D. Cal. Jan. 29, 2014).  And Plaintiffs have taken no discovery and
12  have no other factual basis for their assertion that SJPD receives federal financial assistance, which
13  precludes their RA claim.  *See Sharer v. Oregon*, 581 F.3d 1176, 1180 (9th Cir. 2009).

14  **IV.    Defendants are entitled to judgment as a matter of law on Plaintiff's state-law claims**

15    Plaintiffs' state-law claims rely on the same allegations and theories of liability as in their
16  federal claims under § 1983 and fail for the same reasons.  *See Reese v. County of Sacramento*, 888
17  F.3d 1030, 1045 (9th Cir. 2018) (Bane Act and excessive force are coextensive except insofar as the
18  former also requires a showing of specific intent); *Campbell v. Feld Entm't, Inc.*, 75 F.Supp.3d 1193,
19  1205 (N.D. Cal. 2014) (Ralph Act requires invidious viewpoint animus); *J.P. v. City of Porterville*, 801
20  F. Supp. 2d 965, 990 (E.D. Cal. 2011) ("Battery is a state law tort counterpart to [an] excessive force
21  claim."); FAC ¶¶ 281-283 (alleging same facts between same plaintiffs and defendants in negligence
22  and Fourth Amendment claims).  The claims fail for several additional reasons as well.

23    First, for their Bane Act claims, Plaintiffs must demonstrate that Defendants had "a specific
24  intent to violate [his] right to freedom from unreasonable seizure."  *Reese*, 888 F.3d at 1043. This
25  means that Plaintiffs must show the officers "intended not only the force, but its unreasonableness."  *Id.*
26  1045.  The "mere intention to use force that [is found to be] unreasonable . . . is insufficient."  *Id.*
27  Plaintiffs can cite no evidence to show this specific intent here.  Even if they could establish that force
28  in some instance was unreasonable, there is nothing about the circumstances to suggest any Defendant

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                          21-cv-01705-PJH

2009333_2

specifically intended the unreasonable character of the force.  *See id.*; *Smith v. County of Santa Cruz*, No. 17-CV-05095, 2019 WL 2515841, at *14 (N.D. Cal. June 17, 2019) ("[S]imply showing that an officer's conduct amounts to a constitutional violation under an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement under the Bane Act.").

Second, for their Ralph Act claims, Plaintiffs must prove "Defendants committed or threatened violent acts against [them]" because of their "political affiliation" or some similar trait.  *Campbell v. Feld Ent., Inc.*, 75 F. Supp. 3d 1193, 1205 (N.D. Cal. 2014).  Plaintiffs can point to no evidence that any Defendant discriminated against them because of political affiliation.  Merely alleging unlawful force at a protest does not qualify.  *E.g.*, *Bolbol v. City of Daly City*, 754 F. Supp. 2d 1095, 1117 (N.D. Cal. 2010) (granting summary judgment on Ralph Act claim where officer held an activist's hand in a pain-compliance hold for approximately 15-20 minutes").

Finally, California immunity provisions also bar Plaintiffs' claims.  "California's common law has long provided personal immunity from lawsuits challenging a governmental official's discretionary acts within the scope of his or her authority."  *Conway v. Cty. of Tuolumne*, 231 Cal. App. 4th 1005, 1014 (Cal. Ct. App. 2014).  This immunity extends to decisions by police officials about how best to fulfill government's law-enforcement function in a given case, including the decision by police authorities to use tear gas.  *See id.*  Like the use of tear gas to effect arrest, the decision by police officers to use one particular crowd-control tactic—i.e., PIW to disperse a crowd—is a discretionary act that entails significant law enforcement judgment and expertise.  It is therefore protected by discretionary-act immunity.  *See Id.* 1017–18.  Additionally under California law, an officer's use of force against a person who is part of an unlawful assembly is a privileged act and is thus not amenable to tort liability.  *See Gilmore v. Superior Ct.*, 230 Cal. App. 3d 416, 421 (Ct. App. 1991) ("A privileged act is by definition one for which the actor is absolved of any tort liability, whether premised on the theory of negligence or of intent."); Restatement 2d of Torts § 141 (1965) ("[A] peace officer . . . is privileged to use force against another . . . for the purpose of terminating or preventing the review of an affray or an equally serious breach of the peace . . . .").

## Conclusion

Defendants respectfully request that the Court grant them summary judgment.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

NORA FRIMANN, City Attorney

Dated:  April 14, 2023


By:  ___/s/*Matthew Pritchard*_____
         MATTHEW PRITCHARD
         Sr. Deputy City Attorney

Attorneys for Defendants

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                                    21-cv-01705-PJH

2009333_2